Jennifer L. Brown #10885
Hawaiʻi Civil Rights Project
P.O. Box 8415
Honolulu, HI 96830
Phone: 808-554-5576
Email: hawaiicivilrightsproject@gmail.com

Alphonse A. Gerhardstein #0032053
Jacqueline Greene # 0092733
Friedman, Gilbert, + Gerhardstein
35 E 7th Street, Suite 201
Cincinnati, Ohio 45202
PH: 513.572.4200
FAX: 216.621.0427
Email: al@fgggfirm.com
*Admitted Pro Hac Vice*

Paul Hoffman #71244
John Washington #315991
Schonbrun, Seplow, Harris, Hoffman & Zeldes
200 Pier Avenue # 226
Hermosa Beach, California 90254
Ph: 310-717-7373
Emails: hoffpaul@aol.com; jwashington@sshhzlaw.com
*Admitted Pro Hac Vice*

Attorneys for Plaintiff
JOSHUA SPRIESTERSBACH

## UNITED STATES DISTRICT COURT

## DISTRICT OF HAWAII

| | |
|---|---|
| JOSHUA SPRIESTERSBACH,<br><br>Plaintiff,<br><br>STATE OF HAWAIʻI, CITY AND COUNTY OF HONOLULU, | Case No. 1:21-CV-00456-LEK-RT<br>SECOND AMENDED COMPLAINT[1]<br><br>(1)  42 U.S.C. 1983 – Fourth |

---

[1] This Second Amended Complaint (SAC) is submitted in response to the Court's

1

| | |
|---|---|
| DEPARTMENT OF PUBLIC SAFETY, OFFICE OF THE PUBLIC DEFENDER, NIETZSCHE LYNN TOLAN, MICHELLE MURAOKA, LESLIEY MALOIAN, JASON BAKER, SETH PATEK, DR. JOHN COMPTON, DR. MELISSA VARGO, DR. SHARON TISZA, HAWAIʻI STATE HOSPITAL, DR. ALLISON GARRETT, and JOHN/JANE DOES 1-20,<br><br>                    Defendants. | Amendment<br>(2)  42 U.S.C. 1983 – Fourteenth Amendment<br>(3)  Americans with Disabilities Act<br>(4)  Abuse of Process<br>(5)  Malicious Prosecution<br>(6)  False Imprisonment<br>(7)  Negligence<br>(8)  False Imprisonment<br>(9)  Negligence<br>(10) Medical Malpractice<br>(11) Intentional Infliction of Emotional Distress<br>(12) Negligent Infliction of Emotional Distress<br>(13) Legal Malpractice<br><br>JURY TRIAL DEMANDED |

## INTRODUCTION

1.       Plaintiff Joshua Spriestersbach challenges his outrageous arrest, detention, and forced medical treatment in the Oahu Community Correctional Center and the Hawaiʻi State Hospital over a period of 32 months under the name of Thomas R. Castleberry, which is not his name, for felonies that Thomas R. Castleberry committed, not Joshua.

---

Orders, Dkt. 350 and 351. Medical Defendants (Defendants Compton, Vargo, and Tisza) dismissed by the Court in Doc 151 are not removed in order to preserve appeal rights. Their presence in this complaint is not intended to seek any reconsideration of the order of the court with respect to those Defendants. Plaintiff objects to the most recent scheduling order which holds that the deadline to add parties and amend pleadings has expired and will be pursuing that issue separately. Allegations regarding the City and Public Safety Department Defendants will not be amended until there is a written order superseding Dkt. 352. See Dkt. 361, which deems motion to amend scheduling order and for leave to file second amended complaint (Dkt. 329) withdrawn without prejudice.

2.      Joshua was arrested and detained on May 11, 2017, for crimes committed by a person named Thomas R. Castleberry. Before Joshua's release on January 17, 2020, he was forced to take psychiatric medications against his will, all because Joshua continued to assert that he was not Thomas R. Castleberry and had not committed any of Thomas R. Castleberry's felony crimes.

3.      These traumatic events have already shocked America. *See e.g.* https://www.nytimes.com/2021/08/06/us/hawaii-mistaken-identity-release.html and https://www.nytimes.com/2022/07/26/magazine/joshua-spriestersbach-wrongful-incarceration.html. But the trauma continues. Unless all law enforcement and medical records reflecting Joshua's misidentification are immediately corrected, Joshua faces being rearrested and incarcerated for Thomas R. Castleberry's crimes.

4.      Joshua presents federal claims for relief that arise under 42 U.S.C. § 1983 and supplemental state law claims. City policies and practices caused persons including Joshua to be wrongfully arrested as another person.  In Joshua's case, in addition to other errors in the records, his photo was improperly listed as that of a wanted felon Thomas R. Castleberry, on a digital notebook page causing officers to wrongfully arrest him on Castleberry's felony warrant.  Joshua was repeatedly arrested for the same erroneous warrant, and none of the officers involved corrected it.  City policies and practices caused the records to remain unchanged and foreseeably caused multiple wrongful arrests.  Further, Joshua was known to H.P.D. officers as a mentally ill person and the city should have accommodated his illness in part by correcting known errors in

his records since they rendered him particularly likely to be rearrested on Thomas R. Castleberry's warrant.   Joshua seeks damages and declaratory, equitable, and injunctive relief requiring Defendants to update and properly maintain their warrants so that Joshua is permanently excluded as the subject of Thomas R. Castleberry's warrant for which he was previously arrested. Joshua also seeks an order requiring the H.P.D., D.P.S., and H.S.H. Defendants to revise their policies and procedures to ensure proper identification of the persons in their custody, particularly as applied to houseless and mentally ill persons.

## JURISDICTION AND VENUE

5.       This case arises under the Fourth and Fourteenth Amendments of the U.S. Constitution and Hawaiʻi law.

6.       This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343.  The Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367(a).

7.       Venue is proper in this District pursuant to 28 U.S.C. § 1391 (b)(1) and (b)(2) in that the unlawful actions challenged herein occurred in the District of Hawaiʻi, and the defendants reside in the District of Hawaiʻi.

8.       Joshua timely filed a notice of claim under H.R.S. § 46-72 on August 11, 2021 and an amended notice of claim on November 20, 2021.

## PARTIES

A.       **Plaintiff**

4

9.      Plaintiff JOSHUA SPRIESTERSBACH ("Plaintiff" or "Joshua") was at all times relevant to the facts of this case a resident of the City and County of Honolulu, State of Hawai'i. He is presently a resident of Vermont.

**B.      Defendants**

10.     Defendant STATE OF HAWAI'I ("State") is a state in the United States.

11.     Defendant CITY AND COUNTY OF HONOLULU ("City") is, and was at all relevant times, a municipal corporation formed and existing under the laws of the State of Hawai'i. The City is or was the employer of the Individual Honolulu Police Department ("H.P.D.") Officers.

12.     Defendants, Does 1-5 (collectively the "H.P.D. Officer Defendants" or "Defendant H.P.D. Officers") were at all times relevant to this case, officers with H.P.D. They are sued individually and were at all relevant times, acting under the color of law and in the course and scope of their employment as police officers with the H.P.D. of the Defendant City.

13.     Defendant DEPARTMENT OF PUBLIC SAFETY ("D.P.S.~~D.~~") operates the Oahu Community Correctional Center ("O.C.C.C.") and was at all relevant times, a Hawai'i state corporation formed and existing under the laws of the State of Hawai'i. Defendant Does 6-10 were at all times relevant to this case employees of the D.P.S.~~D.~~ who were employed at the O.C.C.C.  Defendant Does 6- 10 were at all times relevant hereto, citizens and residents of the City and County of Honolulu, State of Hawai'i. They are sued individually and were at all relevant times, acting under the color of law

and in the course and scope of their employment at the D.P.S.

14.     Defendant OFFICE OF THE PUBLIC DEFENDER ("O.P.D.") is, and at all relevant times was, a Hawai'i state corporation formed and existing under the laws of the State of Hawai'i.

15.      Defendants NIETZSCHE LYNN TOLAN, MICHELLE MURAOKA, LESLEY MALOIAN, JASON BAKER, and SETH PATEK and Defendant Does 11-15 (collectively "Defendant Public Defenders") were, at all times relevant, employed as Public Defenders by the State of Hawai'i, and were at all times relevant hereto, citizens and residents of the City and County of Honolulu, State of Hawai'i and working for O.P.D. Defendant Public Defenders are sued in their individual capacities as they were exercising their professional judgment and discretion in representing Joshua and they were acting in their capacity as lawyers and not as government officials.

16.     Defendants DR. JOHN COMPTON ("Dr. Compton"), DR. MELISSA VARGO ("Dr. Vargo"), and DR. SHARON TISZA ("Dr. Tisza") (collectively "Individual Psychiatric and Psychological Defendants") were at all times relevant hereto, citizens and residents of the City and County of Honolulu, State of Hawai'i. Individual Psychiatric and Psychological Defendants were, at all times relevant, employed as psychiatrists and psychologists by the State of Hawai'i and appointed by the First Circuit Court of Hawai'i to evaluate Joshua. Individual Psychiatric and Psychological Defendants are sued in their individual capacities as they were exercising their professional judgment and discretion in evaluating Joshua and acting in their

capacity as psychiatrists or psychologists and not as government officials.

17.     Defendant HAWAI'I STATE HOSPITAL ("H.S.H.") is and was at all relevant times, a Hawai'i state corporation formed and existing under the laws of the State of Hawai'i.

18.     Defendant DR. ALLISON GARRETT ("Dr. Garrett") and Does 16-20 were at all times relevant hereto, citizens and residents of the City and County of Honolulu, State of Hawai'i. Dr. Garrett was, at all times relevant, employed as a Doctor by the State of Hawai'i at the Hawai'i State Hospital ("H.S.H."). Does 16- 20 were doctors and other professional staff at H.S.H. Dr. Garrett and these Doe Defendants 16-20 are sued in their individual capacities as they were exercising their professional judgment and not based on actions taken as government officials.

19.      Dr. Garrett, Does 16-20, and the Individual Psychiatric and Psychological Defendants are collectively referred to as the "Medical Defendants."

20.     Defendants JOHN/JANE DOES 1-20's identities are unknown to Joshua at this time, but upon information and belief, at all relevant times were acting under color of law in their official capacity and in the scope of their employment with H.P.D., D.P.S.D. or H.S.H. of Defendant State of Hawai'i or City. Joshua will give notice of their true names and capacities when ascertained. Joshua is informed and believes and thereon alleges that Defendant Does are responsible in some manner for the damages and injuries hereinafter complained of.

21.     Defendants NIETZSCHE LYNN TOLAN, MICHELLE MURAOKA,

LESLEY MALOIAN, JASON BAKER, SETH PATEK, DR. JOHN COMPTON, DR.

MELISSA VARGO, DR. SHARON TISZA, DR. ALLISON GARRETT, and

JOHN/JANE DOES 1-20 are collectively referred to herein as "Individual Defendants."

22.     Joshua is informed and believes and based thereon alleges that the acts

complained of herein were done within the course and scope of employment by the

various officials of the Entity Defendants, and under color of state law. Joshua is

further informed and believes and thereon alleges that wrongful acts and/or omissions

by any individual defendant were done intentionally, maliciously, or with reckless

disregard for the rights of Joshua.

## STATEMENT OF FACTS

### A.     Joshua Spriestersbach's Early Life

23.     Joshua was born on April 12, 1971 in Sacramento, California. He

graduated in 1989 from Mira Loma High School in Sacramento.

24.     Between 1999 and 2001 Joshua lived for periods of time in California,

Kentucky, and Tennessee.  He developed mental health problems and was hospitalized

several times during that period.

25.     Joshua was hospitalized for several months at the H.S.H. in 2002 for

treatment of a mental illness that developed while living with his family in military base

housing.

26.     When Joshua was released from the hospital in 2003, he moved to

Hawaiʻi Island with the assistance of his sister and brother-in-law. Joshua lived in a

cabin in Orchidland Estates and remained on Hawai'i Island from approximately 2003 until 2006.

27.    In 2006, at the time of Thomas R. Castleberry's crimes on Oahu, Joshua was being treated at a mental health facility on Hawai'i Island and was not present on Oahu.

28.    When Joshua later moved to Oahu, he largely remained houseless when he wasn't being treated by H.S.H. or by Care Hawai'i, an adult mental health care facility. He had lost all communication with his sister and other family members while he was houseless and living on Oahu.

29.    Despite living in poverty and experiencing houselessness, Joshua remained nonviolent, law abiding, and he was a free citizen, able to seek medical care and other contact with institutions as he saw fit. The only "crimes" that Joshua has ever been charged or convicted of were crimes of poverty, such as trespass and sitting or lying on public sidewalks because he was houseless.

**B.    Thomas R. Castleberry's Early Life**

30.    Unlike Joshua, Thomas R. Castleberry has spent much of his life facing serious criminal charges and incarceration.

31.    Since as early as 2001 until his arrest and incarceration in Hawai'i in 2006, Thomas R. Castleberry faced numerous charges and civil actions in Georgia, Missouri, and Iowa. These are states that Joshua has never lived in nor visited during that time.

32.     On July 16, 2006, Thomas R. Castleberry was arrested by H.P.D. officers for numerous charges including Unauthorized Control of Propelled Vehicle, Promoting a Dangerous Drug in the First Degree, and Unlawful Use of Drug Paraphernalia.

33.     H.P.D. fingerprinted and photographed Thomas R. Castleberry, and his mugshot was entered into their criminal database. Once Thomas R. Castleberry was transferred to O.C.C.C. while his charges were pending, his identifying information was also entered into the O.C.C.C. database. Additionally, per state policy, Thomas R. Castleberry's identifying information was also submitted to the Hawai'i Criminal Justice Data Center, a division of the Hawai'i State Attorney General, which is required by law to collect and maintain a database of all individuals charged and convicted of crimes in the state of Hawai'i.

34.     Thomas R. Castleberry never represented to anyone and never claimed to be Joshua Spriestersbach.

35.     In 2007, Thomas R. Castleberry plead guilty to his crimes and was placed on felony HOPE probation.

36.     Thomas R. Castleberry remained on HOPE probation and was monitored by the First Circuit Court until July 14, 2009, when the State of Hawai'i requested that HOPE Probation Judge Court Judge Michael Wilson issue a bench warrant for the arrest of Thomas R. Castleberry for failing to appear in court.

37.     On July 24, 2009, Judge Wilson conducted a hearing and issued the bench warrant for Thomas R. Castleberry. The bench warrant did not include Joshua's name,

identifying information, or list Joshua as an alias of Thomas R. Castleberry.

38.     It appears that Thomas R. Castleberry left Hawai'i on or after 2009 and moved to Arizona. From 2011-2014, Thomas R. Castleberry was charged with various felony crimes and incarcerated in Arizona.

39.     On or before 2016, Thomas R. Castleberry moved to Alaska where he committed additional crimes. Thomas R. Castleberry was in the custody of the Alaska Department of Corrections until July 2022.

40.     Joshua never used the name Thomas R. Castleberry, nor has Joshua ever told the police that his name is Thomas R. Castleberry. Thomas R. Castleberry's date of birth and social security number are completely different than Joshua's. The only commonality they share is that they both share the same birth year – 1971. Additionally, Thomas R. Castleberry's H.P.D. arrestee/prisoner number is A1077743, whereas Joshua's is A6017796.

## C.     Joshua Spriestersbach's Arrest by HPD Officers as Thomas R. Castleberry on July 26, 2010

41.     On July 26, 2010, H.P.D. police observed Joshua Spriestersbach in the Chinatown area after a report that he was "in Honolulu Harbor waters near the Navatek Ship."

42.     Joshua identified himself as William Castleberry.  Joshua's grandfather was named Castleberry.  Joshua was then arrested on the outstanding warrant for *Thomas R.* Castleberry.

43.     Joshua was presented to the H.P.D. Desk Lieutenant or officer in charge

of the receiving desk, who directed that his identity be confirmed with fingerprints.

44.    When fingerprint testing was completed, Joshua's identity was confirmed as Joshua Spriestersbach and not as Thomas R. Castleberry.  Joshua was therefore released without charges.  The arrest report regarding the incident concludes, "AFIS/FINGERPRINTS REAL IDENTITY IS SPRIESTERSBACH, JOSHUA A6017796."

45.    The reports from this arrest combined personal identifying information belonging to Joshua Spriestersbach with personal identifying information belonging to Thomas R. Castleberry and those errors were uploaded to the H.P.D. case reporting system and from there to the state and federal crime data reporting systems.

46.    On information and belief Defendant Does 1-5 H.P.D. officers had a duty to correct the police department records and acting with malice, with reckless disregard of the law or of Joshua's legal rights, and with deliberate indifference to Joshua's constitutional rights, failed to correct their records. They did so knowing that failing to correct their records would expose Joshua to being misidentification and additional arrests.

47.    The officers who made the arrest knew – and it would have been obvious to any reasonable person – that Joshua was a person suffering from a mental health disability based on his bizarre conduct and presence in the water near the abandoned ship and his inability to reasonably explain this conduct at the scene.  This would make it difficult for others to find Joshua credible or for Joshua to vigorously advocate for

himself to ensure he was not falsely arrested.  Joshua suffered from this disability and his disability would have been apparent when interacting or communicating with him.

48.     The H.P.D. officers who made this arrest were fully aware that because of his disability Joshua was at a significant risk of being wrongfully detained and held, as he ultimately was, if they did not correct the case reporting records falsely identifying him as Thomas R. Castleberry.  The H.P.D. arresting officers and the H.P.D. officer in charge of the receiving desk could have accommodated Joshua by correcting the information that incorrectly merging his identity with Thomas R. Castleberry in the databases, or further flagging those records to indicate that Joshua was not Thomas R. Castleberry.  The need for such accommodation was obvious.  Nevertheless, the officers, acting consistent with City policy, practice, and procedure, ignored the substantial risk to Joshua and did not provide the accommodation.

49.     Likewise, the City was fully aware that persons with disabilities such as Joshua's have a history of providing identities that are not their own and then becoming falsely associated with the names of other suspects, because of their disability. The City should have provided reasonable accommodations to Joshua by addressing or making available highly pertinent mental health information; here, for example, that Plaintiff was schizophrenic, bipolar and dysfunctional, and referred to himself as Castleberry. Further the City should have further accommodated by ensuring that the personal information on file for this person with a mental disability was in fact accurate.  The need for the City and its employees to provide such an accommodation was obvious,

though they did not provide it, notwithstanding the substantial risks involved for Joshua and persons like him.

### D.    Joshua's Family Reports Him to City as Mentally Ill and Missing in 2011

50.    On April 14, 2011, one of Joshua's sisters reported him to the City as being missing and indicated that he had a mental disability, that he had been discharged from a state psychiatric hospital in Hawaiʻi, and that he needed medication but often refuses to take medication.  She indicated that Joshua had been diagnosed with, inter alia, schizophrenia and bipolar disorder. She also reported that Joshua would sometimes refer to himself as "Sergeant Castleberry."

51.    Joshua's sister confirmed his identity based on a photo she was shown from a City police database.  That photo was then used on a missing person flyer circulated by the police stating that Joshua "is known to frequent the Chinatown area.  He suffers from a medical condition that requires medication.  Family and friends are very concerned for her (sic) safety and welfare."

52.    On April 19, 2011, Joshua was located at Fort Street Mall/Hotel St.

### E.    Joshua Spriestersbach's Arrest and Detention on October 14, 2011

53.    On October 14, 2011, Joshua was houseless and sleeping on the stairwell of Kawananakoa Middle School in Honolulu. An H.P.D. officers woke up Joshua and repeatedly asked Joshua his name. Joshua would only give the arresting officer his grandfather's last name, "Castleberry." When the H.P.D. officers asked Joshua for his first name, Joshua only replied "um, um" and the H.P.D. officer noted that it was as if

14

he was "thinking of a name to give." Joshua refused to give a first name. When they asked for his date of birth and social security number, Joshua provided his birthdate and social security number.

54.     The arresting officers entered the last name Castleberry into the mobile data computer and a warrant for Thomas R. Castleberry issued in July of 2009 appeared.

55.      Without any further investigation the H.P.D. officers arrested Joshua for trespass and for the outstanding warrant of Thomas R. Castleberry.

56.     Joshua told them he was not Thomas R. Castleberry, and that he was William C. Castleberry, again which was Joshua's grandfather's name and a name he would use on occasion.

57.     Joshua was convicted of trespass but was never brought before the court in 2011 on Thomas R. Castleberry's warrant. This is likely due to the fact that at some point during the booking process H.P.D. Officers realized that Joshua was not Thomas R. Castleberry.

58.     The Incident report from this arrest combined personal identifying information belonging to Joshua Spriestersbach with personal identifying information belonging to Thomas R. Castleberry and those errors were uploaded to the H.P.D. case reporting system and from there to the state and federal crime data reporting systems.

59.     On information and belief Defendant Does 1-5 H.P.D. officers had a duty to correct the police department records and acting with malice, with reckless disregard

of the law or of Joshua's legal rights, and with deliberate indifference to Joshua's constitutional rights, failed to ~~do so~~ correct their records. They did so knowing that would expose Joshua to misidentification and additional arrests.

60.     The officers who made the arrest knew – and it would have been obvious to any reasonable person – that Joshua was a person suffering from a mental disability. The hesitant manner in which he spoke when arrested helped put the officers on notice. His failure to cooperate with a citation and instead insist on arrest was another indication.  A record search would have discovered the 2010 incident in the harbor and the 2011 missing person report from his sister describing his mental illness.  These facts would make it difficult for others to find him credible or for Joshua to vigorously advocate for himself to ensure he was not falsely arrested.  Joshua suffered from this disability and his disability would have been apparent when interacting or communicating with him and reviewing his records.

61.     The officers who made this arrest were fully aware that because of this disability Joshua was at a significant risk of being wrongfully detained and held, as he ultimately was, if they did not correct the case reporting records falsely identifying him. The arresting officers and the officer in charge of the receiving desk could have accommodated Joshua by correcting the information incorrectly merging his identity with Thomas R. Castleberry in the databases, or further flagging that Joshua was not Thomas Castleberry.  The need for such accommodation was obvious.  Nevertheless, the officers, acting consistent with city policy, practice and procedure, ignored the

substantial risk to Joshua and did not provide the accommodation.

62.     Likewise, the City was fully aware that persons with disabilities such as Joshua's have a history of providing identities that are not their own and then becoming falsely associated with the names of suspects, because of their disability. The City should have provided reasonable accommodations to Joshua by addressing or making available highly pertinent mental health information, for example, that Plaintiff was schizophrenic, bipolar and dysfunctional, and referred to himself as Castleberry. Further the City should have further accommodated by ensuring that the personal information on file for this person with a mental disability was in fact accurate.  The need for the City and its employees to provide such an accommodation was obvious, though they did not provide it, notwithstanding the substantial risks involved for Joshua and persons like him.

**F.     Joshua Spriestersbach's Arrest and Detention by H.P.D. Officers on January 17, 2015**

63.     On or about January 17, 2015, Joshua was houseless and was sleeping in Aala Park after hours in the City and County of Honolulu.

64.     The arresting H.P.D. officer approached Joshua and asked his name and personal information at least seven times and he refused to provide it. The H.P.D. officer reported that Joshua repeatedly refused to give his name and stated he would only provide his "signature and number."

65.      An officer ran prints and identified him as Joshua Spriestersbach.

66.     Since H.P.D. Officers did not correct their mistake during the ~~in~~ 2011

17

arrest and other contacts with him, when Joshua was arrested in 2015, the H.P.D. database continued to list Thomas R. Castleberry as an alias of Joshua and personal information continued to be improperly merged for the two individuals.

67.    A warrant check was then performed for the name Joshua Spriestersbach, alias William C. Castleberry, and Thomas R. Castleberry.

68.    The 2009 warrant for Thomas R. Castleberry was active so the H.P.D. officers checked Joshua's prints against Thomas R. Castleberry's and found that Joshua's prints did not match the prints they had on file for Thomas R. Castleberry.

69.    This time, because the H.P.D. officers had compared Joshua and Thomas R. Castleberry's prints before booking Joshua on Thomas R. Castleberry's warrant, Joshua was not arrested on Thomas R. Castleberry's outstanding warrant.

70.    The H.P.D. officers who made the arrest knew – and it would have been obvious to any reasonable person – that Joshua was a person suffering from a mental disability. His unusual responses to the H.P.D. officer when arrested helped put the officers on notice.  A record search would have discovered the 2010 incident in the harbor and the 2011 missing person report from his sister describing his mental illness. These facts would make it difficult for others to find him credible or for Joshua to vigorously advocate for himself to ensure he was not falsely arrested.  Joshua suffered from this disability and his disability would have been apparent when interacting or communicating with him.

71.    The H.P.D. officers who made this arrest were fully aware that because of

this disability Joshua was at a significant risk of being wrongfully detained and held, as he ultimately was, if they did not correct the case reporting records falsely identifying him.  The H.P.D. arresting officers and the H.P.D. officer in charge of the receiving desk could have accommodated Joshua by correcting the information incorrectly merging his identity with Thomas R. Castleberry in the databases, or further flagging that Joshua was not Thomas Castleberry.  The need for such accommodation was obvious.  Nevertheless, the officers, acting consistent with city policy, practice and procedure, ignored the substantial risk to Joshua and did not provide the accommodation.

72.    Likewise, the City was fully aware that persons with disabilities such as Joshua's have a history of providing identities that are not their own and then becoming falsely associated with the names of suspects, because of their disability. The City should have provided reasonable accommodations to Joshua by addressing or making available highly pertinent mental health information, for example, that Joshua was schizophrenic, bipolar and dysfunctional, and referred to himself as Castleberry. Further the City should have further accommodated by ensuring that the personal information on file for this person with a mental disability was in fact accurate.  The need for the City and its employees to provide such an accommodation was obvious, though they did not provide it, notwithstanding the substantial risks involved for Joshua and persons like him.

73.    On information and belief these H.P.D. arresting officers had a duty to

correct the police department records and acting with malice, with reckless disregard of the law or of Joshua's legal rights, and with deliberate indifference to Joshua's constitutional rights, failed to correct the records. They did so knowing that would expose Joshua to misidentification and arrests.

**G.   Joshua Spriestersbach's Arrest and Detention on May 11, 2017 Based on Misidentification**

74.    On May 11, 2017, Joshua, was houseless and waiting for food with many others outside of Safe Haven, located at 126 N. Pauahi St. Honolulu, HI 96817.

75.    At some point, Joshua was awoken by H.P.D. Officer Bruhn with his partner because they believed, in reliance on the digital notebook, explained *infra*, that Joshua was Thomas R. Castleberry who they were seeking to arrest on the open 2009 warrant.

76.    Joshua did not have identification on his person, but he provided H.P.D. officer Bruhn and his partner with his full name "Joshua Spriestersbach," date of birth, and social security number.

77.    Joshua was reclusive and withdrawn and his responses to the H.P.D. officer's inquiries were sparse.  A record search would have discovered the 2010 incident in the harbor and the 2011 missing person report from his sister describing his mental illness.  H.P.D. officer Bruhn and his partner knew or should have known that Joshua was a person suffering from a mental disability which would make it difficult for others to find him credible or for Joshua to vigorously advocate for himself to ensure he was not falsely arrested.

78.     H.P.D. officer Bruhn researched Joshua on the City's Case Reporting System, the City's Digital Notebook, the Crimestopper information he possessed and the State of Hawai'i Criminal Justice Information System database.  H.P.D. officer Bruhn discovered that these records listed Thomas R. Castleberry as an alias for Joshua Spriestersbach.  H.P.D. officer Bruhn also discovered conflicting social security numbers, conflicting state ID numbers, conflicting dates of birth, and other personal data that did not match Thomas R. Castleberry, who he intended to arrest, with Joshua Spriestersbach, who he did in fact arrest.  Further, H.P.D. officer Bruhn discovered or should have discovered the records that indicated that Joshua suffered from a mental disability and required medication.

79.     H.P.D. officer Bruhn never verified that Joshua was in fact the person wanted on the Thomas Castleberry open warrant.  H.P.D. officer Bruhn had no probable cause to arrest Joshua.

80.     On May 11, 2017, H.P.D. officer Bruhn and his partner arrested Joshua under Thomas R. Castleberry's eight-year-old bench warrant, without any probable cause and then transported Joshua to H.P.D.'s Central Police Station.

81.     H.P.D. officer Bruhn knew that the facts he gathered did not confirm that Joshua was the person named in the warrant.  H.P.D. officer Bruhn knew that many of the facts he gathered contradicted any conclusion that Joshua was the person named in the warrant.  Nonetheless, by proceeding with the arrest H.P.D. officer Bruhn acted with malice and with the knowledge of the risk that his actions would lead to

misidentification and arrest and detention of Joshua on the warrant without probable

cause.  In so doing, H.P.D. officer Bruhn also acted with malice toward Joshua,

deliberate indifference and with reckless disregard of Joshua's legal rights.

82.      H.P.D. officer Bruhn was fully aware that because of his disability,

Joshua may have been wrongfully associated with the warrant and that pursuant to City

policy, the merger of his identity with Thoms R Castleberry would not have been

corrected, and that this was particularly likely given his disability.  Officer Bruhn

should have accommodated Joshua by verifying whether this misidentification had

happened.  The need for such an accommodation was obvious.  Nevertheless, Officer

Bruhn ignored the substantial risk to Joshua and did not verify the information, causing

him to be arrested and detained.

### H.    City Digital Notebook Causes Misidentification and Arrest of Mr. Spriestersbach on May 11, 2017.

83.      On May 11, 2017, H.P.D. maintained a database of wanted persons

available to officers through a digital notebook.

84.      The longstanding custom and practice of the City was for H.P.D. officers

to study the photos and personal information in the notebook and rely on that

information to make arrests of individuals described in the digital notebook.  The

practice of using this digital notebook and relying on it to make arrests was so

widespread as to have the force of law.

85.     H.P.D. officers Bruhn and Korenic studied the digital notebook and even printed pages of suspects so that they could compare the photo from the digital notebook to the potential suspects they encountered while on patrol.

86.     On May 11, 2017, the digital notebook had an entry for Thomas R. Castleberry with personal information belonging to Thomas R. Castleberry, but the photo associated with that personal information was in fact the photo of Joshua Spriestersbach and not Thomas R. Castleberry.

87.     At that time the digital notebook entry for Thomas R. Castleberry indicated that an open warrant existed for probation revocation related to several underlying felonies.

88.     On May 11, 2017, H.P.D. officers Bruhn and Korenic, relying on the digital notebook entry for Thomas R. Castleberry which included the photo of Joshua Spriestersbach, arrested Joshua on the open warrant for Thomas R. Castleberry.

89.     On information and belief, the information listed in the digital notebook was derived from the City case reporting system.

90.     On information and belief, the City case reporting system included numerous instances where personal identifiers and photos related to one individual would be improperly entered under a different individual.  These errors remained in the system because they were not corrected.  This caused people to be arrested under the wrong identity for crimes committed by other individuals.  The improper merger of personal identifier information in the City case reporting system was known to the City

and it was particularly harmful to individuals with mental disabilities, including Joshua, who were not able to advocate for themselves effectively in such situations.

91.     Joshua was not arrested for any other violation on May 11, 2017.  He was only arrested on the Thomas R. Castleberry warrant.  Therefore, the inaccurate photo of Thomas R. Castleberry in the City digital notebook and the longstanding practice of using the photos in the City digital notebook to make arrests and failing to correct inaccurate personal identifying information in the City databases was the cause of Joshua's misidentification as Thomas R. Castleberry and the moving force behind Joshua's arrest.

92.     H.P.D. Policy 7.01 VIII F states that, "[a]n arrested person frequently provides false information about his or her identity (e.g., an alias or another person's name)…" The policy also indicates what steps must be taken "to correct misidentifications when they are discovered."  Thus, the City and the its individual H.P.D. officer s including H.P.D. officer Bruhn were on notice that misidentifications of arrested persons did take place. On information and belief, these problems were deemed corrected when the falsely arrested person was released.  The City policy and related training for correcting misidentifications however, does not include any instruction to employees of the H.P.D. to correct errors they discover in the databases or City digital notebook which causes the same misidentification to recur, resulting in persons being arrested several times based on misidentifications.

93.     On information and belief, City employees who fail to correct personal identifiers that are erroneously entered and maintained in the case reporting system have not been disciplined or retrained by the City, further allowing the erroneous information to cause additional wrongful arrests.  This failure to discipline and retrain employees in order to identify and correct errors in the case reporting system was deliberately indifferent to the rights of Joshua and other persons whose information was posted in the case reporting system as it exposed them to repeated arrests based on misidentification.

94.     On information and belief, the City was on notice that errors regarding the personal information and/or photos of wanted persons would be posted in the digital notebook and that there was no system in place to identify and correct those errors. This failure to identify and correct errors in the digital notebook was deliberately indifferent to the rights of Joshua and other persons whose information was posted in the digital notebook as it exposed them to repeated arrests based on misidentification.

 **I.** **City Policymaker Causes Misidentification and Directs Arrest and Detention of Mr. Spriestersbach**

95.     Officer Bruhn transported Joshua to the H.P.D Central Station at approximately 5:15 p.m. on May 11, 2017.

96.     Upon arrival H.P.D. officer Bruhn reported to the H.P.D. officer in charge of the receiving desk to secure approval for the arrest.

97.     Pursuant to H.P.D. policy 7.01 VIII A. 3, the H.P.D. officer in charge of the receiving desk, "shall review the circumstances of each arrest before any person is

booked in order to determine whether there exist sufficient grounds or facts to justify the arrest."

98.     H.P.D. policy requires that the H.P.D. officer in charge of the receiving desk shall be responsible for the proper handling of arrestees, and their decisions with respect to a particular arrest are final. Under City policy, no further review by City officials is made regarding the decisions of the H.P.D. officer in charge of the receiving desk before the arrested person is detained. If the H.P.D. officer in charge of the receiving desk approves the arrest, then the subject of the arrest is booked and not released until the court orders their release.

99.     The H.P.D. receiving officer in charge binds the City as a policymaker with respect to decisions on individual arrests, because final authority has been delegated to the H.P.D. officer in charge of the receiving desk to determine whether sufficient grounds justify arrests.  Decisions by the H.P.D. officer in charge of the receiving desk are in effect decisions of the City with respect to these individual arrests.

100.    The May 11, 2017 arrest report lists "Joshua Spriestersbach" as the "Defendant" along with his correct state ID number, date of birth, social security number and other personal information.

101.    The report also lists Thomas R. Castleberry's name and social security number as an "alias."

102.    The warrant that was the basis for the arrest was issued for Thomas R. Castleberry, not Joshua Spriestersbach.

103.    H.P.D. officer Bruhn disclosed to the H.P.D. officer in charge of the receiving desk the fact that H.P.D. officer Bruhn's record searches relating to Thomas R. Castleberry's warrant produced two conflicting social security numbers, two conflicting names, conflicting personal facts, and photographs that did not match.

104.    On information and belief, H.P.D. officer Bruhn also spoke with the H.P.D. officer in charge of the receiving desk about the fact that the photo of Thomas R. Castleberry in the digital notebook did not match the photo in the flyer created by Crimestoppers.

105.    H.P.D. policy 7.01 VIII A. 8. states that "[n]o booking shall be made for an arrest by warrant without first establishing the identity of the detainee as the person named and accused in the warrant."

106.    H.P.D. policy 7.01 VIII B. 3 further states that "[r]eceiving desk officers shall fingerprint and arrange for an identification photograph of all arrestees …"  The policy at 7.01VIII C.1 also states that, "[a]ll arrestees for whom an H.P.D. Arrest Report has been generated shall be fingerprinted and photographed."

107.    The arrest report for Joshua's arrest states that his arrest is "verified by prints."

108.    On information and belief the H.P.D. officer in charge of the receiving desk approved Joshua's arrest on the Thomas R. Castleberry warrant even though his fingerprints and mugshots made it clear that Joshua Spriestersbach was not Thomas R. Castleberry.

109.    The H.P.D. officer in charge of the receiving desk acted with deliberate indifference to Joshua's rights and recklessly failed to establish that Joshua was in fact the person named in the 2009 probation violation warrant for the arrest of Thomas R. Castleberry.

110.    The H.P.D. officer in charge of the receiving desk, is a final policymaker with respect to arrests and his actions as the H.P.D. officer in charge of the receiving desk bind the City.

111.    The H.P.D. officer in charge of the receiving desk permitted H.P.D. officer Bruhn to handwrite on Thomas R. Castleberry's warrant "AKA Spriestersbach, Joshua C." without ever verifying that Joshua was in fact an alias for Thomas R. Castleberry and that Joshua was the man wanted on the warrant. In fact, Joshua was not an alias for Thomas R. Castleberry and Joshua was not the man wanted on the warrant.

112.    Since the H.P.D. officer in charge of the receiving desk is a final policymaker with respect to arrests, these actions by the H.P.D. officer in charge expressly approving the arrest of Joshua and directing that his arrest proceed, bind the City.

113.     The reckless and deliberately indifferent failure to match the booking photo with previous photos of Thomas R. Castleberry, failure to rely on the fact that the fingerprints did not match Thomas R. Castleberry, falsely stating the arrest report was "verified by prints," failure to verify Joshua's identity as the person wanted on the warrant, the failure to correct records when errors were detected, the failure to rely on

previous investigations verifying Joshua's identity, the continued reliance on records known to contain errors, even after previous false arrests and after this lawsuit was filed, are all actions done maliciously, with reckless disregard to Joshua's legal rights, with deliberate indifference and are all actions by the city that caused the misidentification of Joshua, his arrest and his prolonged incarceration and commitment.

### J.   City Longstanding Custom and Practice Causes Misidentification and Arrest of Mr. Spriestersbach

114.   As set out above, Joshua was first falsely arrested on Thomas R. Castleberry's warrant on July 26, 2010.  He was again arrested on the warrant on October 14, 2011.  The incident report for that arrest (No.11-373552) properly listed Joshua's social security number but improperly listed Thomas R Castleberry's state ID number, thus commencing the process of mixing the identities of these men in the H.P.D. Case Record System.

115.   On information and belief the misidentification was discovered because Joshua was never brought to court on the warrant in 2011.

116.   This false arrest was a violation of Joshua's rights.

117.   The personal information errors in Joshua's records were apparent on the face of the reports in the H.P.D. case reporting system, putting the City on notice of the errors.  It was obvious that Joshua would likely be rearrested for these errors if H.P.D. officers interacted with him.

29

118.    The City was on notice that allowing these errors to remain in their records was deliberately indifferent to persons with personal data in the City record system, including Joshua, causing exposure to misidentification and false arrest.

119.    Numerous case reporting records from interactions between Joshua and the police in 2009, 2010, 2011, 2012, 2015, and 2017 all reveal personal identifiers related to Joshua improperly merged with personal identifiers related to Thomas R. Castleberry. Thus, pursuant to longstanding practice and custom, the H.P.D. case reporting system was never corrected to remove the association of Thomas R. Castleberry's state ID number with Joshua. Further pursuant to longstanding practice and custom, these errors were repeatedly uploaded to the Hawaiʻi State Criminal Justice Database and from there to the National Crime Information Center database.

120.    Pursuant to longstanding practice and custom, the improper association of Joshua with Thomas R. Castleberry was carried over to the City digital notebook and not corrected even after errors were identified.

121.    Joshua was again falsely arrested on Thomas R. Castleberry's warrant in 2015.

122.    This false arrest was a violation of Joshua's rights.

123.    The misidentification was discovered, and Joshua was released. The 2015 arrest report (No. 15-022773) noted, "POSSIBLE WARRANT UNDER CASTLEBERRY, THOMAS, A#1077743.  CHECKS VIA ID (DAISY) PER ID

PRINTS UNDER A#10777743 CASTLEBERRY, THOMAS DO NOT MATCH

SPRIESTERSBACH."

124.    H.P.D. Policy 7.01 VIII F provides a means to "correct misidentifications

when they are discovered."  The policy requires that the "Records and Identification

commander shall also ensure that the Department of the Prosecuting Attorney is

notified of the correct identity of the arrested person." On information and belief,

various individual officers, various officers in charge of the receiving desk and the

Records and Identification Division of H.P.D. discovered the misidentification of

Joshua in 2010, 2011, 2012, 2015, and again in 2017 but the misidentification was not

corrected and the Prosecuting Attorney was not notified.

125.    It was the longstanding policy and practice of the City not to correct

records, triggering misidentification and therefore to permit repeated arrests without

probable cause of persons including Joshua Spriestersbach who had personal

identification data merged with that of an entirely different individual.  As part of this

this longstanding policy and practice searches in the City case reporting system

regarding Joshua failed to properly alert H.P.D. officers in 2017 to the instances in

2010, 2011, and 2015 when fingerprint tests excluded Joshua as Thomas R.

Castleberry. This failure to correct records was deliberately indifferent to the rights of

Joshua and others with errors in their personal information.  This failure to correct

records caused Joshua and others similarly situated to experience improper arrests

based on misidentification.

126.    Even after this suit was filed and after national and local newspapers and other media outlets publicized Joshua's misidentification by H.P.D., the H.P.D. case recording system continued to mix the identities of Joshua and Thomas R Castleberry and these errors were uploaded by the City to the State of Hawai'i Criminal Justice Data Center and from there to the National Crime Information Center, putting Joshua at great risk of rearrest.

127.    The 2009 warrant for Thomas R. Castleberry remains in place.

128.    On information and belief, the erroneous identification of Joshua as Thomas R. Castleberry in the digital notebook was identified at least at the time this case was filed, but the digital notebook was not corrected until May 2022 after Joshua had moved for a preliminary injunction and taken other steps to urge correction of the record.

129.    The City policymakers and employees had notice of the errors in their records that associated Joshua with Thomas R. Castleberry and they knew this association put Joshua at risk of arrest and prolonged detention. Nonetheless, City policymakers and employees acted with malice, reckless disregard, and deliberate indifference to the rights of Joshua by not correcting their records and databases.

//

//

//

//

**K.     City Policies and Customs and the Failure to Discipline, Train and Supervise Officers to Correct Errors Regarding Personal Information of Arrestees Were a Moving Force Behind the Misidentification and Arrest of Joshua Spriestersbach.**

130.  Arresting H.P.D. officer Bruhn was on the H.P.D. police force since 2012.

131.  H.P.D. officer Bruhn and all of the other H.P.D. officers including those interacting with Joshua as early as 2010, who discovered erroneous personal information data in the city case record system, were not trained to correct errors in personal information when they identified errors in H.P.D. records, including but not limited to the digital notebook. Nor were they disciplined or retrained to correct such errors even after this case made national headlines.

132.  Not correcting personal information errors in H.P.D. records made it more likely that H.P.D. officers would rely on erroneous data and misidentify suspects, including Joshua.

133.  The failure to train H.P.D.  officers to correct errors in personal information in H.P.D. records was deliberately indifferent to the rights of persons with personal information in H.P.D. records, including Joshua.

134.  Thomas R. Castleberry's warrant for a probation violation was considered an electronic warrant and on May 11, 2017 H.P.D. officer Bruhn had to print out a copy of the warrant from the warrant database. The printed warrant was considered the "original" warrant. H.P.D. officer Bruhn hand wrote the text "(AKA: Spriestersbach, Joshua C.)" on the "original" Thomas R. Castleberry warrant.

135.  In fact, H.P.D. officer Bruhn never confirmed that the person named in the Thomas R. Castleberry warrant was the same person as Joshua. Nor did the H.P.D. officer in charge of the receiving desk confirm whether Joshua was the person named in the warrant.

136.  On several occasions during his service with H.P.D., officer Bruhn wrote the name of other people on warrants, based on the long-standing H.P.D. custom and practice of treating people identified through an alias the same as persons actually named in warrants.

137.  Discovering possible aliases for people H.P.D. officers encounter is not the same as confirming that the people arrested are actually the people named in warrants.

138.  Relying only on people's aliases will cause people to be misidentified and on information and belief, has caused people to be falsely arrested for the people who are actually named in warrants.

139.  Failing to train and supervise H.P.D. police officers and officers in charge of the receiving desk to positively confirm that people in custody are actually the people named in the warrants makes it likely that H.P.D. officers will misidentify and arrest the wrong people.

140.  Failing to train and supervise H.P.D. officers and H.P.D. officers in charge of the receiving desk to positively confirm that the people in custody are actually the people named in the warrants is deliberately indifferent to people in the H.P.D. records

systems with inaccurate personal identifiers, including Joshua, as it makes false arrests more likely.

141.  The City, through the H.P.D. officer in charge of the receiving desk was deliberately indifferent to persons with inaccurate information in H.P.D. records including Joshua, by supervising H.P.D. officer Bruhn in a manner that allowed him to write an alias name, "AKA Spriestersbach, Joshua C." on Thomas R. Castleberry's warrant without confirming that the person named in the warrant, Thomas R. Castleberry, was the same person as Joshua.  Permitting officers to write alias names on warrants was consistent with the way the H.P.D. officer in charge of the receiving desk and other City supervisors exercised supervision over H.P.D. officers.

142.  H.P.D. Officer Bruhn and the H.P.D. officer in charge of the receiving desk arrested Joshua under Thomas R. Castleberry's eight-year-old bench warrant, without any probable cause.

143.   On May 12, 2017, Joshua was transported to the First Circuit Court and then later to the Department of Public Safety's ("D.P.S.") O.C.C.C., where he was again fingerprinted and his photograph was taken.

144.   Defendant H.P.D. Officers Bruhn and unknown Defendants H.P.D. Officers Does 1-5 and unknown employees Defendant Does 6-10 at O.C.C.C., failed to verify Joshua's identity by comparing his name, photo, fingerprints, and date of birth to that of Thomas R. Castleberry. By failing to verify his identity these defendants acted in violation of all applicable rules and regulations and relevant

standards of care, causing injury to Joshua. They also acted with malice and with reckless disregard and deliberate indifference to the rights of Joshua.

145.    If unknown Defendants Does 6-10, employees at O.C.C.C., had simply compared the booking photos of Joshua to the photo of Thomas R. Castleberry when he was booked at O.C.C.C., they would have discovered the misidentification of Joshua.

    



Joshua C. Spriestersbach          Thomas R. Castleberry

As evidenced by Joshua and Thomas R. Castleberry's photos above and their other identifying information, none of the identifying information of Joshua matched Thomas R. Castleberry's.

146.    Joshua remained at O.C.C.C. for approximately four months. During that entire time Joshua was never properly identified.

**L.    Defendant Public Defenders and State Hospital Defendants Fail to Verify Identify of Joshua Spriestersbach *For More than Two  Years***

147.    Defendant D.P.D. Tolan was appointed to represent Joshua.

148.    Prior to his first court hearing, Joshua told Defendant D.P.D. Tolan that

he was not Thomas R. Castleberry and had not committed Thomas R. Castleberry's crimes. He provided D.P.D. Tolan with his identifying information and told D.P.D. Tolan that he was not even on Oahu in 2006 when Thomas R. Castleberry committed his crimes.

149.    Instead of investigating or verifying his client's information, D.P.D. Tolan requested that the court order a three-doctor panel (Individual Psychiatric and Psychological Defendants Dr. John Compton, Dr. Vargo, and Dr. Tisza) to evaluate Joshua and determine his mental fitness to proceed.

150.    While Joshua was held at H.S.H. under the name of Thomas R. Castleberry and subject to competency evaluations and hearings, he was represented by *six* additional public defenders, most of whom are Defendants in this case. Namely, Michelle Muraoka, Lesley Maloian, Jason Baker, Seth Patek, and unknown Doe Public Defender Defendants 11-15. Neither Defendant Tolan nor any of these additional Defendant Public Defenders verified the identity of their client Joshua, his presence on Oahu in 2006, or otherwise acted on the information Joshua provided to establish that he was not Thomas R. Castleberry.

151.    Defendant Dr. Garrett, H.S.H. staff, and unknown Does 16-20 failed to verify Joshua's identity when he was transferred from O.C.C.C. to H.S.H. Despite having treated Joshua previously and having access to Joshua's medical records and identifying information, H.S.H. staff and doctors failed to review their own files and records to verify Joshua's identity.

152.    At H.S.H., Joshua was evaluated on multiple occasions by Individual Psychiatric and Psychological Defendants Dr. John Compton, Dr. Vargo, and Dr. Tisza. Despite being required to access and having actual access to both Joshua's legal and medical records, they failed to verify his identity. Throughout this time, Joshua continually advised them and other staff at H.S.H. of his real name and identity. These Defendants also ignored the fact that Joshua had been an occasional patient at H.S.H. under his real name – Joshua Spriestersbach – since at least 2002.

153.    From the fall of 2017 until his release in 2020 Defendant Dr. Garrett was the head of the treatment team for Joshua Spriestersbach at H.S.H. Dr. Garrett was treating Mr. Spriestersbach for restoration to competency.

154.    In the fall of 2017 Joshua met with Defendant Dr. Garrett and explained that he was not Thomas R. Castleberry, was never on probation, did not have a drug case, and was not in Oahu in 2006 when the Castleberry crimes were committed.  Dr. Garrett knew Plaintiff had been detained on the basis of Thomas R. Castleberry violating his probation. Joshua repeatedly told Dr. Garrett these things and consistently gave her his real name.

155.    For example, even Dr. Garrett's progress notes, such as that from November 3, 2017, noted he stated things like "he was never on probation or parole." As she also observed "documentation obtained confirms that his name is Joshua rather than William Castleberry, (Nov. 17, 2017 Progress note), and he repeated that "he was never on probation . . . ." (January 17, 2018 Progress Note).  As she noted on February

9, 2018, progress note, he "[c]ontinues to deny that he is on probation." Dr. Garrett also repeatedly identified the patient as "William Castleberry," which was not even the name of the person for whose probation violation Plaintiff was being held.

156.   Dr. Garrett also read the panel examiners reports of Joshua, including those set forth in Section O (ii), *infra*, stating Joshua was further repeating that he was not Thomas Castleberry, had not been on probation, and was not on Oahu in 2006.

157.   Dr. Garrett also had, by June of 2018, medical records from Joshua's prior treatment in 2006 which could not be consistent with Plaintiff being Thomas Castleberry, or Plaintiff being properly detained at H.S.H. These confirmed that Plaintiff was being treated in Hilo at Puna Medical Center in 2006 – while Thomas Castleberry was undergoing proceedings on Oahu in the criminal case at issue here, and these dates were further established in the medical examiners' reports, which Dr. Garrett read.

158.   Early in 2018 H.S.H. social worker Teri Kashiwamura also told Dr. Garrett and Joshua's treatment team that Joshua's identity was confirmed to be Joshua Spriestersbach through his birth certificate, social security card, and Hawaii identification.

159.   Dr. Garrett failed to address the fact that Plaintiff was not Thomas Castleberry even though she learned that his true identity was Joshua Spriestersbach in early 2018. As the psychiatrist at the head of Joshua's treatment team responsible for Joshua's restoration to competency, her failure to pursue verification of his identity was

in violation of all applicable rules, regulations and relevant standards of care related to restoration to competency, causing injury to Joshua.  Furthermore, at H.S.H. all staff are responsible for ensuring the accuracy of patient information, including according to its formal policy.  At hospitals generally, including state hospitals, a basic aspect of physicians' jobs is to ensure the accuracy of patient information and their identities. Dr. Garrett failed in this basic medical aspect and took no steps until 2020 to verify her patient's identity.   She also similarly determined and repeatedly opined that Joshua had a "history of cocaine use disorder" – which was not true, which he repeatedly denied, and which lacked any evidence – and which apparently stemmed from the fact of Thomas Castleberry's underlying drug charges.

160.    Further,  a psychiatrist treating a patient for restoration to competency has a duty to understand the underlying criminal case sufficiently to assess the patient's ability to know the charges against him and participate in his defense.

161.    Dr. Garrett understood that schizophrenic persons can also tell the truth, and she understood that Joshua may be telling the truth and was not Thomas Castleberry and was being wrongfully detained.  She understood that she could take minimal steps to confirm his identity if she desired to do so, and that if he was wrongfully detained her actions would cause his release.

162.    Dr. Garrett took no action until 2020 to investigate or address the fact that Joshua was not Thomas Castleberry, the person for whose probation violation Plaintiff was being detained, though she had the same information in 2020 as she had earlier,

and the same medical records which established Plaintiff could not be Thomas Castleberry as early as June of 2018.

163.    In failing to take any action – including in response to repeated statements indicating that Plaintiff was not and could not be Thomas Castleberry – Defendant Garrett acted with malice and with reckless disregard and deliberate indifference to the rights of Joshua.  There was no reasonable basis and no proper purpose served by her decision not to correct or investigate Joshua's misidentification.

164.    The Defendant Public Defenders, unknown Public Defender Doe Defendants 11-15, Dr. Garrett, Does 16-20, and the Individual Psychiatric and Psychological Defendants actually used Joshua's protests regarding his identity as evidence of his incompetency. Every single one of them had access to all of Joshua's records and files, which included Joshua's identifying information and the identifying information of Thomas R. Castleberry. Prior to January 2020, not a single person acted on the available information to determine that Joshua was telling the truth – that he was not Thomas R. Castleberry. Instead, they determined that Joshua was delusional and incompetent just because he refused to admit that  he was Thomas R. Castleberry and refused to acknowledge Thomas R. Castleberry's crimes.

165.    Joshua provided the Defendant Public Defenders, unknown Public Defender Doe Defendants 11-15, Individual Doctor Defendants, H.S.H. staff and doctors, and Does 16-20 with his name, date of birth, social security number, but they simply failed to use that information to properly identify Joshua.

166.    On or about February 26, 2018, unknown H.S.H. staff and Doctors including Does 11-15 took Joshua into the community to get copies of his social security card and his Hawai'i state identification card.

167.    Joshua was issued identification documents demonstrating to the H.S.H. that he was in fact Joshua Spriestersbach and not Thomas R. Castleberry.

168.    In spite of having conclusive proof that Joshua was not Thomas R. Castleberry, Defendant Garrett, unknown H.S.H. staff and Doctors Does 16-20, and the entire treatment team responsible for Joshua, continued to illegally incarcerate Joshua for two more years.

169.    Unknown H.S.H. staff and Doctors Does 16-20 also had a history of previously treating Joshua, but they all failed to review Joshua's records and files, failed to believe their own client and their own patient, and failed to investigate his identity whatsoever.

## M.    Joshua Spriestersbach's Identity Finally Confirmed and he is Released but Remains at Risk of Rearrest

170.    Eventually in January 2020, Defendant Dr. Garrett, a physician at H.S.H., verified that Joshua was in fact Joshua Spriestersbach and not Thomas R. Castleberry.

171.    Joshua was released from H.S.H. on January 17, 2020.  He was provided fifty cents, two copies of his birth certificate, state I.D., a social security card, and a ride right back to the homeless shelter where he was arrested on May 17, 2017, thirty-two months earlier.

172.    On or about January 20, 2020, Defendant Public Defender Seth Patek,

unknown Public Defender Defendant Does 11-15, representatives of the attorney general, and the prosecutor all met in court in an off the record session, without notice to Joshua and without him being present. These representatives discussed Joshua's release from the hospital, and worked collectively to cover up Joshua's false imprisonment and unwanted medical treatment.

173.   None of the Defendants took any steps at the time of Joshua's release, or any time after, to properly update the warrant for Thomas R. Castleberry and/or correct records that improperly list Joshua Spriestersbach as an alias for Thomas R. Castleberry and vice-versa. As of the date of this filing, the Hawai'i Criminal Justice Data Center which is maintained by Hawai'i Attorney General's office still lists Thomas R. Castleberry as an alias of Joshua Spriestersbach. Joshua therefore remains in jeopardy of once again being falsely arrested and incarcerated for Thomas R. Castleberry's many crimes., because Thomas R. Castleberry's warrant was reissued without correction by the Court after Joshua was released from H.S.H.

174.    It was not until after Joshua was released that the State of Hawaii's Data base had, for the first time, listed Thomas R. Castleberry with the alias of Joshua Spriestersbach. Thomas R. Castleberry never had or used the alias name of Joshua Spriestersbach.

175.   On information, and belief, the database was altered as an attempt to cover-up, explain and excuse the gross miscarriage of justice that was done to Joshua.

//

### N.      Failures By Defendant Individuals and Institutions

176.      At all times relevant to this case the Defendants acted recklessly,

willfully and with deliberate indifference to the rights and health of Joshua. Defendants,

individually and collectively, owed a duty to Joshua and breached their duty to Joshua

by failing to investigate and confirm his identity so that he would not be unlawfully

held in custody for someone else's crimes.

177.      At all times relevant to this action the City had a practice of authorizing

warrants to be amended by officers, including officers in charge of the receiving desk,

without authority from the issuing Court; of failing to correct the records after

discovery that persons have been arrested improperly on warrants for other individuals;

of failing to properly investigate the identity of houseless and mentally ill persons that

are arrested; and of failing to correct the records of houseless and mentally ill persons

who have been improperly arrested. These practices and customs were the moving

force behind Joshua's improper arrest and detention.

178.      In wrongfully arresting Joshua on May 11, 2017, the City acted through

someone authorized to act on its behalf, H.P.D. the officer in charge of the receiving

desk, who expressly directed that Joshua be arrested as Thomas R. Castleberry on the

2009 warrant for Thomas R. Castleberry, even though Joshua was obviously not

Thomas R. Castleberry and was not therefore responsible for any of the wrongful acts

listed in the warrant.

179.      In wrongfully arresting Joshua on May 11, 2017, the City was acting

pursuant to its practice or custom of relying on and not correcting personal identification data known to be wrong including data in its case reporting system, digital notebook, arrest reports, incident reports, and other records.  This reliance on personal identifiers and photos known to be wrong was the moving force behind and caused individuals including Joshua to be arrested falsely for crimes the individuals did not commit.  Joshua was just one victim of this policy and practice. His personal information was repeatedly and erroneously entered and retained following police interactions in 2009, 2010, 2011, 2012, 2015, and 2017. On information and belief there were many other similar victims.  Indeed, shortly after Joshua's lawsuit, another mentally ill man was detained at H.S.H. under similar circumstances following an arrest by H.P.D. officers even though H.P.D. police records and data about the arrested man demonstrated that he could not possibly be the suspect, who was decades younger, causing the detained man to be held without basis in H.S.H just like Joshua.

180.    The H.P.D. officer in charge of the receiving desk made a decision on May 11, 2017 to arrest Joshua on the 2009 warrant for Thomas R. Castleberry.  That decision was not further reviewed in the City before Joshua went to court and it binds the City.  That decision was the moving force behind the constitutional violation suffered by Joshua.

181.    At all times relevant to this action, the City has failed to train, retrain, discipline, and supervise H.P.D. officer Braun, Defendant H.P.D. Officers Does 1-5, the H.P.D. officer in charge of the receiving desk, and other officers who have interacted

with Joshua to make sure they determine exactly who they are arresting and to make sure accurate information is entered in the in the City records, particularly when the officers are interacting with mentally ill and/or houseless members of the community. These practices and customs and failures to train, retrain, discipline and supervise H.P.D. officers were the moving force behind Joshua's improper arrest and detention and the constitutional violations suffered by him.

### O.   OPD Involvement in *State of Hawaii v. Thomas R. Castleberry*, Case Number 0611421 ("Castleberry Case")

### i.   *OPD's Representation of Thomas Castleberry*

182.   The criminal case docketed against Thomas R. Castleberry on July 17, 2006, ("Castleberry case") alleged that on June 30, 2006, Mr. Castleberry used a vehicle without permission, promoted a dangerous drug, used drug paraphernalia, drove recklessly, and for open container containing intoxicating liquor.   (OPD_TC_204-06).

183.   OPD represented Thomas R. Castleberry and appeared on several occasions between 2006 and 2009, before representing Mr. Spriestersbach in the same case. (OPD 273-87). Defendants Lesley Maloian and Michele Muraoka represented Thomas Castleberry in the Castleberry case during this time.  (E.g. OPD 328-33; 334, 342).  Defendant Maloian was the lawyer primarily responsible for the Castleberry case.

184.   The first docket entry in the case, July 17, 2006, references the relevant Honolulu Police Department reports. (OPD 271).  OPD, through Defendant Maloian, possessed the same police reports. These documents, and others maintained by

Defendant Maloian, contain numerous pages identifying the real Thomas Castleberry. (See generally, e.g. OPD_TC_27-215, 238, 251-65, 287-316, 329-391). These documents include photographs of the real Thomas Castleberry, and several pieces of unique information identifying the real Thomas Castleberry such as his social security number, his date of birth, OBTS A#, Operator's License and State ID, FBI number, signature, height, weight, eye and hair colors, and rap sheet.  (*Id.*) Defendant Maloian and OPD's documents regarding the case also include the real Thomas Castleberry's testimony, and details about the incident underlying his criminal prosecution. (OPD_TC_216-31, 235-237, 258-61).

185.   Several proceedings in the Castleberry case occurred during 2006, with Mr. Castleberry making appearances while in custody at a number of them.  (E.g. OPD 273 [7/27/2006]; 274 [9/20/2006]; 275 [10/13/2006]; 276 [11/14/2006]; 277 [12/07/2006]) On December 7, 2006, a guilty plea was entered for Mr. Castleberry in the case, where the Court found that the Defendant understood the nature of the charges against him and the consequence of his plea.  (OPD 276-77).

186.   The court entered a judgment of conviction on June 29, 2007, at the hearing for which Mr. Castleberry was present. (OPD 279).   Mr. Castleberry was sentenced to five years "HOPE" probation with various conditions. [2]  (E.g. OPD 279.)

187.   At this point, Mr. Castleberry had been in custody on Oahu, at Oahu Community Correctional Center ("OCCC") from July 3, 2006, through June 28, 2007.

---

[2] HOPE Probation is a program created by Hawaii's judiciary for a particular supervision of a person on probation.  (E.g. Bento Dep. Tr. 34:18-35:12).

(E.g. OPD 74).

188.   On December 14, 2007, Mr. Castleberry allegedly failed to report to his probation officer and for random drug testing. (OPD_TC_67-68).   On December 18, 2007, a bench warrant issued for Mr. Castleberry's arrest for failure to comply with the terms of probation.  (OPD 281).  On January 13, 2009, an executed bench warrant was received, and a hearing on a motion for revocation of probation and resentencing was set for February 5, 2009. (OPD 282).

189.   On February 5, 2009, Defendant Maloian appeared with Mr. Castleberry present.  (OPD 283).  At that hearing, the court found an inexcusable violation of a material condition of probation, and continued resentencing. (OPD 283) On March 23, 2009, the court resentenced Mr. Castleberry with various terms, including probation for five years.  (OPD 284-86).

190.   On May 28, 2009, a motion was filed to modify the terms of probation in light of Mr. Castleberry allegedly failing to report for random drug testing. Accordingly, on June 3, 2009, Mr. Castleberry appeared with Ms. Maloian and stipulated to a violation of the terms of his probation.  (OPD 286-87, OPD TC_32). The court found again an inexcusable and material probation violation. (OPD 287, OPD_TC_201-02).  A bench warrant for Mr. Castleberry's arrest issued on July 24, 2009 (OPD 287), which was duplicated in 2014. (OPD 287, OPD 1).  This was the warrant for which Plaintiff was arrested, as addressed below.

//
//

ii.   **OPD Representation of Mr. Spriestersbach in the Castleberry Case.**

191.   Mr. Spriestersbach was arrested by the Honolulu Police Department ("HPD") on May 11, 2017 for Mr. Castleberry's bench warrant and taken to Oahu Community Correctional Center ("OCCC") after his arraignment, where he was admitted as "Thomas Castleberry."

192.   Thereafter the court ordered Thomas Castleberry to appear for a hearing concerning his failure to comply with the terms of his probation. (OPD 2). Mr. Spriestersbach remained in custody and was taken to this appearance.

193.   OPD's designee testified that OPD lawyers are aware their clients may be misidentified.  (Bento Dep. Tr. 103:21-105:5 ("Those attorneys have all been made aware of these particular issues.  Some of them have experienced it themselves handling other cases, especially in our district court cases where sometimes family members use each others' names and try to confuse the police, that sort of thing.")

194.   Any and every reasonably competent public defender's office expects that as a function of their attorneys' representation of a client these attorneys would raise and cause to be investigated the fact that their client was incorrectly detained on another person's warrant.  This expectation applies as a fundamental, minimum expectation for the performance of lawyers covering probation and fitness to proceed proceedings such as those here.  There is no exception for the fact that Mr. Spriestersbach was being held for fitness to proceed matters; indeed the obligation of any attorneys representing him in such proceedings to correct a possible error is

particularly weighty in such circumstances.  Correcting a misidentified client in these circumstances is not a matter of policy, but a usual duty which any reasonable and competent counsel is expected to perform.

195.   Even OPD's designee and person most knowledgeable testified that if there were indications that a client was misidentified, he purportedly expected OPD lawyers would "do everything we could" to investigate a misidentification, and that OPD lawyers "would know" to try to establish whether identification was proper.  Each of the OPD Defendants fell far short of this basic expectation of representation of their clients with respect to Mr. Spriestersbach, by failing to do anything about his complaints to them that he was not or could not be Thomas Castleberry or records that clearly confirmed this was true.  There was no reasonable basis or proper purpose supporting the OPD Defendants' decisions to take no minimal action to correct Joshua's misidentification.  In taking no action to correct the fact that Joshua was misidentified, and in the contexts outlined in more detail below, each of the OPD Defendants acted intentionally, maliciously, and in reckless disregard of Joshua's rights.

196.   On June 14, 2017, DPD Tolan appeared in the Castleberry case, *State of Hawaii v. Thomas R. Castleberry* (Case Number 06-1-1421) (OPD 12, 3). The named Defendant in the case was Thomas R. Castleberry and the person produced for the hearing was Mr. Spriestersbach.  The judge referred to the Defendant as Thomas R. Castleberry. DPD Tolan argued for a three-panel medical evaluation of the defendant,

which the court granted.  (OPD 288).  Mr. Spriestersbach told DPD Tolan that he was

not Thomas R. Castleberry, and that he had never been on probation, and that he would

get a birth certificate to establish his identity.  Mr. Spriestersbach repeatedly told the

various public defenders representing him the difference between him and Mr.

Castleberry. He also told them that his real name was Joshua Spriestersbach.

(Spriestersbach Vol. I 81:1-3.)  He told them these things at every interaction with his

public defenders prior to court.

197.    The three medical examiners issued reports on August 30, 2017, about Mr.

Spriestersbach which were filed with the court.  One of the reports stated that Joshua

told the examiner his name was Joshua Spriestersbach, that he did not think it was him

on the order,  that he was not even on Oahu in 2006 and he had no idea he was on

probation so the order could not be for him.

198.    The reports also confirmed Mr. Spriestersbach's statements were accurate.

Another stated that Mr. Castleberry was hospitalized at Hilo Medical Center when

Thomas Castleberry would have been detained on Oahu at OCCC.  The last

emphasized that Joshua understood the seriousness of the legal status but could not see

any relationship between them and his actions, and that he was frustrated from a lack of

help in dealing with this.

199.    On September 5, 2017, Defendant Muraoka appeared in the case.  She

stated to the court that she read these documents.  (Transcript of Recorded Proceedings,

9/5/2017 at 2:15-21).  The court found that Mr. Spriestersbach was unfit to proceed in

the proceedings and committed Mr. Spriestersbach to be placed at Hawaii State Hospital without authorization to leave barring a court order, and appointed examiners to determine his fitness to proceed. (OPD 290).

200.   On November 3, 2017, Dr. Garrett wrote a letter stating that "Mr. Castleberry" has been doing very well and has been clear and coherent, and that the court should evaluate his fitness. (SPPD 48).

201.   Defendant Maloian appeared at a fitness review hearing on November 7, 2017. (OPD 82).  At the hearing she stated that she read Dr. Garrett's letter. (Transcript of Recorded Proceedings, 11/7/2017 at 2:13-18).  The City's designee and person most knowledgeable testified that OPD training was that "when you're representing somebody and there is a 704 evaluation, you read the letters of the examiners." (Bento Tr. 234:15-235:6).  These would have included the letters above.

202.   On November 7, 2017, the court determined that the defendant was unfit and appointed an examiner to determine Mr. Spriestersbach's fitness to proceed with the Castleberry proceedings.  (OPD 291-92).

203.   Dr. Vargo wrote a letter to the Cout dated January 17, 2018.  She repeated that Mr. Spriestersbach was hospitalized in the Hilo Medical Center on June 6, 2007. (SPPD 58).  She noted that Mr. Spriestersbach continues to do well, and had linear thinking and improving insight and judgment.  She stated that he told her his true first and last name, that he did not understand the charges, and repeatedly insisted that he did not believe he had ever been on probation.

204.   DPD Miyamoto appeared on 1/18/2018 for further fitness to proceed proceedings.  (OPD 291).  The court found the Defendant not fit to proceed, and had Mr. Spriestersbach remanded into custody.  (OPD 291).

205.   On March 29, 2018, Dr. Garrett wrote that she believed Mr. Spriestersbach was unfit and that it may take a few months to stabilize and assess.  (SPPD 65)  On April 3, 2018, the court held a fitness review hearing with DPD Komagome present, who reportedly reviewed the letter.  (OPD 292).

206.   Terri Kashiwamura testified that by early 2018, the H.S.H. treatment team had Mr. Spriestersbach's birth certificate, social security number, and state ID. (Kashiwamura Dep. Tr. 18:13-19:3).  Teri Kashiwamura attended the majority of the 2017-2020 hearings.  She stated that at one of these, she brought a copy of Mr. Spriestersbach's birth certificate, social security card, and state ID, and informed the public defender that she had these, and that they show his name as Joshua Spriestersbach. (Kashiwamura Dep. Tr. 19:22-21:11).  No OPD employee made any effort to verify the information.

207.   On July 3, 2018, Dr. Garrett wrote another letter to the court stating that Mr. Castleberry had not improved and that it may take several additional months to know if he was responding to medication.  (SPPD 66). On July 10, 2018, the court set a fitness review hearing for October 9, 2018.  (OPD 292).  DPD Lianne appeared for OPD, with Mr. Spriestersbach by video at HSH.  (OPD 292).

208.   On October 5, 2018, Dr. Garrett wrote a letter stating that Mr. Castleberry

53

had not improved, but there were no current grounds for an OTT ("Order to Treat"), so he should be re-valuated for restorability.  (SPPD 67). On October 9, 2018, the court held a hearing in which it decided to order a three panel examination of Mr. Spriestersbach. (OPD 293) DPD Giventer appeared.  (OPD 293).

209.   The three panel evaluators submitted three more letters in early December, 2018.  One underscored that Joshua still wanted to be referred to as Joshua and not Thomas Castleberry, but the examiner was only referring to him as Castleberry given the proceedings.

210.   Another letter to the court dated December 12, 2018 states again that Mr. Castleberry was hospitalized at Hilo Medical Center on June 6, 2007, and that Mr. Castleberry ended the interview because he was too upset to discuss his legal situation.

211.   The letters suggested that Mr. Spriestersbach was not fit to proceed in the criminal proceedings and he was unlikely to attain fitness.  (E.g. SPPD 75; SPPD 79; SPPD 84).

212.   On December 19, 2018, the there was a court hearing in which the prosecutor sought a contested hearing regarding Mr. Spriestersbach's fitness to proceed, with DPD Esser appearing.  The  court set a contested hearing for February 6, 2019.  (OPD 294).

213.   On January 28, 2019, the court held a status conference. (OPD 294). Defendant Baker stipulated to the examiners' December reports.  He stated that he would have read these reports.

214.   On February 6, 2019, Jason Baker appeared on behalf of Mr. Spriestersbach, requested no contested hearing, and stipulated that Mr. Spriestersbach was unfit to proceed, and would be committed. (OPD 295).  Defendant Baker stated that he would have reviewed the letters from the examiners, at least those most proximate to the hearing, and communicated with the client before the hearing. (Baker Dep. Tr. 99:23-18) The court found Mr. Spriestersbach unfit to proceed, setting a hearing for May 7, 2019.  (OPD 295)

215.   Dr. Vogel wrote a letter to the court on April 30, 2019, stating that Mr. Castleberry appeared unlikely to improve.  (SPPD 113).  On May 7, 2019, the court held a hearing at which DPD Melanie appeared, and the court ordered an examination toward likelihood of restoration the next day.  (OPD 296).

216.   On May 24, 2019, the Director of Health and Public Safety moved for an order authorizing treatment over the patient's objection.  (OPD 296).  Defendant Baker (nor any other OPD employee) appear to have made any written opposition to the motion to medicate Plaintiff against his will.  On June 4, 2019, the court held a hearing regarding the order to treat Mr. Spriestersbach over his opposition.  (OPD 297).  Defendant Baker appeared for OPD.  (OPD 297).  Defendant Baker stated that he does not recall what he did review or did not review to prepare for this hearing.  (Baker Dep. Tr. 129:6-11).  Defendant Baker stated that in appearing for a this hearing, he would have reviewed the examiner's reports, at least the most recent ones, given prior issues of mental health or other history may be relevant depending on what's in those reports.

(Baker Dep. 116-17).

217.   On June 4, 2019, the court granted an order authorizing treating Mr.

Spriestersbach against his will for one year.  (OPD 295-96).

218.   On July 15, 2019, the court held a fitness to proceed hearing.  (OPD 299).

Defendant Patek appeared in the case, and deferred to the court with respect to a further

continuance in the proceedings.  (OPD 299).

219.   Prior to the hearing  an examiner wrote a letter to the court on July 22,

2019 noting again that Mr. Castleberry was hospitalized at Hilo Medical Center on June

6, 2007, again showing that he could not be Thomas Castleberry who was incarcerated

in Oahu during this time awaiting his judgment in the proceedings at issue in this case.

220.   On August 12, 2019, the court held a fitness hearing, with Defendant

Patek appearing.  (OPD 300).  The court discussed the preceding three letters from the

examiners and found Mr. Spriestesrsbach unfit to proceed.  (OPD 299-300).

221.   On October 24, 2019, Dr. Taha from Hawaii State Hospital wrote that Mr.

Spriestersbach's mental health improved, also noting that he had a good understanding

of the legal process including his violation.  (SPPD 219). Defendant Patek again

appeared on October 29, 2019 in the case, and the court ordered a three panel

examination.  (OPD 301).

222.   One of the three examiners wrote a letter to the court dated December 29,

2019 in which she stated in bold and asterisk flagged sentences that she reviewed the

legal history concerning Thomas Castleberry and he insisted none of it was possible

56

because Joshua was not even in Hawaii until 2007.  The other likewise emphasized in

bold and asterisk that the medical unit confirmed by birth certificate Joshua's name was

Joshua Spriestersbach.

223.   On December 30, 2019, the court held a fitness hearing.  (OPD 302).

Defendant Patek appeared in the case.  (OPD 302). Defendant Patek stated he would

have reviewed the December letters from the examiners.  (Patek 156:22-157:13).

Defendant Patek estimates he's aware of ten times during his tenure that a defendant

was misidentified.  (Patek Dep. Tr. 219:18-220:2).

224.   Defendant Patek neither participated in nor asked for any investigation

into his client's identity, nor engaged in any kind of investigation in relation to the case.

(Patek Dep. Tr. 125:18-126:3).

225.   Dr. Garrett testified that on January 2nd, 2020, she left a message with a

public defender stating that Mr. Spriestersbach was telling her he couldn't have been

responsible for the crimes at issue, and that he was in California at the time. (Garrett

Dep. Tr. 227:9-15, 232:16-18.).  Her note confirms:

"He also provided consent for this writer to talk to his public defender as he described
being very frustrated with not being able to talk to his lawyers before hearings and
feeling the lawyer didn't answer questions but only told him what was going to happen.
This writer left a message with his public defender that day [January 2, 2020] regarding
the patient's desire to speak to him and his report that he could not have committed the
crime in question as he did not live in Oahu at the time.  This writer did not receive a
call  back."(Spriestersbach_Hawaii_State_Hospital_39).

226.   On January 22, 2020, the Cout had a hearing, at which Mr. Patek

appeared.  (OPD 303)  The court informed Mr. Patek that Mr. Spriestersbach had not

been Mr. Castleberry, and they released him, and that Defendant Patek should tell his supervisor.  (Patek Dep. Tr. 209:5-23)  Defendant Patek states he told his supervisors what happened.  (Patek Dep Tr. 210:22-211:2).   Defendant Patek did not ask how the misidentification happened, or ask this of his supervisors, nor did he ever try to locate or contact Mr. Spriestersbach after the hearing.  (Patek Dep. Tr. 211:3-23).  Defendant Patek is not aware of OPD taking any steps to ensure a misidentification like this one would not happen again.  (Patek Dep. Tr. 214:25-215:10).

### iii.    OPD Communications with Mr. Spriestersbach

227.   In addition to repeatedly telling his public defenders that he was not Thomas Castleberry and addressing the difference, Mr. Spriestersbach tried calling the office of the public defender, including attempting to reach Seth Patek and Michele Muraoka, repeatedly but they would not answer the phone and the answering machine was full.  (Spriestersbach Dep. 77:21-78:5, 87:3-90:3).

228.   Mr. Spriestersbach did not remember receiving any calls from a public defender, and does not recall ever visiting with the public defender outside of meetings for court. (Spriestersbach Dep. 90:4-16). Mr. Spriestersbach only interacted with OPD public defenders at the window prior to court where he was only able to do so briefly. (Spriestersbach 82:24-83:13, 81:16-19).  OPD has no records recording communications with Mr. Spriestersbach or communicating with Mr. Spriestersbach outside of court. (Bento Dep. Tr. 235:11-236:4).  Dr. Garrett also noted Mr. Spriestersbach's frustrations with his attorneys in different notes, including the one

identified above.

### P.     OPD's Prior Representation of Thomas Castleberry and Joshua Spriestersbach.

229.   OPD represented the real Thomas Castleberry in at least five cases.[3]

Michele Muraoka appears to have appeared for Mr. Castleberry in two of those cases.

OPD 342, OPD 323.

230.    OPD had represented Joshua Spriestersbach in at least three criminal

cases prior to the one underlying this lawsuit.  Defendants Tolan (OPD 313, 314) and

Baker (OPD 315) appear to have represented Mr. Spriestersbach in these cases.

Photographs of Mr. Castleberry were available to any OPD lawyer in OPD case files.

### Q.     OPD Policies and Systems

#### i.     *General Background to OPD's Systems and Procedures in HOPE Proceedings.*

231.   According to OPD's person most knowledgeable, where a client is

approved for representation with OPD in a felony case such as the Castleberry case, the

client is assigned to a specific attorney that has the primary responsibility for

representing the client.  (Bento Dep. Tr. 30:7-14).  However, he testified that this

lawyer no longer has that responsibility once HOPE proceedings commence. (Bento

Dep. Tr. 30:16-20).  At that point, primary responsibility shifted to the attorneys who

---

[3] EKokua Docket for *State of Hawaii vs. Thomas R. Castleberry* (Case No. …..0389)
and EKokua Docket for *State of Hawaii vs. Thomas R. Castleberry* (Case No.
…..0793) and EKokua Docket for *State of Hawaii vs. Thomas R. Castleberry* (Case
No. …..0795) and EKokua Docket for *State of Hawaii vs. Thomas R. Castleberry*
(Case No. …..0796) and EKokua Docket for *State of Hawaii vs. Thomas R.
Castleberry* (Case No. …..0810).

were addressing all HOPE probation cases at the time. (Bento Dep. Tr. 30:21-32:10).

232.   When a HOPE lawyer takes on a case, they are not expected to contact the lawyer who previously had primary responsibility for the case.  (Bento Dep. Tr. 135:24-136:8).  OPD rotated attorneys through HOPE proceedings on around a six-month basis.  (Bento Dep. Tr. 33:18-22) OPD did not keep specific records as to who the HOPE attorneys were during these times. (Bento Dep. Tr. 33:3-8.).[4]

233.   According to Mr. Bento, Lesley Maloian had primary responsibility for the case prior to the HOPE probation violation proceedings. (Bento Dep. 61:6-10.)  OPD's physical case file and the documents relating to Thomas Castleberry's criminal case were kept and stored by the lawyer with primary responsibility for the case (Maloian), and that file was allegedly not transferred to HOPE probation attorneys involved in the proceedings after 2017.  (Bento Dep.  29:4-19, 37:23-38:7.)

234.   Mr. Bento does not recall seeing any HOPE file for this case.  (Bento Tr. 90:7-18). There was allegedly no digital file for the Castleberry case.  (Bento Dep. Tr. 38:14-21).  Mr. Bento testified that initially, HOPE lawyers did not maintain physical files for their clients, and that they would keep notes or forward documents when they thought it was relevant, but HOPE files were not opened until some point between 2017

---

[4] Mr. Bento also noted that judges will go often grab any available  lawyer from the public defender's office and ask them to come in and cover a hearing, meaning it may not even be a HOPE lawyer covering HOPE proceedings.  (Bento Dep. 159:24-160:16).  If there's to be a further hearing, then it would be up to the HOPE attorney or whatever attorney appeared in court to provide the next court date and that information by whatever means they wished. (Bento Dep. 160:22-161:5)

and 2020. (Bento Dep. Tr. 84:7-85:4, 112:10-19).[5] Information about HOPE clients was also not consolidated anywhere between 2017 and 2020.  (Bento Dep. Tr. 89:7-10).

235.   OPD has no central case file management or storage system that collected closed files, individual lawyers held those files until they were destroyed (whenever the lawyer thought that was necessary.) OPD has no computerized case management system, and no kind of centralized repository for notes of anything about what happens with a particular case.  (Bento Dep. Tr. 144:8-145:12).  OPD did not maintain a calendar system to alert attorneys as to hearings or other important events in a case and there was not one in the Castleberry case.  (Bento Dep. Tr. 110:3-11, 145:13-146:11).

236.   Mr. Bento testified that if an OPD attorney thought that a document was relevant in his representation of a HOPE client, OPD's expectation was that the attorney would save such information however he saw fit; OPD had no policy or anything of that nature.  (Bento Dep. Tr. 88:16-89:5, 112:1-8).

### ii.   *OPD Policies and Systems Regarding Recording, Communicating, and Retaining Relevant Information.*

237.   OPD lawyers are trained to write in what OPD calls an "amicus" sheet if they feel that information is important or relevant or needs to be preserved.  (OPD 92:13-21).  There is no case management system that would allow lawyers to access this kind of information digitally.  (Bento Dep. Tr. 93:13-94:12) HOPE lawyers could also save information as they wish, either saving it for themselves or passing

---

[5] In Mr. Bento's view, there was no need to maintain a file on a client until there was a finding of fitness. (Bento Dep. Tr. 118:16-19)

information to another HOPE attorney as notes.  (Bento Dep. Tr. 94:4-11).

238.   Mr. Bento testified as follows:

Q. In the case of HOPE there were – it was a temporary assignment of six months; is that correct?
A. Approximately, yes.
Q. So if there were relevant proceedings after that six months, how would a HOPE attorney make sure that any lawyers working thereafter would have access to relevant information that the first attorney discovered?
A. Well as I said there would be – you know, the attorneys are very good at giving information to anybody that's going to be taking over the case.  And so they find some means of passing – relevant or important information on to the next attorney, either in writing or orally, by putting in notes or an amicus page.  How it was done in this case, I cannot tell you because, again as I said earlier, I could not locate a physical HOPE file."

Bento Dep. Tr. 96:5-97:3.

239.   For a HOPE lawyer representing a client that HOPE lawyers represented before, OPD did not keep any record of who the prior HOPE lawyers were.  (Bento Dep. Tr. 33:3-8.).  There were no HOPE files at least for some time and there was no HOPE file here.

240.   Mr. Bento testified that OPD lawyers knew what to log because they knew what was relevant, and what might be subsequently needed.  (Bento 174:19-175:3).  They were not provide any training on this. (Bento 174:19-175:3).

241.   OPD's designee testified that for HOPE proceedings, one HOPE attorney was always available to run to the court to see if there was going to be a hearing about any of OPD's HOPE clients, and do everything they could to investigate and adjudicate the issue if it was known to them.  (Bento Dep. Tr. 145:18-146:11) There are no sorts of policies about how lawyers are to be apprised of Defendants in a HOPE Probation

case. (Bento Dep. Tr. 110:13-18).

242.   OPD's designee stated the following about OPD's policies for retaining

relevant documents:

Q. Do you know how any retention policies that OPD had were communicated to OPD lawyers?
A. No, except there was a general policy that you were to retain your files until told otherwise.
Q. And how was that communicated to OPD lawyers, if it was?
A. Just through the supervisors.  I remember being told that myself.  And, you know, you spread the word and other people ask the same questions sometimes.  There may have been an email or a memo along the way, but I don't recall.   All I know is that's what I've been taught and that's what I teach.

Q. Were OPD lawyers told that they should retain emails about a case until told otherwise?
A.    Not that I know of, no.
Q. Did they receive any instruction about what emails related to a case that they should retain?
A. No, not that I know of. . . .

Q. Okay.  But they don't receive any training from OPD as to when they should or shouldn't save [emails].)
A. No.
(Bento Dep. Tr. 183:20-185:11)

243.   OPD's designee stated that he was unaware of any particular amount of

time that case documents must be retained at OPD, though he understood that OPD

preserves documents consistent with whatever ethical rules require.  (Bento Dep. Tr.

176:7-177:8).  He did not know the preservation the ethical rules require.  (Bento Dep.

Tr. 177:2-8).  The other Public Defenders deposed did not know any specific retention

policy for OPD.  (Patek Dep. Tr. 116:19-117:4; Baker Dep. Tr. 70:8-18).

244.   OPD's designee was not aware of OPD ever reviewing the kind of

information its HOPE lawyers were recording about their cases, taking any step to assess whether its lawyers were properly recording information, or to assess whether they were transmitting information to subsequent lawyers that they should.  (Bento Dep. Tr. 138:18-140:4).

### R.    *HOPE Lawyers' Access to Relevant Documents.*

245.    OPD lawyers could access prior proceedings to print minutes from a hearing.  (Bento Dep. Tr. 39:4-9, 85:22-86:3).  They could also pull documents filed in the case, including panel letters regarding competency. (Bento Dep. Tr. 86:9-87:12). They could also pull numerous documents identifying the real Thomas Castleberry, including his photographs, his social security number, his date of birth, OBTS A#, Operator's License and State ID, FBI number, signature, height, weight, eye and hair colors, and rap sheet, including from OPD's own files and the case file in the Castleberry case.

246.    Mr. Bento testified that had lawyers on HOPE probation wanted to retrieve the original case file in this case, there was no reason they could not have retrieved the file.  (Bento Dep. Tr. 141:18-142:17).  Given there was no set policy or storage place for files, however if a HOPE attorney wanted to find information from the underlying case, he would have to obtain the help of a supervisor to locate the file.  (Bento Dep. Tr. 142:20-143:8). They could also pull documents filed in the case, including panel letters regarding competency. (Bento Dep. Tr. 86:9-87:12).  OPD lawyers could also access prior proceedings to print minutes from a hearing.  (Bento Dep. Tr. 39:4-9,

85:22-86:3).

247.  OPD's designee testified that the information that a person working HOPE cases would typically receive in a proceeding related to revocation of probation would be the motion for revocation, with the probation officer's declaration, and typically the judgment of the original sentencing and the terms and conditions of probation, along with the alleged violations of probation, and an order pertaining to bail.  (Bento Dep. Tr. 39:24-40:22, 82:18-83:13).  Mr. Bento testified that the latest and controlling sentencing order would normally be handed to HOPE attorneys.  (Bento 165:18-166:8).  Such documents in the case for which Mr. Spriestersbach was being held appear to have Mr. Castleberry's identifiers, including his social security number and date of birth.  (See, e.g. OPD_TC_0039).

248.  OPD also maintains a database in which an employee could type a client's name and get a page that shows the information OPD had at the time the file was opened, which can include a date of birth, social security number and addresses.  (Bento Tr. 76:5-78:120). OPD lawyers are taught that they can access such information by clicking on the server and searching by name. (Bento Dep. Tr. 82:1-11).

**R. OPD Training Regarding Serving Clients with Mental Disabilities.**

249.  Mr. Bento is not aware of any training for OPD lawyers concerning mental disabilities other than situations how and when fitness to proceed proceedings may be instituted, and whether mental illness is a mitigating factor or guiding a client to seek mental health treatment.  (Bento Dep. Tr. 203:16-207:7).  OPD does not have any

specific training on identifying clients with mental disabilities.  (Bento Dep Tr. 207:8-208:25)

250.    OPD's designee is not aware of any OPD training concerning persons with mental illness whom counsel might find difficult to understand or credit because of their illness.  (Bento Dep. Tr. 209:12-210:16)

### S. Efforts to Address Mr. Spriestersbach's Misidentification.

251.   OPD's designee testified that if a person said that he was not the person wanted on a warrant, his understanding was that a lawyer would seek out different means of identification, such as a photograph, or have the person fingerprinted. (Bento Dep. Tr. 190:18-192:16.).  OPD's designee did not know of any particular training regarding the fact that a client had been misidentified as the defendant in a case. (Bento Dep. Tr. 126:7-127:16.)

252.   There is no record of any documents reflecting attempts by any OPD attorney  to ask Mr. Spriestersbach any question pertaining to his identity. (Bento Dep. Tr. 133:12-17), nor OPD lawyers ever raising with Mr. Spriestersbach the statements he was alleged to have made to medical examiners indicating the charges here were not his. (Bento Dep. Tr. 134:17-135:13).

253.   No OPD lawyers investigated Mr. Spriestersbach's identity through confirming it with him, comparing biographical data, photographs against what Mr. Spriestersbach looked like, or his fingerprints. (195:22-197:3).

254.   OPD's designee stated he was not aware of any changes in policies

because of the events of the case.  (236:21-238:3.)  He testified that he was not aware of anyone being disciplined in connection with the events of the case.  (Bento Dep. 236:14-20).

### T.   Joshua Spriestersbach's Physical and Mental Injuries

255.    As a direct, proximate and/or legal result of the individual and/or collective negligence, recklessness, malice and deliberate indifference, and/or other fault of the Defendants, Joshua suffered special and general economic and non-economic damages to be proven at trial, including forced medical treatment and medication and side effects from that medication, loss of freedom, great mental anguish, severe emotional distress, anxiety, embarrassment, humiliation, worry, and anger.

**FIRST CLAIM FOR RELIEF**
**42 U.S.C.  § 1983 - VIOLATIONS OF U.S. CONST. AMEND. IV**
**(Against H.P.D. Officer Defendants, City, D.P.S., and Medical Defendants)**

256.    Joshua restates and incorporates by reference the foregoing paragraphs as if each paragraph was fully set forth herein, including but not limited to paragraphs 1-255.

257.    In wrongfully arresting Joshua on May 11, 2017, the City acted through someone authorized to act on its behalf, the H.P.D. officer in charge of the receiving desk, who expressly directed that Joshua be arrested as Thomas R. Castleberry on the 2009 warrant for Thomas R. Castleberry, even though Joshua was obviously not Thomas R. Castleberry and was not therefore responsible for any of the wrongful acts

listed in the warrant.

258.     On information and belief, the H.P.D. officer in charge of the receiving desk directed H.P.D. officers in numerous instances to proceed with false arrests in addition to that of Joshua by writing the name of a person they arrested over the face of a warrant for a different individual without properly verifying that the person arrested is in fact the one who was wanted in the warrant. The City was on notice that false arrests of various persons had occurred due to the conduct of H.P.D. officers in charge of the receiving desk prior to the arrest of Joshua.

259.     In wrongfully arresting Joshua on May 11, 2017 the City was acting pursuant to its practice or custom of relying on and not correcting personal identification data known to be wrong including data in its case reporting system, digital notebook, arrest reports, incident reports, and other records. This reliance on personal identifiers and photos known to be wrong was the moving force behind and caused individuals including Joshua to be arrested falsely for crimes these individuals did not commit. Prior to the arrest of Joshua, the City was aware that this custom or practice was causing persons to be falsely arrested.

260.     H.P.D. Officer Defendants, City, D.P.S., and Medical Defendants knew or should have known that Joshua was not Thomas R. Castleberry. Despite that knowledge, Defendants unreasonably and without cause arrested and detained Joshua in May 2017.

261.     Does 6-10, who were on information and belief employees of the D.P.S.

68

at O.C.C.C., caused Joshua to be detained without probable cause beginning in 2017 after Joshua's arrival at O.C.C.C. There was no reasonable basis to detain Joshua, and indeed the O.C.C.C.'s own booking photographs showed that Joshua was not Thomas R. Castleberry.

262.    Medical Defendants (Dr. Allison Garrett, Dr. John Compton, Dr. Melissa Vargo, Dr. Sharon Tisza, and Does 16-20) caused Joshua to be detained beginning in 2017, when Joshua was subjected to their evaluation and treatment. They failed to verify Joshua's identify despite Joshua continuously advising them that he was not Thomas R. Castleberry, and despite these Defendants having the correct medical information, including records of previous treatment of Joshua. These defendants acted with deliberate indifference to Joshua's serious medical needs. Further, their response to his medical needs was objectively unreasonable.

263.    As set out above in paragraphs 1-181, the City is liable for these Fourth Amendment violations due to its longstanding customs, policies, and practices which caused the misidentification and arrest of Joshua without probable cause and with knowledge that he was misidentified.  As a proximate result of Defendants' acts and omissions, Joshua was arrested, detained, and suffered the injuries discussed above.

264.    In engaging in the inactions and actions alleged, the Defendants listed in this claim acted under color of law and acted maliciously, oppressively, and/or in reckless disregard of Joshua's constitutional rights, and are liable for punitive damages.

## SECOND CLAIM FOR RELIEF
## 42 U.S.C. § 1983 - VIOLATION OF DUE PROCESS,
## U.S. CONST. AMEND. XIV
### (Against H.P.D. Officer Defendants, City, Individual Non Public Defender Defendants, and Medical Defendants)

265.    Joshua restates and incorporates by reference the foregoing paragraphs as if each paragraph was fully set forth herein, including but not limited to paragraphs 1-264.

266.    This claim does not include the Individual Public Defender Defendants. *See* Doc. 109.

267.    Defendants H.P.D. Officer Defendants, City, Individual Defendants, and Medical Defendants knew or should have known that Joshua was not Thomas R. Castleberry and that Joshua was not the subject of the warrant for which he was arrested and detained. In spite of this, Defendants actively established Joshua as the target of the warrant – including modifying the warrant or Joshua's identifiers to falsely indicate he was Thomas R. Castleberry – and failed to take any action to correct the false information, which Defendants knew or should have known to be false and would likely to cause Joshua to be falsely detained.

268.    Joshua had a significant interest in his right to be free of detention and arrests, and failing to update Thomas R. Castleberry's warrant and related databases Defendants Does 1-5 created a substantial risk of the deprivation of that interest.

269.    It was eminently reasonable, available, and costless to simply update Joshua's information and release him. Nonetheless, Defendants took no reasonable

steps to do either until January 2020, causing him to baselessly remain in custody and be deprived of his liberty interest for 32 months.

270. As set out above in paragraphs 1-181, the City is liable for these Fourteenth Amendment violations due to its customs, policies, and practices which tolerated and allowed such conduct by H.P.D. officers to occur and were a moving force causing the violation.

271. As a proximate result of Defendants' acts and omissions, Joshua was arrested and detained and suffered the injuries discussed above.

272. In engaging in the inactions and actions alleged, the Defendants listed in this claim acted maliciously, oppressively, and/or in reckless disregard of Joshua's constitutional rights, and are liable for punitive damages.

**THIRD CLAIM FOR RELIEF**
**DISCRIMINATION ON THE BASIS OF DISABILITY IN VIOLATION OF**
**THE AMERICANS WITH DISABILITIES ACT**
**(42 U.S.C. § 12101 et seq.)**
**(Against City, P.S.D., H.S.H., State of Hawai'i, Office of Public Defender)**

273. Joshua restates and incorporates by reference the foregoing paragraphs as if each paragraph was fully set forth herein, including but not limited to paragraphs 1-272 and specifically paragraphs 63-82.

274. Joshua suffers from a "disability" within the meaning and scope of 42 U.S.C. § 12102. In particular, Joshua's disability and the perception of him by those in authority makes it difficult for his statements of fact about his identity to be trusted; makes his statements regarding his understanding of legal proceedings to be

discounted; and causes him to be confused, all resulting in difficulty in locating and staying in touch with his mother and sister and other family, difficulty in expressing his mental health treatment needs, and otherwise meeting his daily medical, shelter, food, and mental health needs. Thus his disability substantially interferes with his ability to work, secure food, secure housing, navigate interactions with police and persons in authority, and remain safe without reasonable accommodation. Accordingly, Joshua is a member of the class of persons protected by 42 U.S.C. § 12132, which makes it unlawful for a public entity to discriminate against an individual with a disability or to deny the benefits of services, programs, or activities of a public entity to a person with a disability.

275.    As alleged herein, Defendants listed in this claim discriminated against Joshua and failed to provide reasonable accommodations for Joshua's disability as described above. For example, the employees of Defendants knew that Joshua suffered from a mental health disability, and discounted and ignored Joshua's statements about his identity, even when his documents and other information verified his identity, and failed to provide him the reasonable accommodation of crediting and investigating his statements and ending his baseless arrest and extended detention.

*The City's ADA Liability*

276.    Defendant City is a public entity within the meaning of 42 U.S.C. § 12131. Defendant City is vicariously liable for the acts of the Officer Bruhn and H.P.D. Officers Defendant Does 1-5.

277.    As set forth above, including in paragraphs 63-82, H.P.D. Officers Defendant Does 1-5 knew – and it would have been obvious to any reasonable person – that Joshua was a person suffering from a mental disability which would make it difficult for others to find him credible or for Joshua to vigorously advocate for himself to ensure he was not falsely arrested.  The fact that Joshua often failed to respond to questions, that he was terse when he did talk, that his responses often did not make sense given the context, that he was houseless, and that a search of the records would reveal his episode in the harbor from 2010 and the missing person report listing his mental illness in 2011 demonstrate that Joshua suffered from this disability and the illness would have been apparent when these Defendants interacted or communicating with Joshua.

278.    Defendant Does 1-5 H.P.D. officers were fully aware that because of this disability Joshua was at a significant risk of being wrongfully detained and held, as he ultimately was, if they did not correct the records falsely identifying him.  Defendant Does 1-5 H.P.D. officers could have accommodated Joshua by causing errors to be removed from the databases, or further flagging that Joshua was not Thomas R. Castleberry and the need for such accommodation was obvious.   Nevertheless, Defendant Does 1-5 H.P.D. officers ignored the substantial risk to Joshua and did not provide the accommodation.  As a result, Joshua was repeatedly rearrested and detained and taken into custody on the same warrant due to the same misidentification.

279.    Similarly, H.P.D. officer Bruhn and the H.P.D. officer in charge of the

receiving desk were fully aware that because of this disability Joshua may have been wrongfully associated with the Thomas R. Castleberry warrant and that erroneous identifiers and photos had not have been corrected, and that this was particularly likely given his disability.  H.P.D. officer Bruhn and the officer in charge of the receiving desk could have accommodated Joshua by verifying whether this had happened, and the need for such an accommodation was obvious.  Nevertheless, H.P.D. officer Bruhn and the H.P.D. officer in charge of the receiving desk ignored the substantial risk to Joshua and did not verify the information, causing him to be arrested and held.

280.    Defendant City is also directly liable for its own failures to provide reasonable accommodations for Joshua.  Defendant City was fully aware that its H.P.D. officers would frequently interact with and arrest persons who would have difficulties appearing credible, or be unable to advocate for themselves to ensure that they are not falsely arrested, like Joshua. Defendant City knew some of these people would be falsely identified or connected to true suspects and arrested, and that such people would not be as able to advocate for their freedom and to clarify any such mistakes as others.  However, Defendant City allowed its H.P.D. officers to not correct such database systems or otherwise flag that the person is not the true target of a warrant so as to the reduce the known risk and likelihood that such persons are detained and held. Likewise, the City knows that persons with these disabilities could be accommodated by verifying whether they are in fact the subject of warrants, particularly when the data for such warrants is inconsistent with those of the person arrested.   The City knows that this has resulted in

and will result in persons with mental disabilities being unnecessarily detained.  Indeed, shortly after Joshua's lawsuit, another mentally disabled man was detained at H.S.H. under similar circumstances following arrest by H.P.D. officers even though police records and data about the arrested man demonstrated that he could not possibly be the suspect, who was decades younger, causing the detained man to be held without basis in H.S.H just like Joshua.

### The Department of Public Safety's ADA Liability

281.    Defendant D.P.S. is a public entity within the meaning of 42 U.S.C. § 12131. It is vicariously liable for the acts of the Does 6-10, and directly liable for its own failures to provide reasonable accommodations for Joshua, including through its failure to provide reasonable training and policies accommodating or interacting with people with a mentally disability.

### The Office of Public Defenders' ADA Liability

282.    Defendant O.P.D. is a public entity within the meaning of 42 U.S.C. § 12131. It is vicariously liable for the acts of the Defendant Public Defenders and Does 11-15, and directly liable for its own failures to provide reasonable accommodations for Joshua, including through its failure to provide reasonable training and policies accommodating or interacting with the mentally ill. The Defendant Public Defenders and Does 11-15 violated the ADA as described above.

283.    In particular, the OPD Defendants discriminated against Joshua by ignoring him, and discounting his statements of his innocence as a symptom of his

disability.  The OPD Defendants refused to take Joshua and these indications of his wrongful detention seriously (or take even minimal actions to respond to them), as they would have done for persons who are not mentally ill.  Such treatment unduly burdens mentally ill persons like Plaintiff.

284.    OPD Defendants also failed to provide the basic and reasonable accommodation of taking minimal steps to verify or investigate Joshua's statements, which would have promptly resulted in his release.

285.    The OPD Defendants acted with deliberate indifference toward Joshua. In discounting Joshua and failing to investigate his claims they recklessly disregarded the risk of a substantial harm – facts clearly indicating that Joshua was in fact being wrongfully detained against his will on the basis of a misidentification.  Because of this Joshua spent nearly three years wrongfully held against his will.

286.    The Office of the Public Defender also knew that many of its clients may have mental illnesses, and knew that its clients would from time to time be misidentified.  OPD knowingly failed to provide any training that would address the risk that persons with mental illnesses are misidentified and disbelieved. Indeed, OPD provided no training on how to interact with persons with mental disabilities, let alone basic training on when to credit or investigate their statements.   In fact, OPD compounded the risk that mentally ill persons would be – and would remain – misidentified  by having woefully deficient policies regarding even basic record keeping about defendants like Joshua as outlined above.  In acting in these ways OPD

acted with deliberate indifference and reckless disregard to the consequences to persons like Joshua with severe mental illnesses.

*The Hawaiʻi State Hospital's ADA Liability*

287.    Defendant H.S.H. is a public entity within the meaning of 42 U.S.C. § 12131. It is vicariously liable for the acts of Dr. Garrett, hospital staff, and Does 16-20, and is directly liable for its own failures to provide reasonable accommodations for Joshua, including through its failure to provide reasonable training and policies accommodating or interacting with the people with mentally disabilities.

288.    Dr. Garrett discriminated against Joshua by ignoring him and discounting his statements of his innocence as a symptom of his disability.  She refused to take Joshua and these indications of his wrongful detention seriously (or take even minimal actions to respond to them), as she would have done for persons with a different mental illness.  Such treatment unduly burdens persons with mental illnesses like Plaintiff's.

289.    Dr. Garrett acted with deliberate indifference toward Joshua.  In discounting Joshua and failing to investigate his claims she recklessly disregarded the risk of a substantial harm – facts clearly indicating that Joshua was in fact being wrongfully detained against his will on the basis of a misidentification.  Had she taken actions when it was apparent that Joshua was likely wrongfully detained, he would not have spent nearly three years wrongfully held against his will.

*The State of Hawaiʻi's ADA Liability*

290.    Defendant State of Hawaiʻi is a public entity within the meaning of 42

U.S.C. § 12131. It is vicariously liable for the acts of the state employees and directly liable for its own failures to provide reasonable accommodations for Joshua, including through its failure to provide reasonable training and policies at O.C.C.C. and H.S.H., thereby denying reasonable accommodations to the Joshua and other mentally disabled persons.

*The Defendants City, State, H.S.H. D.P.S. O.P.D. ADA Liability*

291.    As a proximate result of the acts and omissions of the City, State of Hawaiʻi, H.S.H., D.P.S. and O.P.D., and the acts and omissions for which each is vicariously liable, Joshua was arrested and detained and suffered the injuries discussed above.

## FOURTH CLAIM FOR RELIEF
## 42 U.S.C. § 1983 - VIOLATIONS OF U.S. CONST. AMEND. IV
## ABUSE OF PROCESS
### (Against Does 1-5, and City)

292.    Joshua restates and incorporates by reference the foregoing paragraphs as if each paragraph was fully set forth herein.

293.    On August 11, 2021, Joshua timely filed a notice of claim under H.R.S. § 46-72 and filed an amended notice of claim on November 20, 2021.

294.    After initiating proceedings against Joshua, Officer Abraham K. Bruhn, Does 1-5, and the City continued to commit multiple willful actions for the improper purpose of prosecuting Joshua for a crime he did not commit, as more fully alleged above. The Officer Abraham K. Bruhn, Does 1-5, and City used the courts and their authority to cause pain and harm to Joshua despite his innocence and for an improper

purpose.

295.   The H.P.D. officer in charge of the receiving desk acted with an ulterior purpose by approving the arrest of Joshua based on an arrest report that falsely claimed the arrest was verified by prints; without securing a booking photograph as required by City policy; without securing fingerprints as required by City policy; without determining that Joshua was the actual person named in warrant, and without resolving the many contradictory facts about Joshua's identity before directing that the arrest proceed.  These willful acts caused Joshua to be charged under a warrant directed to an entirely different person, an action that is not proper in the regular course of criminal proceedings.

296.   The H.P.D. officer in charge of the receiving desk acted with malice in that he acted without regard to Joshua's legal rights knowing his actions would violate those rights.  He directed Joshua's arrest without probable cause, for the purpose of depriving him of his liberty.  The prosecution of Joshua ended in Joshua's favor.

297.   H.P.D. Officer Bruhn acted with malice, reckless disregard for Joshua's rights and with ulterior purpose by physically arresting Joshua even when he knew that he had no evidence that Joshua was the man actually wanted on the warrant and by writing Joshua's name on the Thomas R. Castleberry warrant even when he had failed to establish that Joshua was Thomas R. Castleberry. He proceeded without probable cause, for the purpose of depriving Joshua of his liberty.  The prosecution of Joshua ended in Joshua's favor.

298.     As a result of the Officer Abraham K. Bruhn, Does 1-5, and City's misconduct described in this count, Joshua suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages.

**FIFTH CLAIM FOR RELIEF**
**MALICIOUS PROSECUTION**
**(Against Defendant Officers Does 1-5)**

299.     Joshua restates and incorporates by reference the foregoing paragraphs as if each paragraph was fully set forth herein.

300.     On August 11, 2021, Joshua timely filed a notice of claim under H.R.S. § 46-72 and filed an amended notice of claim on November 20, 2021.

301.     The Defendants H.P.D. Officers Does 1-5, actions and conduct as set forth above were malicious, as they maliciously initiated proceedings against Joshua without probable cause, resulting in Joshua's wrongful detention and prosecution, until the proceedings were terminated in favor of Joshua when he was correctly identified as Joshua C. Spriestersbach (and not Thomas R. Castleberry) and finally released from custody, as more fully alleged above.

302.     As a result of Defendants H.P.D. Officers Does 1-5's misconduct described in this count, Joshua suffered loss of liberty, great emotional anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages.

**SIXTH CLAIM FOR RELIEF**
**FALSE IMPRISONMENT**
**(Against Defendant Does 6-10, D.P.S., and State of Hawai'i)**

303.    Joshua restates and incorporates by reference the foregoing paragraphs as if each paragraph was fully set forth herein.

304.    On August 11, 2021, Joshua timely filed a notice of claim under H.R.S. § 46-72 and filed an amended notice of claim on November 20, 2021.

305.    Defendant Does 6-10, D.P.S., and State of Hawai'i intentionally confined Joshua without lawful privilege and against his consent, causing him physical and emotional injury.

**SEVENTH CLAIM FOR RELIEF**
**NEGLIGENCE**
**(Against Defendant Does 6-10, D.P.S., and State of Hawai'i)**

306.    Joshua restates and incorporates by reference the foregoing paragraphs as if each paragraph was fully set forth herein.

307.    On August 11, 2021, Joshua timely filed a notice of claim under H.R.S. § 46-72 and filed an amended notice of claim on November 20, 2021.

308.    Defendant Does 6-10, D.P.S., and State of Hawai'i owed Joshua a legal duty to conform to a standard of care, namely, to ensure that it did not deprive him of his liberty without a valid basis.

309.    Defendant Does 6-10, D.P.S., and State of Hawai'i breached the duty, causing Joshua injury.

310.    As a proximate result of the breach of the duties of Defendant Does 6- 10,

D.P.S., and State of Hawai'i, Joshua suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages.

## EIGHTH CLAIM FOR RELIEF
## FALSE IMPRISONMENT
### (Against Medical Defendants, H.S.H., and State of Hawai'i)

311.     Joshua restates and incorporates by reference the foregoing paragraphs as if each paragraph was fully set forth herein.

312.     On August 11, 2021, Joshua timely filed a notice of claim under H.R.S. § 46-72 and filed an amended notice of claim on November 20, 2021.

313.     The Medical Defendants (Dr. Garrett, the Individual Psychiatric and Psychological Defendants, and Does 16-20), H.S.H., and State of Hawai'i intentionally confined Joshua without lawful privilege and against his consent, as described above, causing physical and emotional injury to him.

## NINTH CLAIM FOR RELIEF
## NEGLIGENCE
### (Against Medical Defendants, H.S.H., and State of Hawai'i)

314.     Joshua restates and incorporates by reference the foregoing paragraphs as if each paragraph was fully set forth herein.

315.     On August 11, 2021, Joshua timely filed a notice of claim under H.R.S. § 46-72 and filed an amended notice of claim on November 20, 2021.

316.     The Medical Defendants (Dr. Garrett, the Individual Psychiatric and Psychological Defendants, and Does 16-20), H.S.H., and State of Hawai'i owed Joshua

a duty to conform to a standard of medical care, namely, to ensure that they did not

deprive him of his liberty without a valid basis and provided him with adequate medical

care.

317.    The Medical Defendants, H.S.H., and State of Hawai'i failed to properly

identify Joshua once he was in the care of H.S.H.

318.    The Medical Defendants, H.S.H., and State of Hawai'i all had in their

possession, copies of all of Joshua's legal and medical records which included

identifying information of Joshua and Thomas R. Castleberry.

319.    The Medical Defendants, H.S.H., and State of Hawai'i failed to review

their own files and further failed to investigate claims raised by Joshua

throughout the course of his confinement at H.S.H. that he was not Thomas R.

Castleberry and had not committed Thomas R. Castleberry's crimes.

320.    The Medical Defendants, H.S.H., and State of Hawai'i ignored Joshua's

claims and determined him to be delusional and decompensating, and recommended

more medication be administered to Joshua against his will. Ignoring Joshua,

Defendants H.S.H., Medical Defendants, and State of Hawai'i got a court order to

administer strong anti-psychotic medication that caused Joshua much physical and

emotional anguish.

321.    The Medical Defendants, H.S.H., and State of Hawai'i owed Joshua a

duty to conform to a standard of medical care, namely, to ensure that it did not deprive

him of his liberty without a valid basis and provided him with adequate medical care.

322.     The Medical Defendants, H.S.H., and State of Hawai'i breached their

duty, causing Joshua injury.

323.     As a proximate result of the breach of their duties by the Medical

Defendants, H.S.H., and State of Hawai'i Joshua suffered loss of liberty, great mental

anguish, humiliation, degradation, physical and emotional pain and suffering, and other

grievous and continuing injuries and damages.

### TENTH CLAIM FOR RELIEF
### MEDICAL MALPRACTICE
### (Against Medical Defendants, H.S.H., and State of Hawai'i)

324.     Joshua restates and incorporates by reference the foregoing paragraphs as

if each paragraph was fully set forth herein.

325.     On August 11, 2021, Joshua timely filed a notice of claim under H.R.S. §

46-72 and filed an amended notice of claim on November 20, 2021.

326.     The Medical Defendants (Dr. Garrett, the Individual Psychiatric and

Psychological Defendants, and Does 16-20), H.S.H., and State of Hawai'i owed Joshua

a duty to conform to a standard of medical care, namely, to ensure that they did not

deprive him of his liberty without a valid basis and provided him with adequate medical

care.

327.     The Medical Defendants, H.S.H., and State of Hawai'i failed to properly

identify Joshua once he was in the care of H.S.H.

328.     The Medical Defendants, H.S.H., and State of Hawai'i all had in their

possession, copies of all of Joshua's legal and medical records which included

identifying information of Joshua and Thomas R. Castleberry.

329.    The Medical Defendants, H.S.H., and State of Hawai'i failed to review their own files and further failed to investigate claims raised by Joshua throughout the course of his confinement at H.S.H. that he was not Thomas R. Castleberry and had not committed Thomas R. Castleberry's crimes.

330.    The Medical Defendants, H.S.H., and State of Hawai'i ignored Joshua's claims and determined him to be delusional and decompensating, and recommended more medication be administered to Joshua against his will. Ignoring Joshua, Defendants H.S.H., Medical Defendants, and State of Hawai'i got a court order to administer strong anti-psychotic medication that caused Joshua much physical and emotional anguish.

331.    The Medical Defendants, H.S.H., and State of Hawai'i owed Joshua a duty to conform to a standard of medical care, namely, to ensure that it did not deprive him of his liberty without a valid basis and provided him with adequate medical care.

332.     The Medical Defendants, H.S.H., and State of Hawai'i breached their duty, causing Joshua injury.

333.    As a proximate result of the breach of their duties by the Medical Defendants, H.S.H., and State of Hawai'i Joshua suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages.

## ELEVENTH CLAIM FOR RELIEF
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (Against Individual Defendants, City, D.P.S., H.S.H., and State of Hawaiʻi)

334.    Joshua restates and incorporates by reference the foregoing paragraphs as if each paragraph was fully set forth herein.

335.    On August 11, 2021, Joshua timely filed a notice of claim under H.R.S. § 46-72 and filed an amended notice of claim on November 20, 2021.

336.    The City employees including H.P.D. officer Bruhn, the officer in charge of the receiving desk, Does 1 – 5, and others acted within the scope of their employment in arresting and detaining Joshua on the warrant for Thomas R. Castleberry.  The City is liable for the actions of its employees pursuant to the doctrine of *respondeat superior*.

337.    H.P.D. officer Bruhn and the officer in charge of the receiving desk acted with malice when they arrested and detained Joshua h when his fingerprints did not match those of Thomas R. Castleberry; when his photo did not match Thomas R. Castleberry's; when his personal identifiers did not match those of Thomas R. Castleberry; and when they chose to simply change the name on the warrant rather than defer the arrest and confirm that Joshua was not Thomas R. Castleberry.  These city employees knew that their actions would cause severe emotional distress to Joshua.

338.    The Individual Defendants, City, D.P.S., H.S.H., and State of Hawaiʻi's actions and conduct as set forth above were intentional, reckless, extreme, and outrageous. Additionally, the Individual Defendants, City, D.P.S.Ð, H.S.H., and State

of Hawaiʻi's actions were malicious and rooted in an abuse of power and authority and were undertaken with the intent to cause or were in reckless disregard for the probability that their actions would cause Joshua severe emotional distress, as more fully alleged above.

339.    As an actual and proximate result of the Individual Defendants, City, P.S.D., H.S.H., and State of Hawaiʻi's actions, Joshua suffered and continues to suffer severe emotional distress. As an actual and proximate result of the Individual Defendants, City, P.S.D., H.S.H., and State of Hawaiʻi's actions, Joshua was involuntarily committed and was also physically injured, including through being physically restrained, medicated against his will, and suffering adverse physical side effects from the medication.

**TWELFTH CLAIM FOR RELIEF**
**NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**
**(Against Individual Defendants, City, D.P.S.Ð, H.S.H., and State of Hawaiʻi)**

340.    Joshua restates and incorporates by reference the foregoing paragraphs as if each paragraph was fully set forth herein.

341.    On August 11, 2021, Joshua timely filed a notice of claim under H.R.S. § 46-72 and filed an amended notice of claim on November 20, 2021.

342.    Alternatively, the Individual Defendants, City, D.P.S.Ð, H.S.H., and State of Hawaiʻi's actions and conduct as set forth above were negligent, but still extreme and outrageous. The Individual Defendants, City, D.P.S.Ð, H.S.H., and State of Hawaiʻi's actions were rooted in an abuse of power of authority and were undertaken

negligently and with disregard for the probability that they would cause Joshua severe emotional distress, as more fully alleged above.

343.   The City employees including H.P.D. Officer Bruhn, the H.P.D. Officer in charge of the receiving desk, Does 1 – 5, and others who interacted with Joshua in 2009, 2010, 2011, 2012, 2015, and 2017 and who entered erroneous personal information the case reporting system and did not correct such errors all acted within the scope of their employment even when arresting and detaining Joshua on the warrant for Thomas R. Castleberry and failing to correct personal information errors. The City is liable for the actions of its employees pursuant to the doctrine of respondeat superior.

344.   H.P.D. Officer Bruhn and the H.P.D. Officer in charge of the receiving desk acted with malice when in May 2017 they arrested and detained Joshua when his fingerprints did not match those of Thomas R. Castleberry; when his photo did not match Thomas R. Castleberry's; when his personal identifiers did not match those of Thomas R. Castleberry; and when they chose to simply change the name on the warrant rather than defer the arrest and confirm that Joshua was not Thomas R. Castleberry. These city employees knew that their actions would cause severe emotional distress to Joshua.

345.   As an actual and proximate result of the Individual Defendants, City, D.P.S., H.S.H., and State of Hawai'i's actions, Joshua suffered and continues to suffer severe emotional distress. As an actual and proximate result of the Individual Defendants, City, P.S.D., H.S.H., and State of Hawai'i's actions, Joshua was

88

involuntarily committed and was also physically injured, including through being physically restrained,  medicated against his will, and suffering adverse physical side effects from the medication.

### THIRTEENTH CLAIM FOR RELIEF
### LEGAL MALPRACTICE
**(Against Defendant O.P.D. and Individual Public Defenders)**

346.     Joshua restates and incorporates by reference the foregoing paragraphs as if each paragraph was fully set forth herein.

347.     On August 11, 2021, Joshua timely filed a notice of claim under H.R.S. § 46-72 and filed an amended notice of claim on November 20, 2021.

348.     Defendant O.P.D., Individual Public Defenders, and Public Defender Does 11-15 owed Joshua a duty of care to diligently investigate the issue of identity in his case.

349.     Defendant O.P.D., Individual Public Defenders, and Public Defender Does 11-15 had a duty to confer with Joshua on the objective of their representation.

350.     Defendant O.P.D., Individual Public Defenders, and Public Defender Does 11-15 had a duty to read Thomas R. Castleberry's court file, Joshua's files, and Joshua's medical reports. The medical reports submitted to the court on the issue of competency mentioned numerous times that Joshua was insisting he was not Thomas R. Castleberry and that some Individual Defendant Doctors confirmed he was not Thomas R. Castleberry. Defendant O.P.D., Individual Public Defenders, and Public Defender Does 11-15 failed to act on this information in the files and otherwise

investigate their client's identity, which would have shown that Joshua was not Thomas R. Castleberry and that Joshua was telling the truth.

351.    In January 2020, once they admitted that Joshua had been wrongfully incarcerated for Thomas R. Castleberry's crimes, Defendant Patek, Defendant O.P.D., Individual Public Defenders, and Public Defender Does 11-15 had a duty to make a record with the Court and also request that the criminal database be corrected so that Joshua would not be unlawfully arrested and incarcerated as Thomas R. Castleberry in the future. None of those actions were taken and Joshua was not even given notice of or transported to the courtroom for the off the record meeting on his case.

352.    Defendant O.P.D., Individual Public Defenders, and Public Defender Does 11-15 breached their duty as written above.

353.    As a proximate result of the breach of their duties by the Defendant O.P.D., Individual Public Defenders, and Public Defender Does 11-15, Joshua suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages.

**PRAYER FOR RELIEF**

**WHEREFORE**, Joshua respectfully requests relief as follows:

A.    General and compensatory damages against all Defendants, jointly and severally, in an amount according to proof at trial;

B.    Punitive and exemplary damages against all Defendants sued in their individual capacities in an amount to be proven at trial;

90

C.      Attorney's fees pursuant to 42 U.S.C. § 1988, 42 U.S.C. § 12205, and any

appropriate state law theory;

D.      Any and all other damages allowed by law according to proof to be

determined at the time of trial in this matter;

E.      All fees and costs allowed by law;

F.      An Injunction prohibiting defendants from continuing to enforce Thomas

R. Castleberry's warrant until it is properly updated and actions are taken to

prevent any further false arrest of Joshua on that warrant and to correct the

criminal database that has the name Thomas R. Castleberry as an alias of Joshua

Spriestersbach.

G.      Any other relief the court deems just, including appropriate orders to

remedy systemic defects in warrant and arrest procedures at the City, booking

and detention procedures at O.C.C.C., patient identification, admission and

treatment procedures at H.S.H., and client identification and representation

procedures at D.P.D.

## DEMAND FOR JURY TRIAL

Joshua hereby respectfully demands that a trial by jury be conducted with

respect to all issues presented herein.

Dated:  March 29, 2024

By:  /s/ Alphonse A. Gerhardstein
Jennifer L. Brown
Alphonse A. Gerhardstein
Jacqueline Greene
Paul Hoffman
John Washington

Attorneys for Plaintiff
JOSHUA SPRIESTERSBACH