UNITED STATES DISTRICT COURT

DISTRICT OF HAWAII

| | |
|---|---|
| JOSHUA SPRIESTERSBACH,<br><br>            Plaintiff,<br><br>   vs.<br><br>STATE OF HAWAII, CITY AND COUNTY OF HONOLULU, OFFICER ABRAHAM K. BRUHN, DEPARTMENT OF PUBLIC SAFETY, OFFICE OF THE PUBLIC DEFENDER, NIETZSCHE LYNN TOLAN, MICHELLE MURAOKA, LESLIE MALOIAN, JACQUELINE ESSER, JASON BAKER, MERLINDA GARMA, SETH PATEK, DR. JOHN COMPTON, DR. MELISSA VARGO, DR. SHARON TISZA, HAWAII STATE HOSPITAL, DR. ALLISON GARRETT, JOHN/JANE DOES 1-20,<br><br>         Defendants. | CIV. NO. 21-00456 LEK-RT |

**ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANT CITY AND COUNTY OF HONOLULU'S
<u>MOTIONS FILED ON NOVEMBER 1, 2024, [DKT. NOS. 257, 258]</u>**

On November 1, 2023, Defendant City and County of Honolulu ("the City") filed its Motion to Strike and/or Dismiss with Prejudice Newly Added Federal Failure to Discipline, Train, and Supervise and Final Policy-Maker Claims ("New Claims Motion") and its Motion to Dismiss First Amended Complaint (ECF No. 250) ("Original Claims Motion"). [Dkt. no. 257, 258.] On December 29, 2023, Plaintiff Joshua Spriestersbach ("Spriestersbach") filed his opposition to the New Claims Motion ("New Claims Opposition") and his opposition to the Original

Claims Motion ("Original Claims Opposition"). [Dkt. nos. 298, 300.] Also on December 29, 2023, Defendants Office of the Public Defender ("OPD"), Nietzsche Lynn Tolan, Michele Muraoka, Lesley Maloian, Jason Baker, and Seth Patek (collectively "PD Defendants") filed a statement of no position as to the City's motions. [Dkt. no. 296.] On January 12, 2024, the City filed its reply in support of the Original Claims Motion and its reply in support of the New Claims Motion. [Dkt. nos. 305, 306.]

These matters came on for hearing on February 12, 2024.[1] On March 15, 2024, an entering order was issued informing the parties of this Court's rulings on the New Claims Motion and the Original Claims Motion ("3/15/24 EO Ruling"). [Dkt. no. 352.] The instant Order supersedes the 3/15/24 EO Ruling. The New Claims Motion and the Original Claims Motion (collectively "the Motions") are hereby granted in part and denied in part for the reasons set forth below.

---

[1] The City's motions were heard with two other motions, which have been ruled upon in separate orders. See Order Granting in Part and Denying in Part Defendant Allison Garrett, M.D.'s Motion to Dismiss First Amended Complaint Filed October 18, 2023 (ECF 250), filed 3/15/24 (dkt. no. 350) ("Order on Dr. Garrett's Motion"), *available at* 2024 WL 1142198; Order Granting in Part and Denying in Part the PD Defendants' Motion to Dismiss Plaintiff Joshua Spriestersbach's *First Amended Complaint* Filed on October 18, 2023, filed 3/15/24 (dkt. no. 351) ("Order on the PD Defendants' Motion"), *available at* 2024 WL 1142830.

**BACKGROUND**

Spriestersbach filed his original Complaint on November 21, 2021. [Dkt. no. 1.] The Motions address his October 18, 2023 First Amended Complaint ("Amended Complaint"). [Dkt. no. 250.] This Court previously issued an order addressing Spriestersbach's claims against the City in the original Complaint. See Order: Granting in Part and Denying in Part Defendant City and County of Honolulu's Motion for Judgment on the Pleadings; Granting Defendant Dr. Sharon Tisza's Motion to Dismiss Complaint; and Granting Defendants Dr. John Compton and Dr. Melissa Vargo's Substantive Joinder in Defendant Dr. Sharon Tisza's Motion to Dismiss Complaint, filed 8/18/22 (dkt. no. 151) ("8/18/22 Order").[2]

The case arises from Spriestersbach's May 11, 2017 arrest and prosecution for crimes committed by Thomas R. Castleberry and Spriestersbach's subsequent detention and civil commitment related to that arrest until January 17, 2020. See Amended Complaint at ¶¶ 2, 4. Relevant to the instant Motion, the claims in the Amended Complaint are:[3]

---

[2] The 8/18/22 Order is also available at 622 F. Supp. 3d 948.

[3] Doe Defendants 1-5 are unknown police officers with the Honolulu Police Department ("HPD"). See Amended Complaint at ¶ 12. The claims that are not alleged against the City and/or Doe Defendants 1-5 are not relevant to the claims against the City and will not be addressed in this Order.

-a Title 42 United States Code Section 1983 claim against the City and Defendant Allison Garrett, M.D. ("Dr. Garrett"), alleging violations of Spriestersbach's rights under the Fourth Amendment to the United States Constitution ("Count I");

-a Section 1983 claim against the City and Dr. Garrett alleging violations of Spriestersbach's due process rights under the Fourteenth Amendment ("Count II");

-a disability discrimination claim against the City and OPD, based upon violations of the Americans with Disabilities Act ("ADA"), Title 42 United States Code Section 12101, *et seq.* ("Count III");

-a Section 1983 claim against the City and Doe Defendants 1-5 alleging abuse of process, in violation of Spriestersbach's rights under the Fourteenth Amendment ("Count IV");

-a malicious prosecution claim against Doe Defendants 1-5 ("Count V");

-an intentional infliction of emotional distress ("IIED") claim against Defendants Nietzsche Lynn Tolan, Michele Muraoka, Lesley Maloian, Jason Baker, and Seth Patek (collectively "Individual PD Defendants"), the City, and Dr. Garrett ("Count XI"); and

-a negligent infliction of emotional distress ("NIED") claim against the City, the Individual PD Defendants, and Dr. Garrett ("Count XII").

The core factual allegations supporting Spriestersbach's claims against the City in the Amended Complaint are the same as those in the original Complaint. They are summarized in the 8/18/22 Order and will not be repeated here. See 8/18/22 Order, 622 F. Supp. 3d at 952-54. The instant Order will address the new factual allegations that Spriestersbach added in the Amended Complaint to address the defects identified in the 8/18/22 Order.

4

The original Complaint alleged that Spriestersbach was arrested by HPD officers on two prior occasions before his May 11, 2017 arrest – an October 14, 2011 arrest and a January 17, 2015 arrest. See id. at 952-53. The Amended Complaint adds allegations about a July 26, 2010 arrest.

The HPD report regarding the July 26, 2010 arrest states that, on that date, Spriestersbach was observed "'in Honolulu Harbor waters near the Navatek ship.'" [Amended Complaint at ¶ 40.] Because Spriestersbach identified himself as William Castleberry, he was arrested on the outstanding bench warrant issued on July 24, 2009 for Thomas R. Castleberry ("Castleberry Warrant"). [Id. at ¶¶ 36, 41.] Spriestersbach alleges:

> 46.  The officers who made the arrest knew – and it would have been obvious to any reasonable person – that [Spriestersbach] was a person suffering from a mental health disability based on his bizarre conduct and presence in the water near the abandoned ship and his inability to reasonably explain this conduct at the scene. This would make it difficult for others to find [Spriestersbach] credible or for [Spriestersbach] to vigorously advocate for himself to ensure he was not falsely arrested. [Spriestersbach] suffered from this disability and disability would have been apparent when interacting or communicating with him.

> 47.  The H.P.D. officers who made this arrest were fully aware that because of his disability [Spriestersbach] was at a significant risk of being wrongfully detained and held, as he ultimately was, if they did not correct the case reporting records falsely identifying him as

5

Thomas R. Castleberry. The H.P.D. arresting
officers and the H.P.D. officer in charge of the
receiving desk could have accommodated
[Spriestersbach] by correcting the information
that incorrectly merging his identity with Thomas
R. Castleberry in the databases, or further
flagging those records to indicate that
[Spriestersbach] was not Thomas R. Castleberry.
The need for such accommodation was obvious.
Nevertheless, the officers, acting consistent
with City policy, practice, and procedure,
ignored the substantial risk to [Spriestersbach]
and did not provide the accommodation.

48. Likewise, the City was fully aware that
persons with disabilities such as
[Spriestersbach]'s have a history of providing
identities that are not their own and then
becoming falsely associated with the names of
other suspects, because of their disability. The
City should have provided reasonable
accommodations to [Spriestersbach] by addressing
or making available highly pertinent mental
health information; here, for example, that
Plaintiff was schizophrenic, bipolar and
dysfunctional, and referred to himself as
Castleberry. Further the City should have further
accommodated by ensuring that the personal
information on file for this person with a mental
disability was in fact accurate. The need for the
City and its employees to provide such an
accommodation was obvious, though they did not
provide it, notwithstanding the substantial risks
involved for [Spriestersbach] and persons like
him.

[Id. at pgs. 12-13.]

"[T]he H.P.D. Desk Lieutenant or officer in charge of

the receiving desk . . . directed that [Spriestersbach's]

identity be confirmed with fingerprints." [Id. at ¶ 42.] The

fingerprint analysis confirmed Spriestersbach's identity, and he

was released. The fact that the fingerprint analysis proved his

identity as Joshua Spriestersbach is noted on the arrest report, but the report also erroneously combined Spriestersbach's personal identifying information with Thomas Castleberry's information. The erroneous information was loaded into HPD's case reporting system and then from HPD's system to state and federal crime data reporting systems. [Id. at ¶¶ 43-44.] Spriestersbach alleges

> [o]n information and belief Defendant Does 1-5 H.P.D. officers had a duty to correct the police department records and acting with malice, with reckless disregard of the law or of [Spriestersbach]'s legal rights, and with deliberate indifference to [Spriestersbach]'s constitutional rights, failed to correct their records. They did so knowing that failing to correct their records would expose [Spriestersbach] to being misidentification [sic] and additional arrests.

[Id. at ¶ 45.]

The Amended Complaint also contains new factual allegations regarding an April 14, 2011 missing person report that one of his sisters made with the City. [Id. at ¶ 49.] She indicated that Spriestersbach had a mental disability, gave some information about his diagnoses and medications, and said he would refer to himself as "'Sergeant Castleberry.'" [Id.] She identified a photograph of Spriestersbach from an HPD database,

and the photograph was used to make a missing persons flyer.[4] On April 19, 2011, Spriestersbach was found in the Fort Street Mall and Hotel Street area. [Id. at ¶ 50.]

As to the October 14, 2011 arrest described in the original Complaint, the Amended Complaint added the allegation that, although Spriestersbach gave the HPD officers the last name Castleberry and refused to give a first name, when the officer asked him for his birth date and his social security number, Spriestersbach complied. [Id. at ¶ 52.] Further, Spriestersbach added that the incident report for the October 14, 2011 arrest combined Spriestersbach's personal identifying information with Thomas Castleberry's, and the erroneous information was uploaded to the HPD reporting system, and then to state and federal criminal data reporting systems. [Id. at ¶ 57.] Spriestersbach alleges the error must have been discovered because, following the October 14, 2011 arrest, he was not brought before a court on the Castleberry Warrant. [Id. at ¶¶ 113-14.] Further, Spriestersbach alleges Doe Defendants 1-5 "acted with malice[ and] reckless disregard of the law or of [Spriestersbach]'s legal rights" when they failed to correct the HPD records, and when they failed to correct the

---

[4] The flyer appears to have been created by Crimestoppers. See Amended Complaint at ¶ 103.

records, "[t]hey did so knowing that would expose [Spriestersbach] to misidentification and additional arrests." [Id. at ¶ 58.] Spriestersbach adds allegations substantively similar to paragraphs 46-48 regarding the October 14, 2011 arrest. See id. at ¶¶ 59-61.

As to the January 17, 2015 arrest described in the original Complaint, the Amended Complaint added the allegation that, because the HPD databases still comingled Spriestersbach's personal identifying information with Thomas Castleberry's, their information continued to be improperly merged. [Id. at ¶ 65.] Spriestersbach added allegations substantively similar to paragraphs 46-48 regarding the January 17, 2015 arrest. See id. at ¶¶ 69-71. Spriestersbach also added an allegation about Doe Defendants 1-5 and the January 17, 2015 arrest that is similar to paragraph 58. See id. at ¶ 72. In addition, Spriestersbach alleges the erroneous identification was discovered, and the arrest report had a note: "'POSSIBLE WARRANT UNDER CASTLEBERRY, THOMAS, A#1077743. CHECKS VIA ID (DAISY) PER ID PRINTS UNDER A#10777743 CASTLEBERRY, THOMAS DO NOT MATCH Spriestersbach.'" [Id. at ¶ 122 (emphasis in Amended Complaint).]

As to the May 11, 2017 arrest, Spriestersbach adds the allegation that HPD Officer Abraham Bruhn ("Bruhn") and his partner believed Spriestersbach was Thomas Castleberry because they were relying on a digital notebook. [Id. at ¶ 74.] The

digital notebook was a database of wanted persons, and it was a long-standing City practice for HPD officers to study the photographs and information in the digital notebook and to rely on it when making arrests. [Id. at ¶ 83.] Spriestersbach alleges, "[o]n information and belief, the information listed in the digital notebook was derived from the City case reporting system." [Id. at ¶ 88.]

According to Spriestersbach, "[t]he practice of using this digital notebook and relying on it to make arrests was so widespread as to have the force of law." [Id.] On May 11, 2017, there was an entry in the digital notebook for Thomas Castleberry that indicated an open warrant and that included Thomas Castleberry's personal information, but the entry had a photograph of Spriestersbach. Bruhn and his partner arrested Spriestersbach on the Castleberry Warrant in reliance on the digital notebook. [Id. at ¶¶ 85-87.] Spriestersbach alleges this type of error in the City case reporting system occurred numerous times, and the errors remained in the system because the system was not corrected. Further, the error comingling Spriestersbach's and Castleberry's information was known to the City. Spriestersbach argues this type of error was particularly harmful to persons with mental disability because of their impaired ability to advocate for themselves. [Id. at ¶ 89.]

Spriestersbach emphasizes that, on May 11, 2017, he was only arrested based upon the Castleberry Warrant. [Id. at ¶ 90.]

Spriestersbach argues that his behavior on May 11, 2017 should have made it apparent to Bruhn and Bruhn's partner that he was a person with a mental disability, and therefore others would not believe his statements and he would be unable to advocate for himself. Because of this, Bruhn and his partner should have done a record search, which would have revealed the 2010 harbor incident and the 2011 missing person report by Spriestersbach's sister. [Id. at ¶ 76.] Spriestersbach alleges:

> 77.  H.P.D. officer Bruhn researched [Spriestersbach] on the City's Case Reporting System, the City's Digital Notebook, the Crimestopper information he possessed and the State of Hawai`i Criminal Justice Information System database. H.P.D. officer Bruhn discovered that these records listed Thomas R. Castleberry as an alias for Joshua Spriestersbach. H.P.D. officer Bruhn also discovered conflicting social security numbers, conflicting state ID numbers, conflicting dates of birth, and other personal data that did not match Thomas R. Castleberry, who he intended to arrest, with Joshua Spriestersbach, who he did in fact arrest. Further, H.P.D. officer Bruhn discovered or should have discovered the records that indicated that [Spriestersbach] suffered from a mental disability and required medication.
>
> . . . .
>
> 80.  H.P.D. officer Bruhn knew that the facts he gathered did not confirm that [Spriestersbach] was the person named in the warrant. H.P.D. officer Bruhn knew that many of the facts he gathered contradicted any conclusion that [Spriestersbach] was the person named in the

11

warrant. Nonetheless, by proceeding with the
arrest H.P.D. officer Bruhn acted with malice and
with the knowledge of the risk that his actions
would lead to and detention of [Spriestersbach]
on the warrant without probable cause. In so
doing, H.P.D. officer Bruhn also acted with
malice toward [Spriestersbach], deliberate
indifference and with reckless disregard of
[Spriestersbach]'s legal rights.

81.  H.P.D. officer Bruhn was fully aware
that because of his disability, [Spriestersbach]
may have been wrongfully associated with the
warrant and that pursuant to City policy, the
merger of his identity with Thomas R Castleberry
would not have been corrected, and that this was
particularly likely given his disability. Officer
Bruhn should have accommodated [Spriestersbach]
by verifying whether this misidentification had
happened. The need for such an accommodation was
obvious. Nevertheless, Officer Bruhn ignored the
substantial risk to [Spriestersbach] and did not
verify the information, causing him to be
arrested and detained.

[Id. at pgs. 21-22.] Spriestersbach emphasizes that, on May 11,

2017, he was only arrested on the Castleberry Warrant. In other

words, but for the comingling of Spriestersbach's and Thomas

Castleberry's information in the City's digital notebook,

Spriestersbach would not have been arrested. [Id. at ¶ 90.]

H.P.D. Policy 7.01 VIII F states that, "[a]n
arrested person frequently provides false
information about his or her identity (e.g., an
alias or another person's name) . . ." The policy
also indicates what steps must be taken "to
correct misidentifications when they are
discovered." Thus, the City and the its [sic]
individual H.P.D. officers including H.P.D.
officer Bruhn were on notice that
misidentifications of arrested persons did take
place. On information and belief, these problems
were deemed corrected when the falsely arrested

> person was released. The City policy and related
> training for correcting misidentifications,
> however, does not include any instruction to
> employees of the H.P.D. to correct errors they
> discover in the databases or City digital
> notebook which causes the same misidentification
> to recur, resulting in persons being arrested
> several times based on misidentifications.

[Id. at ¶ 91.] Spriestersbach alleges that the City had notice
that the digital notebook contained errors in the personal
information and/or photographs of some of the persons depicted
therein. The City was also on notice that there was no system in
place to identify and correct such errors. Spriestersbach
alleges the City does not discipline or retrain employees who
enter erroneous personal identifying information in case
reporting systems or who fail to correct such errors.
Spriestersbach alleges the failure to identify and correct
errors in the digital notebook and the failure to discipline and
retrain employees who made or failed to correct such errors
constitute deliberate indifference to persons like
Spriestersbach who may be arrested because of erroneous
information in the digital notebook. [Id. at ¶¶ 92-93.]
Spriestersbach also argues the City had notice of the comingling
of his information with Thomas Castleberry's information because
the comingling was apparent on the face of the arrest reports,
and therefore it should have been obvious that, if
Spriestersbach interacted with HPD officers in the future, he

13

could be arrested again because of these errors. By allowing the
erroneous information to remain, the City was deliberately
indifferent that Spriestersbach and other persons in similar
situations would be misidentified and falsely arrested. [Id. at
¶¶ 116-17.] Further, there were other case reports regarding
Spriestersbach's interactions with HPD – from 2009 to 2012,
2015, and 2017 - that improperly had Thomas Castleberry's
personal information. Pursuant to HPD's longstanding practice
and custom, these case reports with the erroneous information
were uploaded state and national databases and to the HPD
digital notebook. [Id. at ¶¶ 118-19.]

Spriestersbach also adds additional allegations
regarding the events after his May 11, 2017 arrest. When
Spriestersbach was transported to the HPD Central Station after
the arrest, Bruhn reported to the HPD officer who was in charge
of the receiving desk ("Receiving Officer-in-Charge"). [Id. at
¶¶ 94-95.] Pursuant to HPD policy 7.01 VIII.A.3, the Receiving
Officer-in-Charge was required to "'review the circumstances of
each arrest before any person is booked in order to determine
whether there exist sufficient grounds or facts to justify the
arrest.'" [Id. at ¶ 97.] In addition, Section VIII.A.8 of that
policy states "'[n]o booking shall be made for an arrest by
warrant without first establishing the identity of the detainee

14

as the person named and accused in the warrant.'" [Id. at
¶ 104.]

Spriestersbach alleges the arrest report for the
May 11, 2017 arrest lists his name as the defendant, with his
state ID number, birth date, social security number, and other
personal information, but it also lists Thomas R. Castleberry as
an alias and includes Thomas Castleberry's social security
number. [Id. at ¶¶ 99-100.] According to Spriestersbach, Bruhn
informed the Receiving Officer-in-Charge that a search relating
to the Castleberry Warrant revealed conflicting names, social
security numbers, photographs, and other personal facts. Bruhn
also informed the Receiving Officer-in-Charge that the digital
notebook's photograph for Thomas Castleberry did not match the
Crimestoppers flyer for Spriestersbach. [Id. at ¶¶ 102-03.]
Spriestersbach points out that HPD policy 7.01 VIII.C.1 requires
that "'all arrestees for whom an H.P.D. Arrest Report has been
generated shall be fingerprinted and photographed.'" [Id. at
¶ 105 (brackets omitted).] Spriestersbach points out that the
May 11, 2017 arrest report states his arrest was "'verified by
prints.'" [Id. at ¶ 106.]

Spriestersbach alleges the Receiving Officer-in-Charge
approved his May 11, 2017 arrest, even though Spriestersbach's
fingerprints and mugshots should have confirmed that he was not
Thomas Castleberry. Further, in doing approving the arrest, the

15

Receiving Officer-in-Charge acted with deliberate indifference to Spriestersbach's rights and was reckless when the officer failed to confirm Spriestersbach's identity. [Id. at ¶¶ 107-08.] The Receiving Officer-in-Charge allowed Bruhn to hand-write "'AKA Spriestersbach, Joshua C." on the Castleberry Warrant,[5] even though they did not verify that Spriestersbach was Thomas Castleberry's alias, nor that Spriestersbach was the person named in the warrant. [Id. at ¶ 110.] Spriestersbach alleges "[p]ermitting officers to write alias names on warrants was consistent with the way the H.P.D. officer in charge of the receiving desk and other City supervisors exercised supervision over H.P.D. officers." [Id. at ¶ 140.] According to Spriestersbach, all of the actions associated with his booking and the approval of his arrest were "done maliciously, with reckless disregard to [his] legal rights, with deliberate indifference and are all actions by the city that caused the misidentification of [Spriestersbach], his arrest and his prolonged incarceration and commitment." [Id. at ¶ 112.] Further, the City, acting through the Receiving Officer-in-Charge, was deliberately indifferent to Spriestersbach's rights

---

[5] Spriestersbach alleges that, on May 11, 2017, the Castleberry Warrant was considered an electronic warrant. When Bruhn printed out the warrant from the warrant database, the printed warrant was then treated as the original warrant. Bruhn made his handwritten note on the original warrant. [Amended Complaint at ¶ 133.]

16

when it allowed Bruhn to make the handwritten note on the
Castleberry Warrant because the Receiving Officer-in-Charge did
not confirm that Spriestersbach was the person named on the
warrant. [Id. at ¶ 140.]

> Spriestersbach alleges:
>
> The H.P.D. receiving officer in charge binds the
> City as a policymaker with respect to decisions
> on individual arrests, because final authority
> has been delegated to the H.P.D. officer in
> charge of the receiving desk to determine whether
> sufficient grounds justify arrests. Decisions by
> the H.P.D. officer in charge of the receiving
> desk are in effect decisions of the City with
> respect to these individual arrests.

Id. at ¶ 98; see also id. at ¶ 109 (similar). Spriestersbach
therefore alleges the Receiving Officer-in-Charge's approval of
his May 11, 2017 arrest and the officer's decisions regarding
the protocols used during the approval process are binding on
the City. [Id. at ¶ 111.]

Spriestersbach also argues HPD Policy 7.01 VIII.F
requires that, when misidentifications are discovered, the
"'Records and Identification commander shall also ensure that
the Department of the Prosecuting Attorney is notified of the
correct identity of the arrested person.'" [Id. at ¶ 123.]
Spriestersbach contends various HPD officers - including the
officer serving as the Receiving Officers-in-Charge at the time
of each of Spriestersbach's arrests - and the HPD Records and
Identification Division discovered Spriestersbach's

17

misidentification in 2010, 2011, 2012, 2015, and 2017, but they
did not follow Policy 7.01 VIII.F. According to Spriestersbach,
HPD had a longstanding policy of not correcting records. [Id. at
¶¶ 123-24.] This resulted in "repeated arrests without probable
cause of persons including Joshua Spriestersbach." [Id. at
¶ 124.]

Spriestersbach points out that the Castleberry Warrant
is still active. Further, even after this case was filed, the
HPD case reporting system continued to improperly comingle
Spriestersbach's personal information with Thomas Castleberry's
and the errors continued to be uploaded to state and national
reporting systems. [Id. at ¶¶ 125-26.] According to
Spriestersbach, the HPD digital notebook was not corrected until
2022, *i.e.,* after he filed a motion for a preliminary
injunction. [Id. at ¶ 127.] Spriestersbach argues "City
policymakers and employees acted with malice, reckless
disregard, and deliberate indifference to [his] rights . . . by
not correcting their records and databases." [Id. at ¶ 128.]

Spriestersbach emphasizes that Bruhn was an HPD
officer since 2012, but Bruhn and the other officers who
encountered Spriestersbach and who discovered the erroneous
personal information in the case record system were not trained
to correct the errors. The failure to correct erroneous records
made it more likely that officers' reliance on the records would

18

lead to the misidentification of suspects, including Spriestersbach. The City's failure to train personnel regarding the correction of errors was deliberately indifferent to Spriestersbach's rights and the rights of others. [Id. at ¶¶ 129-32.]

Spriestersbach states that, "[o]n occasions during his service with H.P.D., officer Bruhn wrote the name of other people on warrants, based on the long-standing H.P.D. custom and practice of treating people identified through an alias the same as persons actually named in warrants." [Id. at ¶ 135.] Spriestersbach alleges this practice leads to misidentifications and causes people to be falsely arrested on warrants issued for another person. Similarly, the City's failure to train and supervise HPD officers, including the Receiving Officers-in-Charge, to confirm that the person taken into custody is the person named on the warrant was likely to result in misidentification and wrongful arrest. Further, the City was deliberately indifferent to the rights of persons, including Spriestersbach, who had errors in their HPD records incorporating the personal information of other persons. [Id. at ¶¶ 137-39.]

Spriestersbach alleges that, in his May 11, 2017 arrest, the Receiving Officer-in-Charge was authorized to act on the City's behalf, and the City approved Spriestersbach's arrest

even though it should have been obvious that Spriestersbach was
not the person named in the Castleberry Warrant. After the
Receiving Officer-in-Charge made the decision to approve the
arrest, there was no further review by the City before
Spriestersbach was required to appear in court, and therefore
the decision by the Receiving Officer-in-Charge is binding upon
the City. Further, the May 11, 2017 arrest was pursuant to the
City's practice or custom of relying on HPD records, including
the digital notebook and arrest records, even though the City
was aware that errors in the personal information contained in
those systems were not corrected. [Id. at ¶¶ 166-68.]
Spriestersbach alleges the "reliance on personal identifiers and
photos known to be wrong was the moving force behind and caused
individuals including [Spriestersbach] to be arrested falsely
for crimes the individuals did not commit," and the Receiving
Officer-in-Charge's decision to approve his May 11, 2017 arrest
was the moving force behind the violation of Spriestersbach's
constitutional rights. [Id. at ¶¶ 167-68.] Spriestersbach
alleges "there were many other similar victims," including one
"mentally ill man" who was arrested shortly after Spriestersbach
filed this action. [Id. at ¶ 167.]

Count I of the Amended Complaint now includes a
summary of the new factual allegations about the Receiving
Officer-in-Charge and the City's custom and practice of relying

20

on record systems that contained erroneous personal information that was not corrected. See id. at ¶¶ 172-74. Spriestersbach also added the allegation that the City's customs, policies, and practices caused his misidentification and arrest on the Castleberry Warrant and that the violations of his rights and the injuries he suffered were the proximate result of the defendants' actions and omissions. [Id. at ¶ 178.]

Count III of the Amended Complaint now includes a summary of the allegations regarding Doe Defendants 1-5, Bruhn, and the Receiving Officer-in-Charge for the May 11, 2017 arrest and the fact that they all knew or should have known that Spriestersbach was a person with a mental disability when they arrested him in 2011, 2015, and 2017, and they failed to accommodate him by verifying his identity. See id. at ¶¶ 192-94. Count III also alleges the City has direct liability because it knew that HPD officers would frequently interact with disabled persons who would have difficulty advocating for themselves to prevent a false arrest. In spite of this knowledge, the City allowed HPD officers to leave known errors in the record systems uncorrected and unaddressed. The City also failed to require that such persons be accommodated by requiring that their identity be confirmed prior to arrest. Spriestersbach argues the City knew that its inactions would result in the wrongful arrest of persons with mental disabilities. [Id. at ¶ 195.]

21

Count IV of the Amended Complaint now includes allegations about Bruhn and the Receiving Officer-in-Charge on the date of the May 11, 2017 arrest, alleging that they acted with malice, reckless disregard for Spriestersbach's rights, and an ulterior purpose. Their actions resulted in Spriestersbach being arrested without probable cause and being deprived of his liberty. The prosecution that ensued from the May 11, 2017 arrest ultimately resulted in Spriestersbach's favor. [Id. at ¶¶ 204-06.]

Counts XI and XII of the Amended Complaint now include allegations that the City is liable under respondeat superior for the actions of Bruhn, the Receiving Officer-in-Charge, and Doe Defendants 1-5. Spriestersbach summarizes the allegations regarding the conduct of Bruhn and the Receiving Officer-in-Charge related to the May 11, 2017 arrest, and Spriestersbach argues they knew their actions would cause Spriestersbach severe emotional distress. [Id. at ¶¶ 245-46, 252-53.]

In the New Claims Motion, the City argues Spriestersbach's "newly added federal claims in the First Amended Compliant – Pembaur/Praprotnik final policy maker and failure to discipline, train, and supervise claims" ("the New Claims") should be dismissed. [New Claims Motion at 2 & n.1 (citing Louis v. Praprotnik, 485 U.S. 112, 123 (1988) (plurality opinion); Pembaur v. Cincinnati, 475 U.S. 469, 480 (1986)).] The

City contends the New Claims should be stricken because
Spriestersbach violated the orders of this Court and the
magistrate judge. In the alternative, the City argues the New
Claims should be dismissed because they fail to state plausible
claims for relief. [Id.]

In the Original Claims Motion, the City seeks the
dismissal with prejudice of all claims against it in the Amended
Complaint. [Original Claims Motion at 2.] The City contends
Spriestersbach failed to cure the deficiencies in his claims
that this Court identified in the 8/18/22 Order. [Original
Claims Motion, Mem. in Supp. at 1.]

**DISCUSSION**

I. **New Claims Motion**

    A. **Request to Strike**

This Court turns first to the City's request that the
New Claims be stricken. In the 8/18/22 Order, this Court granted
Spriestersbach leave to amend his claims against the City to
cure the defects identified in the order. See 8/18/22 Order, 622
F. Supp. 3d at 971. The 8/18/22 Order did not grant
Spriestersbach leave to add new claims or new theories of
liability against the City.

Although it was not entirely clear in the original
Complaint, reading the Complaint as a whole, the claims against
the City in Counts I and II were based in part on a failure to

23

train and supervise theory. See Complaint at ¶ 62 ("At all times
relevant to this action, the City has failed to train and
supervise Officer Defendant Braun, Defendant H.P.D. Officers
Does 1-5, and other officers to determine exactly who they are
arresting and to make sure accurate information is in their
records, particularly when the officers are interacting with
mentally ill and/or houseless members of the community. These
failures to train and supervise were the moving force behind
[Spriestersbach's] improper arrest and detention.").[6] Although
failure to discipline was not alleged in the original Complaint,
the addition of failure to discipline allegations was an
amendment of the failure to train and supervise theory that was
alleged in Counts I and II of the original Complaint. Therefore,
the addition of failure to discipline allegations and the
expansion of the allegations regarding the failure to train and
supervise did not violate the 8/18/22 Order. The City's New
Claims Motion is denied to the extent that the City requests
that the portions of Counts I and II based on the alleged
failure to discipline, train, and supervise be stricken.[7]

---

[6] Spriestersbach's claim against the City in Count IV of the
original Complaint was not based upon a failure to train or
supervise theory. See Complaint at ¶¶ 87-90.

[7] This Court does not construe Spriestersbach's abuse of
process claim against the City in Count IV of the Amended
Complaint as based upon a failure to train, supervise, or
discipline theory. See Amended Complaint at ¶¶ 201-07.

As to Spriestersbach's allegations regarding a final policymaker as to individual arrests, this Court agrees with the City that Counts I and II of the original Complaint were not based on similar allegations. See generally Complaint at ¶¶ 64-77; compare, e.g., Amended Complaint at ¶ 98 ("The H.P.D. receiving officer in charge binds the City as a policymaker with respect to decisions on individual arrests, because final authority has been delegated to the H.P.D. officer in charge of the receiving desk to determine whether sufficient grounds justify arrests."). The addition of the final policymaker allegations in the Amended Complaint constitutes the assertion of a new theory of liability, in violation of the 8/18/22 Order. Although this Court could strike the portions of Counts I and II based on a final policymaker theory, this Court declines to do so for the sake of a complete analysis of Spriestersbach's claims. Thus, to the extent that the New Claims Motion asks this Court to strike the portions of Counts I and II based on final policymaker allegations, the motion is denied.

B. **Failure to State a Claim**

This Court next turns to Spriestersbach's alternative argument that the New Claims should be dismissed because they fail to state plausible claims for relief. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) ("To survive a motion to dismiss, a complaint must contain sufficient factual matter,

accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." (citations and internal quotation marks omitted)).

First, the New Claims Motion's request to dismiss the portions of Counts I and II based on alleged failures to train and supervise is denied because this Court will address the sufficiency of those portions of Counts I and II together with the other claims at issue in the Original Claims Motion.

### 1.   **Failure to Discipline**

As to the new portions of Counts I and II based on the City's alleged failure to discipline, this Court notes that the Ninth Circuit has stated:

> We have recognized that a § 1983 plaintiff may prove the second type of <u>Monell</u> liability,[8] deliberate indifference, through evidence of a "failure to investigate and discipline employees in the face of **widespread constitutional violations**." <u>Hunter v. Cty. of Sacramento</u>, 652 F.3d 1225, 1234 n.8 (9th Cir. 2011). Thus, it is sufficient under our case law to prove a "custom" of encouraging excessive force to provide evidence that personnel have been permitted to use force with impunity. <u>Id.</u> at 1233 ("We have

---

[8] See 8/18/22 Order, 622 F. Supp. 3d at 959, for a description of the legal principles applicable to a Section 1983 claim against a municipality based on <u>Monell v. Department of Social Services of New York City</u>, 436 U.S. 658 (1978).

long recognized that a custom or practice can be
inferred from widespread practices or evidence of
repeated constitutional violations for which the
errant municipal officers were not discharged or
reprimanded." (internal quotation marks and
citations omitted)); Larez [v. City of Los
Angeles], 946 F.2d [630,] 647 [(9th Cir. 1991)]
("[T]here was evidence of a departmental policy
or custom of resorting to the use of excessive
force. The jury properly could find such policy
or custom from the failure of Gates to take any
remedial steps after the violations."); McRorie
v. Shimoda, 795 F.2d 780, 784 (9th Cir. 1986)
("McRorie alleges that guards seriously injured
him and twenty-eight other prisoners during the
shakedown and that Sergeant Dunn was acting under
orders of his superiors. If proved, these acts
reflect a [policy or custom]."); see also
Velazquez v. City of Long Beach, 793 F.3d 1010,
1027-28 (9th Cir. 2015) (recognizing that a
plaintiff could present "a failure-to-discipline
Monell theory" based on evidence "that the City
had a policy or custom of failing to investigate
and discipline officers who had allegedly
committed prior instances of excessive force").

Rodriguez v. Cnty. of Los Angeles, 891 F.3d 776, 803 (9th Cir.

2018) (some alterations in Rodriguez) (emphasis added).

        In Rodriguez, the jury returned verdicts against the

County of Los Angeles and nineteen Los Angeles County Sheriff's

Department ("LASD") officers, and denied the defendants' motion

for judgment as a matter of law and their motion for a new

trial. Id. at 790. On appeal, the Ninth Circuit held that there

was substantial evidence establishing a "failure to investigate

and discipline employees in the face of widespread

constitutional violations." Id. at 803. That evidence included:

a report by a citizens' commission report regarding problems

with excessive force at the facility where the incidents at issue in the case occurred; the testimony of one of the defendant officer's supervisors that, according to his investigation, the defendant condoned subordinates' use of excessive force; evidence that LASD did not follow policies regarding the tracking of incidents involving the use of force against prisoners; and evidence that supervisors observed practices involving the use of excessive force but did nothing about them. Id. at 789-90, 803. Although Rodriguez did not address a district court's ruling on a motion to dismiss, the case is instructive as to the type of facts that are ultimately necessary establish municipal liability based on a failure to discipline.

Spriestersbach alleges the City did not discipline employees who failed to identify and correct personal identifying information after it was entered into the applicable case reporting system. [Amended Complaint at ¶ 92.] He also alleges the City failed to discipline Braun, Doe Defendants 1-5, the Receiving Officer-in-Charge, and others "to make sure they determine exactly who they are arresting and to make sure accurate information is entered in the in the City records, particularly when the officers are interacting with mentally ill and/or houseless members of the community." [Id. at ¶ 169.]

Spriestersbach alleges "[n]umerous case reporting records from interactions between [Spriestersbach] and the police in 2009, 2010, 2011, 2012, 2015, and 2017 all reveal personal identifiers related to [Spriestersbach] improperly merged with personal identifiers related to Thomas R. Castleberry." [Id. at ¶ 118.] He also generally alleges, "[o]n information and belief, the City case reporting system included numerous instances where personal identifiers and photos related to one individual would be improperly entered under a different individual." [Id. at ¶ 89.] Spriestersbach asserts the errors were not corrected, causing people to be wrongfully arrested for crimes they did not commit. [Id.]

Spriestersbach, however, does not identify any specific incidents when a person was wrongfully arrested because identifying information for another individual was erroneously included in the person's records. Although this Court is required to assume that the factual allegations in the Amended Complaint are true, that assumption does not apply to Spriestersbach's allegation of "numerous instances" of wrongful arrests based on erroneous personal identifiers because it is a conclusory allegation of one of the elements of his failure to discipline claim. See Iqbal, 556 U.S. at 678 ("Although for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true, we are not bound to accept

as true a legal conclusion couched as a factual allegation."
(citation and internal quotation marks omitted)); id.
("Threadbare recitals of the elements of a cause of action,
supported by mere conclusory statements, do not suffice."
(citation omitted)).

          Further, Spriestersbach does not allege that any City
supervisor was aware of and failed to act upon widespread
arrests of persons based upon erroneous identifying information.
The only allegation in the Amended Complaint regarding City
supervisors states: "Permitting officers to write alias names on
warrants was consistent with the way the H.P.D. officer in
charge of the receiving desk and other City supervisors
exercised supervision over H.P.D. officers." [Amended Complaint
at ¶ 140.] Even assuming that this allegation is true, it is
insufficient to allow this Court to draw the reasonable
inference that City supervisors were aware of and failed act
upon widespread arrests of persons based upon erroneous
identifying information. See Iqbal, 556 U.S. at 678.

          Spriestersbach alleges there were multiple incidents
where either his personal identifying information was comingled
with Thomas Castleberry's or it became apparent that comingling
of their information had occurred in the past. See Amended
Complaint at ¶ 118. However, the unspecified incidents referred
to in paragraph 118, which occurred over an almost eight-year

30

period, are insufficient to establish widespread constitutional violations. See Sabra v. Maricopa Cnty. Cmty. Coll. Dist., 44 F.4th 867, 884 (9th Cir. 2022) ("Plaintiffs cannot allege a widespread practice or custom based on isolated or sporadic incidents; liability must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." (brackets, citations, and internal quotation marks omitted)). This Court therefore concludes that Spriestersbach fails to plead sufficient factual allegations to state a plausible Monell claim based on failure to discipline. The portions of Counts I and II based on the City's alleged failure to discipline are dismissed.

Dismissal with prejudice and without leave to amend is not appropriate unless it is clear . . . that the complaint could not be saved by amendment." Hoang v. Bank of Am., N.A., 910 F.3d 1096, 1102 (9th Cir. 2018) (citation and quotation marks omitted)). Spriestersbach had the opportunity to conduct significant discovery before he filed the Amended Complaint. Further, Spriestersbach has not indicated that he would be able to add further allegations to support his failure to discipline theory if he were granted leave to amend. This Court therefore concludes it is clear that Spriestersbach cannot cure the defect in these portions of Counts I and II by amendment. The dismissal

31

of the portions of Counts I and II based upon the City's alleged failure to discipline is with prejudice.

### 2.   **Final Policymaker**

Spriestersbach alleges the Receiving Officer-in-Charge is a final policymaker for purposes of his Monell claims because that officer has been delegated the power to change warrants without court approval. [New Claims Opp. at 12-13.]

The Ninth Circuit has stated that:

> ["T]he identification of those officials whose decisions represent the official policy of the local government unit is itself a legal question to be resolved by the trial judge **before** the case is submitted to the jury." Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 737, 109 S. Ct. 2702, 105 L. Ed. 2d 598 (1989) (internal quotation marks and citation omitted); see also Christie v. Iopa, 176 F.3d 1231, 1235 (9th Cir. 1999). "Once those officials who have the power to make official policy on a particular issue have been identified, it is for the jury to determine whether their decisions have caused the deprivation of rights at issue . . . ." Jett, 491 U.S. at 737, 109 S. Ct. 2702.

Lytle v. Carl, 382 F.3d 978, 982 (9th Cir. 2004) (emphasis and some alterations in Lytle). "Whether an official is a policymaker for Monell purposes is a question governed by state law." Ellins v. City of Sierra Madre, 710 F.3d 1049, 1066 (9th Cir. 2013) (citing City of St. Louis v. Praprotnik, 485 U.S. 112, 124, 108 S. Ct. 915, 99 L. Ed. 2d 107 (1988)).

Spriestersbach does not identify any state law that renders the Receiving Officer-in-Charge a final policymaker for

either HPD or the City. See, e.g., Puana v. Kealoha, CIV.
NO. 16-00659 LEK-WRP, 2023 WL 413127, at *3-4 (D. Hawai`i
Jan. 25, 2023) (concluding that the HPD Chief of Police
"possessed final policymaking authority for the actions that
lead to the presumed deprivation of [the plaintiff]'s
constitutional rights," based upon Hawai`i Revised Statutes
Section 52D-3, and Sections 6-1601, 6-1603, 6-1604, 6-1606 of
the Revised Charter of the City and County of Honolulu 1973
(Amended 2017 Edition)). Spriestersbach appears to acknowledge
that he cannot do so and relies solely upon a delegated power
theory. See New Claims Opp. at 13.

> A municipal employee may act as a *de facto*
> policymaker under § 1983 without explicit
> authority under state law, but we are ordinarily
> "not justified in assuming that municipal
> policymaking authority lies somewhere else than
> where the applicable law purports to put it."
> City of St. Louis v. Praprotnik, 485 U.S. 112,
> 126, 108 S. Ct. 915, 99 L. Ed. 2d 107 (1988).
> Depending on the circumstances, however, we may
> also look to the way a local government entity
> operates in practice. Jett, 491 U.S. at 737, 109
> S. Ct. 2702 (trial judge must identify official
> policymakers based on "state and local positive
> law, as well as custom or usage having the force
> of law") (citation and quotation marks omitted).
> While "[a]uthority to make municipal policy may
> be granted directly by a legislative enactment,"
> it may also be "delegated by an official who
> possesses such authority." Pembaur v. Cincinnati,
> 475 U.S. 469, 483, 106 S. Ct. 1292, 89 L. Ed. 2d
> 452 (1986).

Lytle, 382 F.3d at 982-83 (alteration in Lytle).

Spriestersbach does not allege who delegated final policymaking authority to the Receiving Officer-in-Charge nor how that authority was delegated. Spriestersbach only pleads the conclusory allegation that the Receiving Officer-in-Charge is "a policymaker with respect to decisions on individual arrests, because final authority has been delegated to" that officer. See Amended Complaint at ¶ 98. Nor would Spriestersbach be able to plead additional factual allegations to establish that every HPD officer who serves as the Receiving Officer-in-Charge at any given time has been delegated final policymaking authority. Cf. Christie v. Iopa, 176 F.3d 1231, 1237 (9th Cir. 1999) ("[T]his court has refused to hold that the Los Angeles chief of police had delegated final policymaking authority to rank-and-file police officers." (some citations omitted) (citing Trevino v. Gates, 99 F.3d 911, 920 (9th Cir. 1996) ("The police officers who shot Bahena were not 'officials with final policy-making authority' and they were not ordered to shoot by the police chief, the City Council or anyone else possessing final policy-making authority.")). This Court therefore concludes that Spriestersbach has failed to plead a plausible Monell claim based on a final policymaker theory and dismisses the portions of Counts I, II, and IV based on that theory of liability. Because this Court also concludes that Spriestersbach cannot

save those portions of Counts I, II and IV by amendment, the dismissal is with prejudice.

## II.  **Original Claims Motion**

### A.    **Time-Bar Argument**

The City acknowledges that this Court ruled on its time-bar argument in the 8/18/22 Order. See Original Claims Motion, Mem. in Supp. at 22. However, the City argues "the new allegations in the [Amended Complaint] reinforce the fact that [Spriestersbach] is relying on time-barred actions in 2011 and 2015 as the basis for liability, and not simply for 'background.'" [Id.] This Court rejects this argument and reiterates that it construes the factual allegations regarding events in 2011 and 2015 as background for Spriestersbach's claims, which arise from his arrest on May 11, 2017 and his subsequent detention. See 8/18/22 Oder, 622 F. Supp. 3d at 954-55 n.5.

The City also raises additional arguments in which the City attempts to establish that this Court erred in rejecting the City's time-bar challenge to the claims in the original Complaint. [Original Claims Motion, Mem. in Supp. at 24-25.] These arguments are rejected as an untimely attempt to seek reconsideration of the 8/18/22 Order. See Local Rule LR60.1 (stating a motion for reconsideration alleging "[m]anifest error

of law or fact" "must be filed and served within fourteen (14) days after the court's order is issued").

  The City's Original Claims Motion is therefore denied as to the City's time-bar arguments.

**B. Count I (Fourth Amendment Violation –<br>Wrongful Arrest and Detention) and Count II<br><u>(Fourteenth Amendment – Due Process Violation)</u>**

  In the 8/18/22 Order, this Court noted that Spriestersbach's claim against the City in Count I of the original Complaint was based upon the City's alleged inaction and failure to implement adequate policies. 662 F. Supp. 3d at 959. Judgment on the pleadings was granted in favor of the City as to that claim because the Complaint did not "allege a policy that is 'so facially deficient that any reasonable policymaker would recognize the need to take action,'" nor did it contain sufficient allegations of "'a pattern of prior, similar violations of federally protected rights, **of which the relevant policymakers had actual or constructive notice.**'" <u>Id.</u> at 960 (emphasis in 8/18/22 Order) (quoting <u>Park v. City & Cnty. of Honolulu</u>, 952 F.3d 1136, 1141, 1142 (9th Cir. 2020)). Judgment on the pleadings was granted in favor of the City as to Count II based on the same analysis as Count I. <u>Id.</u>

  In light of this Court's ruling that that the Receiving Officer-in-Charge is not a final policymaker for purposes of Spriestersbach's <u>Monell</u> claims, Spriestersbach's

Section 1983 claims in the Amended Complaint are based upon the
City's alleged inaction and failure to implement adequate
policies. See, e.g., Amended Complaint at ¶¶ 174-75, 178. Thus,
Spriestersbach's Section 1983 claims against the City in the
Amended Complaint will be analyzed under the same standards as
the Section 1983 claims against the City in the original
Complaint.

### 1. **Digital Notebook**

Spriestersbach alleges that, on May 11, 2017, Bruhn
and his partner initiated contact with him because, based on the
digital notebook, they believed Spriestersbach was the person
they were seeking to arrest on the Castleberry Warrant. [Id. at
¶ 74.] On May 11, 2017, the entry in the digital notebook for
Thomas Castleberry had Thomas Castleberry's personal
information, but Spriestersbach's photograph. [Id. at ¶ 85.]
Spriestersbach alleges that, pursuant to the longstanding custom
and practice regarding the digital notebook, the previous
"improper association of [Spriestersbach] with Thomas R.
Castleberry was carried over to the City digital notebook and
not corrected even after errors were identified." See id. at
¶ 119.

On May 11, 2017, Spriestersbach gave the officers his
name, birth date, and social security number. [Id. at ¶ 75.]
Bruhn researched Spriestersbach's name in various databases,

37

including the digital notebook, [id. at ¶ 77,] and Bruhn and his partner arrested Spriestersbach on the Castleberry Warrant in reliance on the digital notebook, [id. at ¶ 87]. Spriestersbach alleges HPD officers had a longstanding custom and practice of studying the photos and information in the digital notebook and relying on that information when they made arrests. [Id. at ¶ 83.] For example, Bruhn and his partner would "stud[y] the digital notebook and . . . print[] pages of suspects so that they could compare the photo from the digital notebook to the potential suspects they encountered while on patrol." [Id. at ¶ 84.]

Spriestersbach alleges the information in the digital notebook comes from the City's case reporting system, and the City's case reporting system has numerous instances of personal identifying information entered for the wrong person. [Id. at ¶ 89.] Spriestersbach also alleges that, under City policy, a mistaken identification arrest caused by erroneous information in the reporting system is considered to have been corrected when the arrestee is released. City policies do not require HPD employees to correct the erroneous information in the digital notebook, nor are they trained to do so. Id. at ¶ 91; see also id. at ¶ 130. Spriestersbach alleges:

> On information and belief, the City was on notice
> that errors regarding the personal information
> and/or photos of wanted persons would be posted

38

in the digital notebook and that there was no
system in place to identify and correct those
errors. This failure to identify and correct
errors in the digital notebook was deliberately
indifferent to the rights of [Spriestersbach] and
other persons whose information was posted in the
digital notebook as it exposed them to repeated
arrests based on misidentification.

[Id. at ¶ 93.]

Accepting the factual allegations of the Amended
Complaint as true, Spriestersbach has sufficiently alleged
deliberate indifference by the City because the custom and
practice of failing to correct known instances of personal
identifying information being incorrectly associated with the
wrong person in the digital notebook is "so facially deficient
that any reasonable policymaker would recognize the need to take
action." See Park, 952 F.3d at 1141. Further, Spriestersbach has
sufficiently alleged that the custom and practice caused the
deprivation of his constitutional rights. See id. This Court
therefore concludes that Spriestersbach has pled plausible
Monell claims in Counts I and II based upon the customs,
practices, and policies related to the use of the digital
notebook, particularly the failure to correct known errors in
the digital notebook. This includes Spriestersbach's allegations
that the City failed to provide adequate training and
supervision regarding the use of the digital notebook,
particularly the failure to correct known errors in the digital

notebook. The City's Original Claims Motion is denied to the extent that it seeks dismissal of the portions of Counts I and II based upon the customs, practices, and policies related to the use of the digital notebook.

### 2. **Other Allegations**

To the extent that Spriestersbach's claims against the City in Counts I and II are premised upon City customs, practices, and policies other than those related to the use of the digital notebook, including other instances of allegedly deficient training and supervision, those portions of Counts I and II are insufficiently pled and are therefore dismissed. Further, the dismissal is with prejudice because, based on the procedural history of this case, this Court concludes that it is not possible for Spriestersbach to cure the defects in those claims by amendment. The City's Original Claims Motion is granted as to the portions of Counts I and II asserting claims against the City premised upon City customs, practices, and policies other than those related to the use of the digital notebook.

### C. **Count IV – Section 1983 Abuse of Process Claim**

In the 8/18/22 Order, this Court noted that it was unclear whether a Section 1983 abuse of process claim is established by the same elements as the Hawai`i law abuse of process claim or whether it is essentially a malicious

prosecution claim with the additional requirement of conduct
that shocks the conscience. 622 F. Supp. 3d at 961. This Court
dismissed the Section 1983 abuse of process claim in the
original Complaint because it did not include

> sufficient factual allegations to support
> [Spriestersbach's] abuse of process claim against
> the City because Count IV only makes the
> conclusory allegation that the City "continued to
> commit multiple willful actions for the improper
> purpose of prosecuting [him] for a crime he did
> not commit, as more fully alleged above." See
> Complaint at ¶ 89.

Id.

Compared to the original Complaint, the Amended
Complaint includes additional allegations about the Receiving
Officer-in-Charge's ulterior purpose, malice, and reckless
disregard. See Amended Complaint at ¶¶ 204-06. However, because
this Court has ruled that the Receiving Officer-in-Charge is not
a final policymaker for purposes of a Monell claim against the
City, Spriestersbach's additional factual allegations in
Count IV are insufficient to state a plausible abuse of process
claim against the City. That portion of Count IV is therefore
dismissed, and the dismissal is with prejudice because, based on
the procedural history of this case, this Court concludes that
it is not possible for Spriestersbach to cure the defects in his
abuse of process claim against the City by amendment. The City's
Original Claims Motion is granted as to Count IV.

D.    **Count III – ADA Claim**

In the 8/18/22 Order, this Court concluded the original Complaint sufficiently alleged that he is a qualified person with a disability for purposes of the ADA and that, because of his disability, he was either denied the benefits of the City's police services or subjected to discrimination by a City agency. 622 F. Supp. 3d at 962-63. However, judgment on the pleadings was granted in favor of the City as to Spriestersbach's ADA claim because the Complaint did not sufficiently allege that the HPD officers who arrested him on May 11, 2017 knew or should have known about his disability. Id. at 963-64.

In the Amended Complaint, Spriestersbach added the allegation that:

> As set forth above, including in paragraphs 62-80, [Doe Defendants] 1-5 knew – and it would have been obvious to any reasonable person – that [Spriestersbach] was a person suffering from a mental disability which would make it difficult for others to find him credible or for [Spriestersbach] to vigorously advocate for himself to ensure he was not falsely arrested. The fact that [Spriestersbach] often failed to respond to questions, that he was terse when he did talk, that his responses often did not make sense given the context, that he was houseless, and that a search of the records would reveal his episode in the harbor from 2010 and the missing person report listing his mental illness in 2011 demonstrate that [Spriestersbach] suffered from this disability and the illness would have been apparent when these Defendants interacted or communicating with [Spriestersbach].

42

[Amended Complaint at ¶ 192.] Paragraphs 62 to 72 of the Amended Complaint describe Spriestersbach's arrest on January 15, 2015, when Spriestersbach refused to provide his name to the HPD officer "at least seven times" and, according to the officer, Spriestersbach "stated he would only provide his 'signature and number.'" [Id. at ¶ 63.] Spriestersbach alleges "[t]he H.P.D. officers who made the arrest knew – and it would have been obvious to any reasonable person – that [Spriestersbach] was a person suffering from a mental disability. His unusual responses to the H.P.D. officer when arrested helped put the officers on notice." [Id. at ¶ 69.] Even assuming that the HPD officers who arrested Spriestersbach on January 15, 2015 knew or should have known about Spriestersbach's disability, the allegations regarding Spriestersbach's January 15, 2015 arrest are merely background, and his claims arise only from his May 11, 2017 arrest and the events that followed. See supra Discussion Section II.A.

In contrast to the January 15, 2015 arrest, there are no allegations that Spriestersbach failed to respond to questions prior to the May 11, 2017 arrest or that, when he did respond, his answers did not make sense. On May 11, 2017, Spriestersbach "was houseless and waiting for food with many others outside of Safe Haven." [Amended Complaint at ¶ 73.] He

43

was sleeping and was awoken by Bruhn and his partner. Spriestersbach provided his name, birth date, and social security number. [Id. at ¶¶ 74-75.] He alleges he "was reclusive and withdrawn and his responses to the H.P.D. officer's inquiries were sparse." [Id. at ¶ 76.] The allegations regarding Spriestersbach's May 11, 2017 arrest are insufficient to allow this Court to draw the reasonable inference that Bruhn and his partner knew or should have known about his disability.

Spriestersbach also appears to base his ADA claim upon the alleged failure to correct known errors in HPD databases, including the digital notebook. See id. at ¶¶ 193-94. Spriestersbach does not adequately allege that the failure to correct known errors was because of his disability. See Payan v. Los Angeles Cmty. Coll. Dist., 11 F.4th 729, 737 (9th Cir. 2021). Thus, to the extent that Spriestersbach's claim against the City in Count III is based upon the alleged failure to correct known errors in the relevant City databases, Spriestersbach fails to state a plausible ADA claim.

Spriestersbach also alleges the City is directly liable because it failed to provide him with reasonable accommodations. [Amended Complaint at ¶ 195.]

> Defendant City was fully aware that its H.P.D.
> officers would frequently interact with and
> arrest persons who would have difficulties
> appearing credible, or be unable to advocate for
> themselves to ensure that they are not falsely

arrested, like [Spriestersbach]. Defendant City
knew some of these people would be falsely
identified or connected to true suspects and
arrested, and that such people would not be as
able to advocate for their freedom and to clarify
any such mistakes as others. However, Defendant
City allowed its H.P.D. officers to not correct
such database systems or otherwise flag that the
person is not the true target of a warrant so as
to the reduce the known risk and likelihood that
such persons are detained and held. Likewise, the
City knows that persons with these disabilities
could be accommodated by verifying whether they
are in fact the subject of warrants, particularly
when the data for such warrants is inconsistent
with those of the person arrested.

[Id.] Spriestersbach argues that the City should have

accommodated his disability by confirming his identifying

information, but, as discussed above, Spriestersbach has not

sufficiently alleged that the arresting officers on May 11, 2017

knew or should have known about Spriestersbach's disability.

Because they did not have reason to know of Spriestersbach's

disability, they did not have a duty to provide an accommodation

for his disability. Further, to the extent that Spriestersbach

argues the City is liable because it did not require City

personnel to correct errors in City databases, Spriestersbach

does not adequately allege that the City failed to make such

corrections because of Spriestersbach's disability.

Spriestersbach has failed to allege a plausible ADA

claim against the City. His claim against the City in Count III

must be dismissed, and the dismissal is with prejudice because

this Court concludes that, under the circumstances of this case, it is not possible for Spriestersbach to cure the defects in his ADA claim against the City by amendment. The City's Original Claims Motion is granted as to Count III.

### E.    Count XI (IIED) and Count XII (NIED)

As with the original Complaint, Spriestersbach's IIED and NIED claims against the City are based on the respondeat superior doctrine. See 8/18/22 Order, 622 F. Supp. 3d at 964 (citing Complaint at ¶¶ 126-33); Amended Complaint at ¶¶ 245, 252. Thus, the standards described in the 8/18/22 Order are also applicable to Spriestersbach's IIED and NIED claims in the Amended Complaint.

Spriestersbach's IIED claim and NIED claim in the original Complaint were based upon Bruhn's and other HPD officers' involvement in Spriestersbach's May 11, 2017 arrest. This Court concluded that Spriestersbach sufficiently alleged that they were acting within the scope of their authority, but he failed to plead sufficient factual allegations to support his position that they acted maliciously when they misidentified and arrested him as Thomas Castleberry. 8/18/22 Order, 622 F. Supp. 3d at 964-65.

Spriestersbach's IIED claim and NIED claim in the Amended Complaint are based primarily upon the actions of Bruhn and the Receiving Officer-in-Charge. See Amended Complaint at

46

¶¶ 246, 253. Reading the Amended Complaint as a whole, Spriestersbach sufficiently alleges they were acting within the scope of their respective authority during the events relevant to this case. See Vargas v. City & Cnty. of Honolulu, CIV. NO. 19-00116 LEK-WRP, 2020 WL 3547941, at *18-19 (D. Hawai`i June 30, 2020); see also, e.g., Amended Complaint at ¶¶ 74-79, 94-97. As to malice, Spriestersbach alleges

> H.P.D. officer Bruhn and the officer in charge of the receiving desk acted with malice when they arrested and detained [Spriestersbach] when his fingerprints did not match those of Thomas R. Castleberry; when his photo did not match Thomas R. Castleberry's; when his personal identifiers did not match those of Thomas R. Castleberry; and when they chose to simply change the name on the warrant rather than defer the arrest and confirm that [Spriestersbach] was not Thomas R. Castleberry. These city employees knew that their actions would cause severe emotional distress to [Spriestersbach].

Amended Complaint at ¶ 246; see also id. at ¶ 253 (similar). Further, paragraph 80, quoted supra, contains allegations that Bruhn acted with malice.

Spriestersbach alleges the Receiving Officer-in-Charge approved Spriestersbach's May 11, 2017 arrest on the Castleberry Warrant, [id. at ¶ 107,] in spite of the following circumstances:

> 102. H.P.D. officer Bruhn disclosed to the H.P.D. officer in charge of the receiving desk the fact that H.P.D. officer Bruhn's record searches relating to Thomas R. Castleberry's warrant produced two conflicting social security

47

> numbers, two conflicting names, conflicting
> personal facts, and photographs that did not
> match.
>
> 103. On information and belief, H.P.D.
> officer Bruhn also spoke with the H.P.D. officer
> in charge of the receiving desk about the fact
> that the photo of Thomas R. Castleberry in the
> digital notebook did not match the photo in the
> flyer created by Crimestoppers.

[Id. at pg. 27.] Further, the arrest report states that

Spriestersbach's arrest was verified through fingerprints. [Id.

at ¶ 106.] However, that apparently was false because, after

Spriestersbach's July 26, 2010 arrest on the Castleberry

Warrant, fingerprint testing confirmed that Spriestersbach was

not Thomas Castleberry, and Spriestersbach was released without

charges. See id. at ¶¶ 41-43. Similarly, after his January 17,

2015 arrest, HPD officers confirmed that Spriestersbach's

fingerprints did not match Thomas Castleberry's, and

Spriestersbach was not arrested on the Castleberry Warrant. See

id. at ¶¶ 62-68. It can be reasonably inferred that, on May 11,

2017, Spriestersbach's fingerprints were either not taken or

were not analyzed because, if they had been, the analysis would

have confirmed that Spriestersbach was not Thomas Castleberry.

Spriestersbach also alleges the Receiving Officer-in-Charge

allowed Bruhn to write "AKA Spriestersbach, Joshua C." on the

Castleberry Warrant, even though they did not verify that

Spriestersbach was the person named in the Castleberry Warrant.
[Id. at ¶ 110.]

This Court concludes that the Amended Complaint's
allegations are sufficient to allege that Bruhn and the
Receiving Officer-in-Charge were motivated by malice when they
engaged in the actions and omissions described in the Amended
Complaint. See Vargas, 2020 WL 3547941, at *18. Therefore,
Spriestersbach has sufficiently alleged a basis for the City's
respondeat superior liability for his IIED and NIED claims. This
Court must therefore determine whether the Amended Complaint
pleads allegations that, if proven, would establish the elements
of Spriestersbach's IIED and NIED claims.

### 1.   Count XI - IIED

The Hawai`i Supreme Court has stated:

> [T]he tort of IIED consists of four elements:
> "1) that the act allegedly causing the harm was
> intentional or reckless, 2) that the act was
> outrageous, and 3) that the act caused 4) extreme
> emotional distress to another." Hac [v. Univ. of
> Hawai`i], 102 Hawai`i [102,] 106-07, 73 P.3d
> [46,] 60-61 [(2003)]. "The term 'outrageous' has
> been construed to mean without just cause or
> excuse and beyond all bounds of decency." Enoka
> v. AIG Hawai`i Ins. Co., Inc., 109 Hawai`i 537,
> 559 128 P.3d 850, 872 (2006) (citations and some
> internal quotation marks omitted). "The question
> whether the actions of the alleged tortfeasor are
> unreasonable or outrageous is for the court in
> the first instance, although where reasonable
> people may differ on that question it should be
> left to the jury." Takaki v. Allied Machinery
> Corp., 87 Hawai`i 57, 68, 951 P.2d 507, 518 (App.
> 1998) (quotations and quotation marks omitted).

<u>Young v. Allstate Ins. Co.</u>, 119 Hawai`i 403, 429, 198 P.3d 666, 692 (2008) (footnote omitted).

Based on the factual allegations discussed above, Spriestersbach has adequately alleged that Bruhn's actions and the Receiving Officer-in-Charge's actions were intentional or reckless. Spriestersbach alleges that because of their actions, he "suffered and continues to suffer severe emotional distress." <u>See</u> Amended Complaint at ¶ 248. Further, this Court finds that reasonable people could differ as to the question of whether Bruhn's actions and the Receiving Officer-in-Charge's actions were outrageous. <u>See</u> <u>Young</u>, 119 Hawai`i at 429, 198 P.3d at 692. This Court therefore concludes that Spriestersbach has stated a plausible IIED claim against the City based upon Bruhn's and the Receiving Officer-in-Charge's actions and omissions related to Spriestersbach's May 11, 2017 arrest. The City's Original Claims Motion is therefore denied as to Count XI.

## 2. **Count XII - NIED**

This district court has stated the elements of an NIED claim are:

(1)  that the defendant engaged in negligent conduct;

(2)  that the plaintiff suffered serious emotional distress; and,

(3) that such negligent conduct by the defendant was a legal cause of the serious emotional distress.

Kauhako v. State of Hawaii Bd. Of [sic] Ed., Civ. No. 13-00567 DKW-BMK, 2015 WL 5312359, *11 (D. Haw. Sept. 9, 2015).

An NIED claim is merely a negligence claim alleging a wholly psychic injury. Duty and breach of duty are essential elements of an NIED claim and are analyzed utilizing ordinary negligence principles. Kahoohanohano v. Dep't of Human Servs., 178 P.3d 538, 582 (Haw. 2008).

Ricks v. Matayoshi, CIV. NO. 16-00044 HG-KSC, 2017 WL 1025170, at *11 (D. Hawai`i Mar. 16, 2017), aff'd sub nom. Ricks v. Dep't of Educ., 752 F. App'x 518 (9th Cir. 2019). Further, under Hawai`i law, as part of the plaintiff's requirement to prove actual injury, he must prove "that someone was physically injured by the defendant's conduct, be it the plaintiff himself or herself or someone else." Doe Parents No. 1 v. State, Dep't of Educ., 100 Hawai`i 34, 69–70, 58 P.3d 545, 580–81 (2002) (citation omitted).

Based on the factual allegations discussed above, Spriestersbach has adequately alleged that Bruhn's and the Receiving Officer-in-Charge's actions and omissions were at least negligent. Spriestersbach alleges that because of their actions, he "suffered and continues to suffer severe emotional distress." See Amended Complaint at ¶ 254. Although Count XII does not expressly allege a physical injury caused by their

conduct, Spriestersbach alleges he suffered physical injury because of his unlawful imprisonment while in Defendant Department of Public Safety's ("DPS") custody and while he was in Defendant Hawai`i State Hospital's ("HSH") custody. See id. at ¶¶ 214, 222. It can be reasonably inferred from the factual allegations of the Amended Complaint that Bruhn's conduct the Receiving Officer-in-Charge's conduct were legal causes of Spriestersbach's physical injury because, but for their conduct, Spriestersbach would not have been placed in DPS's custody nor would he have been subjected to the judicial proceedings that placed him in HSH's custody. This Court therefore concludes that Spriestersbach has stated a plausible NIED claim against the City based upon Bruhn's and the Receiving Officer-in-Charge's actions and omissions related to Spriestersbach's May 11, 2017 arrest. The City's Original Claims Motion is therefore denied as to Count XII.

### 3. The Second Amended Complaint

The Order on Dr. Garrett's Motion and the Order on the PD Defendants' Motion directed Spriestersbach to file his second amended complaint by March 29, 2024. [Order on Dr. Garrett's Motion at 31; Order on the PD Defendants' Motion at 33.] The 3/15/24 EO Ruling stated that Spriestersbach's claims against the City in Counts XI and XII were dismissed with prejudice and that the forthcoming written order on the City's Motions would

52

not affect the deadline set in the Order on Dr. Garrett's Motion
and the Order on the PD Defendants' Motion. See 3/15/24 EO
Ruling at PageID.4233-34.

Spriestersbach filed his Second Amended Complaint on
March 29, 2024. [Dkt. no. 362.] Count XI of the Second Amended
Complaint includes an IIED claim against the City and Count XII
of the Second Amended Complaint includes an NIED claim against
the City. See id. at ¶¶ 334-45. On April 12, 2024, the City
filed its **Answer** to Second Amended Complaint (Dkt. 362) ("City
Answer"). [Dkt. no. 378.] The City responded to the allegations
in Counts XI and XII of the Second Amended Complaint. See id. at
¶¶ 44-45. Thus, although the instant Order differs from the
3/15/24 Order as to the disposition of Counts XI and XII, it is
unnecessary to amend either Spriestersbach's Second Amended
Complaint or the City Answer.

## CONCLUSION

For the foregoing reasons, the City's Motion to Strike
and/or Dismiss with Prejudice Newly Added Federal Failure to
Discipline, Train, and Supervise and Final Policy-Maker Claims
and its Motion to Dismiss First Amended Complaint (ECF No. 250),
both filed November 1, 2023, are HEREBY GRANTED IN PART AND
DENIED IN PART. The City's New Claims Motion is GRANTED insofar
as the following claims are DISMISSED WITH PREJUDICE: the
portions of Counts I and II asserting Section 1983 claims

53

against the City based on the alleged failure to discipline; and the portions of Counts I, II, and IV asserting Section 1983 claims against the City based on a final policymaker theory of liability. The New Claims Motion is DENIED in all other respects.

The City's Original Claims Motion is GRANTED insofar as the following claims are DISMISSED WITH PREJUDICE: the portions of Counts I and II asserting Section 1983 claims against the City based upon City customs, practices, and policies other than those related to the use of the digital notebook; Spriestersbach's ADA claim against the City in Count III; and Spriestersbach's Section 1983 abuse of process claim against the City in Count IV. The City's Original Claims Motion is DENIED as to: the City's time-bar argument; the City's request to dismiss the portion of Counts I and II alleging Section 1983 claims against the City based upon the customs, practices, and policies related to the use of the digital notebook; the City's request to dismiss Spriestersbach's IIED claim against the City in Count XI; and the City's request to dismiss Spriestersbach's NIED claim against the City in Count XII.

IT IS SO ORDERED.

DATED AT HONOLULU, HAWAII, April 19, 2024.



/s/ Leslie E. Kobayashi
Leslie E. Kobayashi
United States District Judge

JOSHUA SPRIESTERBACH VS. STATE OF HAWAII, ET AL.; CV 21-00456
LEK-RT; ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT
CITY AND COUNTY OF HONOLULU'S MOTIONS FILED ON NOVEMBER 1, 2024,
[DKT. NOS. 257, 258]