Deposition of:

## Abraham K. Bruhn

June 17, 2022

JOSHUA SPRIESTERSBACH

v.

STATE OF HAWAII, et al.

Case No.1:21-cv-00456-LEK-RT



513-233-3000
877.233.4403
FAX:  513-233-2310
depo@elitereportingagency.com

www.elitereportingagency.com

1

```
 1              UNITED STATES DISTRICT COURT

 2                  DISTRICT OF HAWAII

 3

 4

 5    _____
                                     )
 6    JOSHUA SPRIESTERSBACH,         )
                                     )
 7          Plaintiff,               )
                                     )  Case No.
 8              vs.                   )  1:21-cv-00456-LEK-RT
                                     )
 9    STATE OF HAWAII, et al.,       )
                                     )
10          Defendants.              )
      _____)
11

12

13

14

15        Deposition of:   ABRAHAM K. BRUHN
                             (via videoconference)
16        Pursuant to:     Notice

17        Date and Time:   Friday, June 17, 2022
                           2:05 P.M. EST
18        Place:           530 South King Street
                           Honolulu, Hawaii  96813
19        Reporter:        Tracy L. Allen, RPR, RMR
                             (via videoconference)
20                         Notary Public - State of Ohio

21

22

23

24

25
```

1        Q.    In the digital notebook, do you

2    search by name, do you search by date like who

3    are the latest entries; how do you work that?

4        A.    So for our unit at the time, we just

5    search by warrants and then we search by

6    district.

7              So it will show per district which

8    persons has warrants, where their hangouts are.

9    And that's how we did it.

10       Q.    How would you know which people are

11    appropriate to place in which district?

12       A.    I'm sorry.

13             What was the question?

14       Q.    Like how would you know which people

15    are the ones that you would search -- you would

16    be accessing in District 1?

17       A.    Oh, okay.

18             It would be either their previous

19    arrest in a certain city or their current

20    hangout locations.

21       Q.    And who determines what their

22    current hangout locations are?

23       A.    I don't know who inputs the

24    warrants, but I'm just going to make an

25    assumption that they either gather it from the

1          Q.   If you were just on a bike, would

2     you have access to the warrant pages when

3     you're outside of the station?

4          A.   No.

5          Q.   Was your station the central station

6     or were you -- did you work out of a regional

7     substation?

8          A.   Central.

9          Q.   Is this digital notebook still

10    available through your mobile data terminal in

11    the cruisers?

12         A.   Yes.

13         Q.   Had you occasion to look at the

14    picture that we now know as Joshua

15    Spriestersbach connected to a warrant prior to

16    May 11, 2017; had you studied it before that

17    day?

18         A.   Yes.

19         Q.   How long had it been resident in

20    your digital notebook, that picture?

21         A.   From -- well, I joined the bike unit

22    in 2015 and that's when we -- that's what our

23    normal routine would be, right, to study

24    warrants.  So from 2015 up until the arrest.

25         Q.   So you saw Joshua Spriestersbach's

1    picture every day you studied the warrant

2    pages?

3          A.    Yes.

4          Q.    During that period, did his picture

5    change at all or was it always the same

6    picture?

7          A.    It was always the same picture.

8          Q.    All right.  Well, we're going to

9    look at documents in a minute, but why don't

10   you just tell me what you recall from

11   May 11th, 2017 and your encounter with Joshua

12   Spriestersbach.

13         A.    Okay.  So that day we were

14   patrolling, we're driving.

15               So there's Maunakea Street, and then

16   there's River of Life that serves food for the

17   homeless around that area.

18               So we turned down Pauahi.  I see

19   Mr. Spriestersbach sitting down, back up --

20   back erect against the wall, and we made eye

21   contact.

22               And it was at that point to where at

23   the time I told my partner, I say, yeah, I

24   think that might be the guy that we've been

25   looking for.

1              So my partner made a U-turn, we get

2     out.  And as I'm approaching

3     Mr. Spriestersbach, my partner is pulling

4     out -- because we made copies of those --

5     warrant information.

6              So as I'm approaching him, my

7     partner is looking for the warrant.  And at

8     that time I, you know, I spoke with him.

9              I said, hey, I'm Officer Bruhn,

10    Honolulu Police Department.  The reason why I'm

11    talking to you is because you match someone

12    that we have warrant information on.

13              And as I'm talking to him, my

14    partner pulls out the printout that we made and

15    he says, hey, you're right.  That looks just

16    like him.

17              And so, you know, I asked

18    Mr. Spriestersbach for his last name.  I say,

19    hey, what's your name?

20              He gives me Castleberry.  And so

21    because he gave me Castleberry and that's the

22    information on the warrant information that we

23    had, I go back to the computer, I make a few

24    checks, and I go back to Mr. Spriestersbach and

25    I said, hey, what's your first name?

1          You know, I'm just trying to make

2     sure that the information you give me doesn't

3     match this warrant.  If it doesn't match, you

4     know, we'll be on our way and then you'll be

5     okay to just continue doing what you're doing.

6          And at that point he gave me Joshua.

7     So I said, so your name is Joshua Castleberry?

8          He said, yes.  And I'm not going to

9     give you any more information.

10          I said, what's your birth date?

11          And he says, I'm not saying anything

12     else.

13          So I run him in Joshua Castleberry,

14     and there's still not much information that I

15     needed.  So I go back to him a third time.

16          I said, hey, listen dude, your last

17     name matches a name on the warrant, you know.

18     Right now it's starting to not look good for

19     you.  So he finally gave me his social, his

20     actual social.

21          So I go back to the computer for a

22     third time, I believe, and I run his social in

23     CJIS.  And in CJIS it pulls up Joshua

24     Spriestersbach.

25          And underneath there's an alias --

1    report, right?

2         A.    Yes.

3         Q.    Are there any other documents that

4    you prepared as a result of your encounter with

5    Joshua that day?

6         A.    No.

7         Q.    What happened after you -- well, let

8    me just ask it differently.

9              Did you ever call dispatch to get

10   any additional information about the person you

11   were interviewing?

12        A.    I did do a warrant check, but under

13   the name of Thomas Castleberry.  I can't

14   remember if I ever did any type of previous

15   arrest checks under Joshua's social.

16        Q.    And what does it mean to do a

17   warrant check?

18        A.    Well, because we were stopping him

19   for the warrant, we need to confirm the warrant

20   before we can initiate the arrest.

21              So that's what we did with dispatch.

22        Q.    Just tell me what that involves.

23        A.    We just come over the radio and

24   said, hey, you know -- at that time I was 9132.

25   So I believe I said, 9132, warrant check.  I

27

1    gave her the information for the warrant that

2    we knew of.

3              And, you know, she read it back for

4    Thomas Castleberry, bail amount 11,000.  Do you

5    want us to confirm?

6              At which point, I said, yes, confirm

7    warrant, please.

8              MR. GERHARDSTEIN:  Tracy, is this

9         set up for me to share screen?

10             THE REPORTER:  It should be.

11   BY MR. GERHARDSTEIN:

12        Q.   Okay.  I'm going to show you what

13   we're marking as Exhibit 1.

14             Can you see that, Mr. Bruhn?

15        A.   Yes.

16        Q.   Is this a page out of the warrant

17   pages that you're describing?

18        A.   That's -- it's a page out of digital

19   notebook but not in the warrant section.

20        Q.   Okay.  Well, tell me what this is

21   then.

22        A.   So, basically, this is just

23   information about -- on the name, if you can

24   see, Thomas Ralph Castleberry, his Alpha

25   number, if he ever had warrants, the crimes he

1   committed, hangouts, his height, weight.

2        Q.   And I take it you would access a

3   page like this after you saw that, in the

4   warrant section, that you wanted to see if

5   Thomas Castleberry was around, right?

6             If you were looking for a guy named

7   Thomas Castleberry had a warrant for him, then

8   you'd go to this page to see what he looked

9   like, right?

10       A.   Yes.

11       Q.   And this page would give you other

12  personal information.

13            MR. GERHARDSTEIN:  By the way, this

14            is under the protective order, Counsel.

15            The transcript doesn't need to be

16            under the protective order so long as we

17            don't use the personal information that

18            we need to redact.

19            So help me out with that if I screw

20            up, please.

21  BY MR. GERHARDSTEIN:

22       Q.   The picture, is that the same

23  picture you had been looking at for a couple

24  years prior to actually encountering Joshua

25  Spriestersbach?

1        A.   Yes.

2             Q.   And is that the same picture, this

3    picture that's on Exhibit 1, that mirrored what

4    you saw, what Joshua Spriestersbach looked like

5    on May 11th, 2017?

6        A.   Yes.

7             Q.   So his hair was the same?

8        A.   Yes.

9             Q.   Probably had a different shirt, but,

10   I mean, the hair was the same?

11       A.   Yeah.   Yes.

12            Q.   Now, since this case has been filed,

13   have you satisfied yourself that all of the

14   personal information that is on the fields on

15   this page belongs to Mr. Castleberry but the

16   picture belongs to Mr. Spriestersbach; do you

17   agree with that?

18            A.   I thought you said after this case

19   had been -- I agree with it now, yes.

20            Q.   Okay.   You didn't know that back in

21   2017 --

22       A.   Yes.

23            Q.   -- is that right?

24       A.   Yes.

25            Q.   The tabs that are above the fields

30

1    of information here, what -- are those just

2    things you can click on to get additional

3    information or interact with this program?

4          A.   Yes.  So if this was warrant

5    information -- at the time I don't believe

6    there was an Edit Person or Add Comment.  It

7    was information on a warrant, but if you just

8    was to run this guy, just add information --

9    like say somebody stopped him and he gave

10   this -- for whatever reason he gave Castleberry

11   again, you can input, I stopped this person at

12   this date and time, has added information that

13   he could add under just regular digital

14   notebook.

15          Q.   Do any of those tabs allow us to

16   click and then go look at warrants, or do we

17   access that a different way?

18          A.   So you access that from the home

19   page of digital notebook.

20          Q.   And we aren't looking at the home

21   page?

22          A.   No.

23          Q.   Is digital notebook still set up the

24   same way?

25          A.   I believe so, yes.

1    the line where it said Warrant/Arrest on Sight?

2         A.   So this is just -- so, basically, if

3    you search this name, this is the information

4    you show up, but under the warrant it will show

5    that he was wanted for $11,000 warrant, from

6    what I can remember, and his last known

7    location he was seen or arrested.

8         Q.   Okay.  But I'm trying to take you

9    back to this page and the status of this page

10   just prior to your arrest of

11   Mr. Spriestersbach.

12        A.   Okay.  Okay.  Yeah.

13             So the Warrant/Arrest on Sight, it

14   would have a Y indicating yes.

15        Q.   Okay.  Was there any discussion with

16   Mr. Spriestersbach as to any other law

17   violation that he was engaged in at the time

18   you encountered him on the 17th -- on the 11th

19   of May in 2017?

20        A.   No.

21        Q.   Do you have a sit and lie law or

22   ordinance in Honolulu?

23        A.   We did, but for the time frame, I

24   believe he wasn't in violation of sit-lie.

25        Q.   And what do you mean by that, for

41

1          A.    I did not.  I don't believe I did.

2          Q.    So what did you do at that time?

3          A.    So after he gave me his social and

4     then I seen the information connecting him

5     somehow to the warrant information, I made the

6     arrest.

7               Searched him for any weapons, you

8     know, means of escape.  That's the normal type

9     things we do.  And then we transported him to

10    our central receiving division.

11         Q.    Let me ask you one other question

12    before we get to the station.

13         A.    Yes.

14         Q.    You said that you secured

15    information where you could match the social

16    security number Joshua had given you to Joshua

17    Spriestersbach from CJIS.

18               How did you do that?

19         A.    So in CJIS itself it will show the

20    aliases and then it will have the social to

21    whatever alias there was.

22               So under Thomas Castleberry, they

23    had the full social on the warrant information.

24    And then under William C. Castleberry, it had

25    the last four -- I believe it had the last four

1    of the warrant social information.

2            And because we had -- because he

3    gave me Joshua Castleberry, his picture

4    matched, and the social under his aliases

5    matched the social under the warrant, we made

6    the arrest.

7        Q.   I'm trying to ask a little bit about

8    the systems in play here because we're trying

9    to figure out how this happened.  Okay?

10       A.   Uh-huh.

11       Q.   So CJIS is not something run by the

12   City of Honolulu, right?

13       A.   I can't really answer that, but I

14   believe it's statewide.

15       Q.   And that's something you access on

16   your mobile data terminal?

17       A.   Yes.  We have an app for -- as of

18   right now that I know of, it's for HPD

19   officers.

20       Q.   And can you access CJIS through your

21   digital notebook?

22       A.   No.

23       Q.   Can you get the same information on

24   your digital notebook that you get from CJIS?

25       A.   To be honest, it depends, because

44

1    was a mistake in CJIS information?

2         A.    I have not.

3         Q.    In your training, have you ever

4    learned what, if anything, you should do if you

5    discover a mistake in CJIS information?

6         A.    I can't recall, to be honest.

7         Q.    When you looked up -- did you look

8    up Castleberry or did you look up a social

9    security number when you entered the CJIS

10    database?

11         A.    In CJIS it was through the social.

12         Q.    Okay.  When you used the social --

13    and the first one you used was actually

14    Castleberry's, right?

15         A.    Yes.

16         Q.    -- what picture came up on CJIS?

17         A.    The picture that came up on CJIS was

18    of Castleberry in a green jumpsuit.

19         Q.    So that was a different picture than

20    the picture you had on your digital notebook,

21    right?

22         A.    Yes.

23         Q.    As you sit here today, do you recall

24    whether the person who was depicted when you

25    searched Castleberry's social security number

1     on CJIS, was that person the same one depicted

2     in the photograph that is in E-1, the digital

3     notebook?

4           A.   I'm sorry.  Today?

5           Q.   Well, we just looked at E-1, right,

6     and that's Joshua Spriestersbach?

7           A.   Yes.

8           Q.   Do you remember that?

9                You see that, correct?

10          A.   I never ran -- I never run that --

11    the social under Castleberry.  I didn't run

12    them in CJIS that day.

13          Q.   Oh, okay.  I misunderstood.

14          A.   It was just Spriestersbach's social

15    that he provided.

16          Q.   So when you ran Spriestersbach's

17    social, what picture did you get?

18          A.   I can't remember.  It's just of him

19    with a green -- it looks like a green jumpsuit.

20          Q.   And were you satisfied that it was

21    the same person whose picture you had looked at

22    in the digital notebook?

23          A.   Yes.  Based off of the social he

24    provided, yes.

25          Q.   So at that point you had used a

1          A.   No.

2          Q.   Okay.  You said after you turned him

3   over to those central receiving desk officers,

4   you went and met with whom?

5          A.   I met with my desk lieutenant.

6          Q.   And why was that?

7          A.   It's procedure for us to go and

8   apprise the desk lieutenant of the facts and

9   circumstances of the arrest.  The desk

10  lieutenant will do a more thorough search, you

11  know, information search and they determine

12  whether or not the arrest is good or not.

13         Q.   Were you alone or with your partner

14  through all this?

15         A.   Through the appraisal, I was alone.

16         Q.   What do you mean, through the

17  appraisal?

18         A.   So when I met with the desk

19  lieutenant, it was just me.  My partner just

20  stayed in the car.

21         Q.   Where was Mr. Spriestersbach while

22  you met with the desk lieutenant?

23         A.   He was in a different section of CRD

24  with CRD officers.

25         Q.   Who was the desk lieutenant?

1    did you discuss the fact that

2    Mr. Spriestersbach's picture was connected to

3    two different social security numbers on these

4    databases that you were both looking at?

5          A.   Yes.

6          Q.   And what was the lieutenant's take

7    on that issue?

8               MR. LEWALLEN:  Objection.  Calls for

9          speculation.

10              If you know, you can answer.

11   BY MR. GERHARDSTEIN:

12         Q.   If you know.

13         A.   I mean, basically, he just -- we

14   just agreed that, you know, he possibly gave a

15   name that's not affixed to a warrant just

16   trying to not get arrested for it.

17         Q.   In your presence, did the lieutenant

18   do any further investigation to determine which

19   of those social security numbers actually

20   belonged to the person you had in custody?

21         A.   So in my presence, he basically did

22   the same searches that I did out in the field

23   with CJIS.  And it was from that point on we

24   just -- he just said, hey, you know, it's a

25   good arrest based off of what I'm looking at

1          A.   All I did was sign it.  I don't know

2     exactly how the process goes for CRD.  So I'm

3     not sure if CRD serves him a signed warrant,

4     but me physically, I didn't physically hand

5     deliver a copy of the warrant that I signed to

6     Mr. Spriestersbach.

7          Q.   Did you see anyone else provide

8     Mr. Spriestersbach with a physical copy of the

9     warrant --

10         A.   I did not.

11         Q.   -- for Thomas Castleberry?

12              While you were writing on the

13    warrant, did you write Mr. Spriestersbach's

14    name on the warrant?

15         A.   Yes, I did.

16         Q.   Why was that?

17         A.   On that day, I believed that

18    Mr. Spriestersbach was, indeed, Thomas

19    Castleberry.  So I wrote Joshua Spriestersbach

20    just for further information for the courts to

21    see that maybe Joshua Spriestersbach is his

22    alias that he uses rather than his real name.

23         Q.   Did you discuss whether to put

24    Mr. Spriestersbach's name on the warrant with

25    any other supervisor or other officer?

1            A.    No.

2            Q.    Had you done this before?

3            A.    Yes.

4            Q.    So in what situations did you add

5    names to the face of a warrant?

6            A.    So we've had numerous arrests

7    with -- warrant arrests.  And sometimes in

8    CJIS, they would book the arrestee under their

9    real name, and then sometimes under CJIS it

10   would book the arrestee under their alias.

11            So there was, I want to say, at

12   least more than five times we made an arrest to

13   where a suspect in a warrant actually had his

14   real name and an alias and put it in CJIS.

15            So we -- at the time, I thought this

16   could have been another situation to where

17   Thomas Castleberry is his real name and Joshua

18   Spriestersbach was his name as an alias input

19   in CJIS.

20            Q.    You said that --

21            MR. LEWALLEN:  Excuse me, Al?

22            MR. GERHARDSTEIN:  Yes.

23            MR. LEWALLEN:  You know, at a

24       convenient time, could we take a short

25       break?

57

```
 1              MR. GERHARDSTEIN:  Yes.  We can do

 2         that right now, if you'd like.

 3              MR. LEWALLEN:  Yeah.  I need a break

 4         for a second.  Thank you.

 5              MR. GERHARDSTEIN:  All right.

 6         Everybody's drinking coffee.

 7              MR. LEWALLEN:  Yeah.

 8              MR. GERHARDSTEIN:  Ten minutes.  Be

 9         back in ten minutes.  Okay?

10              MR. LEWALLEN:  Very good.  Thank

11         you.

12              (A recess was taken from 3:11 to

13              3:27.)

14              MR. GERHARDSTEIN:  Back on the

15         record.

16    BY MR. GERHARDSTEIN:

17         Q.   We were discussing the fact that you

18    had put Mr. Spriestersbach's name on the

19    warrant.

20              Do you recall that?

21         A.   Yes.

22         Q.   And you said you had done that in

23    several other situations where you had made an

24    arrest on a warrant where a person also had an

25    alias, right?
```

58

1          A.   Yes.

2              Q.   And in any of those instances where

3    you had put a suspect's name on a warrant,

4    other than the name in which the warrant was

5    issued, had anyone ever disciplined you for

6    that?

7          A.   No.

8              Q.   Had anybody ever said it was

9    inappropriate to do that?

10          A.   No.

11              Q.   Had you discussed it with any of

12    your supervisors or colleagues as to either

13    being the right thing to do or not?

14          A.   I have not.

15              Q.   And did you ever receive any

16    retraining with respect to the practice of

17    putting an alias name on the face of a warrant?

18          A.   No.

19              Q.   Now, was that name placed on what

20    we're calling the original, the copy of the

21    warrant that had your original writing on it?

22          A.   Yes.

23              Q.   And if you know, what happens to

24    that original?

25          A.   I don't -- I can't really say, but

1          Q.    Is the -- you were talking about

2     meeting with the desk lieutenant.  And then you

3     actually discussed the arrest with the desk

4     lieutenant.

5               This says, The officer in charge

6     shall review the circumstances of each arrest

7     before any person is booked in order to

8     determine whether there exist sufficient

9     grounds or facts to justify the arrest.

10              Is it your understanding the person

11    you were talking to was serving as the officer

12    in charge?

13         A.    Yes.

14         Q.    Now, are you aware of any problem

15    that has been experienced at the central police

16    station with booking people, taking their

17    photographs, and getting their fingerprints?

18              MR. LEWALLEN:  Objection.  Vague and

19         ambiguous.

20              If you understand the question,

21         proceed.

22         A.    No.

23    BY MR. GERHARDSTEIN:

24         Q.    So as far as you know, most

25    arrestees have their mug shot taken and their

111

1        Q.   Now, it says that if an

2    identification is corrected, there will be a

3    form used, HPD-510.

4             Have you ever used that form or

5    received that form in connection with any

6    arrest you made?

7        A.   No.

8        Q.   Have you ever been trained on when

9    to refer a matter to the identification

10   section?

11       A.   I can't remember.

12       Q.   Have you ever been disciplined or

13   retrained when any identification you made

14   turned out to be incorrect?

15       A.   I have not.

16       Q.   Have you ever learned that any

17   identification that you made was incorrect?

18       A.   I have not.

19       Q.   Now, your next exhibit -- I think it

20   is 6.  Hold on.  Yeah, it's 6. -- is policy

21   7.10 involving warrants.

22             And on the second page under C.1. it

23   says, When serving a penal summons or warrant,

24   the officer shall provide a copy to the person

25   named in the document.