Deposition of:

# Darryl T. Kon

February 01, 2024

JOSHUA SPRIESTERSBACH

v.

STATE OF HAWAII, et al.

Case No.1:21-cv-00456-LEK-RT



513-233-3000
depo@elitereportingagency.com

*www.elitereportingagency.com*

```
 1              UNITED STATES DISTRICT COURT

 2                   DISTRICT OF HAWAII

 3

 4

 5   _____
                                  )
 6   JOSHUA SPRIESTERSBACH,        )
                                  )
 7          Plaintiff,            )
                                  )  Case No.
 8               vs.             )  1:21-cv-00456-LEK-RT
                                  )
 9   STATE OF HAWAII, et al.,      )
                                  )
10          Defendants.           )
     _____)
11

12

13

14

15      Deposition of:  DARRYL T. KON
                          (via videoconference)
16      Pursuant to:    Notice

17      Date and Time:  Thursday, February 1, 2024
                          1:33 p.m. EST
18      Place:          530 South King Street
                          Honolulu, Hawaii  96813
19      Reporter:       Tracy L. Allen, RPR, RMR
                          (via videoconference)
20                      Notary Public - State of Ohio

21

22

23

24

25
```

1    APPEARANCES OF COUNSEL:

2

3       For the plaintiff:

4            Alphonse A. Gerhardstein, Esq.
               (via videoconference)
5                   of
             Friedman, Gilbert + Gerhardstein
6            35 East Seventh Street
             Suite 201
7            Cincinnati, Ohio  45202
             513.572.4200
8            al@fggfirm.com

9

10      For the defendants Office of The Public
         Defender, Nietzsche Lynn Tolan, Michele
11       Muraoka, Leslie Maloian, Jason Baker,
         Merlinda Garma, and Seth Patek:
12
             Justine T. Hura, Esq.
13             (via videoconference)
                   of
14           Department of the Attorney General
             Tort Litigation
15           425 Queen Street
             Honolulu, Hawaii  96813
16           808.586.1500
             justine.t.hura@hawaii.gov
17

18

19

20

21

22

23

24

25

3

1    APPEARANCES OF COUNSEL:

2

3      For the defendants City and County of
         Honolulu, and Officer Abraham K. Bruhn:
4
             Richard D. Lewallen, Esq.
5              (via videoconference)
                      of
6            Department of the Corporation Counsel
             Deputy Corporation Counsel
7            City and County of Honolulu
             530 South King Street
8            Room 110
             Honolulu, Hawaii  96813
9            808.768.5242
             rlewallen@honolulu.gov
10

11

12     For the defendants State of Hawaii,
         Department of Public Safety, Dr. John
13       Compton, Dr. Melissa Vargo, Hawaii State
         Hospital:
14
             Kendall J. Moser, Esq.
15             (via videoconference)
                      of
16           Department of the Attorney General
             425 Queen Street
17           Honolulu, Hawaii  96813
             808.586.1494
18           kendall.j.moser@hawaii.gov

19

20

21

22

23

24

25

4

```
 1   APPEARANCES OF COUNSEL:

 2

 3      For the defendant Dr. Allison Garrett:

 4          Nicholas Lee, Esq.
              (via videoconference)
 5              of
            Roeca Luria Shin LLP
 6          900 Davies Pacific Center
            841 Bishop Street
 7          Honolulu, Hawaii  96813
            808.538.7500
 8          nlee@rlhlaw.com

 9

10

11                      - - -

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

5

```
 1                    I N D E X

 2

 3   DARRYL T. KON                            PAGE

 4        EXAMINATION BY MR. GERHARDSTEIN        7
          EXAMINATION BY MS. HURA               70
 5

 6   EXHIBITS                     MARKED   REFERENCED

 7        PLAINTIFF'S EXHIBIT  1      -        28
          PLAINTIFF'S EXHIBIT  2      -        19
 8        PLAINTIFF'S EXHIBIT  3      -        62
          PLAINTIFF'S EXHIBIT 38      -        57
 9

10

                          - - -
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1        THE REPORTER:  We are on the record.

2    This is the remote deposition of Darryl

3    Kon.  The time is approximately 1:33 p.m.

4    Eastern Standard Time, and the date is

5    February 1st, 2024.

6        Would counsel and everyone present

7    in each room please identify yourself for

8    the record?

9        MR. GERHARDSTEIN:  Al Gerhardstein

10   for the plaintiff.

11       MR. MOSER:  Kendall Moser for the

12   State of Hawaii, the Department of Public

13   Safety, and the Hawaii State Hospital.

14       MS. HURA:  Good morning.  Justine

15   Hura, deputy attorney general, for the

16   Office of the Public Defender defendants.

17       MR. LEE:  And good morning,

18   everyone.  This is Nicholas Lee.  Present

19   for Dr. Allison Garrett.

20       MR. LEWALLEN:  Good morning.

21   Richard Lewallen on behalf of the City

22   and County of Honolulu.

23       I'm here with Darryl Kon.

24       THE REPORTER:  Does everyone agree

25   to and understand this deposition is

1          being taken remotely and that a remote

2          oath will be administered by a

3          stenographic reporter who is also a

4          notary in the State of Ohio?

5                    MR. GERHARDSTEIN:  Plaintiff agrees.

6                    MR. MOSER:  Yes.

7                    MS. HURA:  Yes.

8                    MR. LEE:  Yes.

9                    MR. LEWALLEN:  I agree, yes.

10                    DARRYL T. KON

11   a witness herein, having been duly sworn, was

12   examined and deposed as follows:

13                    EXAMINATION

14   BY MR. GERHARDSTEIN:

15          Q.   Good morning, Mr. Kon.

16          A.   Good morning.

17          Q.   Please state your full name for the

18   record.

19          A.   Darryl Takeshi Kon.

20          Q.   And how do you spell your middle

21   name?

22          A.   T-a-k-e-s-h-i.

23          Q.   And what is your current employment?

24          A.   Criminal investigator for the State

25   of Hawaii Attorney General's Office.

8

1      Q.    How long have you done that?

2      A.    About four years.

3      Q.    So was there a gap between your

4  retirement from the police department and

5  starting this job?

6      A.    Yes.  A little more than a year.

7      Q.    What did you do during that period.

8      A.    Tried to retire.

9      Q.    And why was that so hard?

10     A.    Cost of living, just keep busy.

11 Just keeping busy.

12     Q.    And what are your duties as a

13 criminal investigator for the attorney general?

14     A.    It has recently changed, but I was a

15 felony level investigator at the airport,

16 Daniel K. Inouye Airport.

17           And now since the state is forming a

18 new department of law enforcement, we have been

19 reassigned our duties.  And, basically, I help

20 out wherever I can.

21     Q.    As an investigator, are you working

22 individual criminal cases?

23     A.    More or less, yes.

24     Q.    Okay.  And who's your boss?

25     A.    Supervisor boss or --

```
 1        Q.    Yeah.

 2        A.    Daniel Reed, R-e-e-d.

 3        Q.    What's his title?

 4        A.    Supervisory special agent.

 5        Q.    And then who's his boss?

 6        A.    There's a Garrett Maeda, who's a

 7   deputy chief/special agent.

 8        Q.    And who's his boss?

 9        A.    Thomas Alipio, chief/special agent.

10        Q.    Who's his boss?

11        A.    Probably the attorney general

12   herself.

13        Q.    Okay.  With respect to the duties

14   you had working for the attorney general, have

15   you done any work at all related to the lawsuit

16   that brings us together today filed by Joshua

17   Spriestersbach?

18        A.    No, not at all.

19        Q.    Okay.  And I understand that you

20   graduated high school in 1981; is that correct?

21        A.    Yes.

22        Q.    And you studied first aid and

23   helicopter repair in the military?

24        A.    Yes.

25        Q.    You were appointed to the Honolulu
```

10

1    Police Department on January 30, 1986?

2          A.    Yes.

3          Q.    And then take me through your career

4    at Honolulu Police Department.  What were your

5    various jobs and what were your duties in those

6    jobs?

7          A.    Besides initial training, recruit

8    school, FTO program, my first assignment was to

9    the receiving desk as an officer processing

10   custodies.

11             I then was transferred to Kalihi,

12   District of Kalihi.  We call it District 5.

13   Worked there for approximately five years.

14             I made motor, what is called motor,

15   which is you get to drive your own car.  I

16   worked in Kailua for one year.  Transferred

17   back to Kalihi.

18             And in my sixth or seventh year I

19   transferred to a traffic fatal team where I did

20   traffic fatalities and other follow-ups for

21   about seven years.

22             I got transferred to narcotics/vice,

23   gambling detail.  Had the shortest career

24   there.  I got promoted to detective working CID

25   for approximately eight years.  Handled

1    everything from auto thefts to robberies to

2    murders.

3              I transferred -- I made -- I

4    transferred to District 4 as a sergeant.  It's

5    a blur.  I'm sorry.

6         Q.    You're doing fine.

7         A.    Went to Waikiki for a short period

8    of time as a sergeant.  I made lieutenant

9    something like in my 25th year.  I don't

10   remember.  Got assigned to records division,

11   then narcotics vice, I believe, then receiving

12   desk.  All about one year, year and a half, two

13   years each.  Then I ended up in ITD.  And

14   somewhere in between I was a District 4

15   lieutenant, also.

16        Q.    What do you mean by receiving desk?

17   You said that you started there.

18        A.    As a rookie.  As a rookie, that was

19   my first assignment.  I was a -- from year and

20   a half to about two and a half years.  I was

21   there maybe a year.

22        Q.    Okay.

23        A.    It was manually processing people.

24   We had typewriters back then.

25        Q.    Where was that located?

12

```
1          A.    That was at the old police station,
2     801 South Beretania Street.  No.  1405
3     Beretania Street I believe is the old address.
4     The old Sears building.
5          Q.    And CID, is that -- what does that
6     stand for?
7          A.    Criminal investigation division.
8          Q.    Did you serve as the officer in
9     charge of the receiving desk while you were a
10    lieutenant?
11         A.    Yes.
12         Q.    And when you served as the officer
13    in charge of the receiving desk while you were
14    a lieutenant, where was the receiving desk?
15         A.    801 South Beretania Street in the
16    basement, level one.  I was the watch -- one of
17    the watch commanders.  I'm not the D supervisor
18    of the receiving desk.  I'm the watch
19    commander.
20         Q.    Is that the central police station?
21         A.    Yes.
22         Q.    What does it mean to be watch
23    commander?
24         A.    I'm in charge of approximately ten
25    officers on any given day and accept
```

13

1    responsibility and duties of whatever happens

2    at the desk, including accepting or

3    disapproving arrests, things of that nature.

4        Q.   So if you are working as the officer

5    in charge of the receiving desk, does that mean

6    you're also, in your experience, the watch

7    commander?

8        A.   Yes.

9        Q.   And you said that you would accept

10    or disapprove of arrests.  What's that mean?

11        A.   On any given day an officer would

12    come in, must apprise the lieutenant in charge

13    of the arrest, of any injuries, et cetera,

14    regarding a custody.

15           I would have to determine if the

16    probable cause is acceptable, it matches what

17    the charges are on the -- what the person's

18    being arrested for is correct.  Look at if it

19    was -- again, a narcotics vice, was it a bad

20    search, things like that.  If things went

21    wrong, I would not accept the case.

22        Q.   What happens if you did accept the

23    case?

24        A.   Then it's a founded arrest.

25        Q.   What happens to the suspect?

14

1          A.    It depends on level of arrest you're

2     talking about from a traffic offense to a

3     felony.  Traffic offenses are probably the

4     lowest that we handle.  I determine bail or we

5     look at a bail sheet and we determine bail.

6               If it's a felony, I make sure that

7     the detective is assigned to the case, et

8     cetera.

9               There's various conditions and you

10    just have to adapt.

11         Q.    If the arrest involves an arrest on

12    a warrant, what happens to the individual if

13    you determine that the arrest on the warrant is

14    a founded arrest?

15         A.    Unfounded?

16         Q.    No.  You used the term founded I

17    thought.

18         A.    Oh, founded.  Okay.

19               Well, we examine the warrant and we

20    arrest the person on the power of the warrant,

21    make sure everything matches, birth date,

22    names, et cetera, on whatever the computer

23    gives us, and validate the warrant.

24         Q.    And what do you mean, validate the

25    warrant?

1          A.    Make sure it exists.  You know,

2     sometimes the name is in the computer but the

3     warrant is not there and not accounted for, so

4     things like that have to be verified.

5               There's about five computer checks

6     that a watch commander does prior to accepting

7     the arrest from CJIS, driver's license, NCIC,

8     TROs.  You can go as deep as you want to go;

9     sexual offenders.

10              You can do various checks before

11    accepting arrest and check for additional

12    warrants.

13              Sometimes the officers or police

14    dispatch misses a warrant or -- so you tell the

15    officer, can you please verify this additional

16    warrant?

17         Q.    Okay.  And assuming when you're

18    serving as watch commander and you determine

19    this is a valid arrest on a warrant, what

20    happens to the individual at that point?

21         A.    He's processed through,

22    fingerprinted, mugged, and served the warrant.

23              Basically, that this warrant is the

24    reason for your arrest.  It's issued by this

25    magistrate or judge.  Your bail amount is here.

16

1   Feel free to call anyone that can bail you out,

2   including bondsman.  And that's about it.  It's

3   a very routine process.

4         Q.   And that's something you did, I

5   assume, many times when you served as an

6   officer in charge of the receiving desk, right?

7         A.   I do not personally serve the

8   documents.  I have a crew that does that.  I'm

9   more concerned with the administration portion

10  of the -- of the arrests.

11        Q.   Right.  But I mean, I assume that

12  you made this determination that arrests were

13  valid on multiple occasions in your career

14  as --

15        A.   Yes, yes.

16        Q.   Okay.

17        A.   From a rookie to the last day.  I

18  mean, you're always working at different points

19  of you -- either as an arresting officer, or in

20  my end of my career, I was the person asking

21  the questions.

22        Q.   And when you're serving as officer

23  in charge of the receiving desk or watch

24  commander and you determine that an arrest on a

25  warrant was valid, would -- based on that

17

1    determination, would the person, if they didn't

2    make bail, would they go to some sort of

3    lockup?

4         A.   Yes.  So a court date will be set on

5    and he'll be given -- taken to court the next

6    available day.

7         Q.   And prior to being taken to court,

8    where would the individual have been held in

9    2017?

10        A.   At our main police station, central

11   receiving division, 81 South Beretania Street,

12   in a cellblock.

13        Q.   So based on your determination as

14   the officer in charge of the receiving desk,

15   the individual arrested on a warrant, if you

16   determine it's valid, would be in that

17   cellblock until taken to court; is that fair?

18        A.   Yes.

19        Q.   And you didn't have to go to any

20   other supervisor or colleague to make the

21   determination that the arrest was valid,

22   correct?

23        MR. LEWALLEN:  Objection.  Vague and

24        ambiguous as to time and place and

25        person.

18

```
 1              MS. HURA:  Objection.  Vague and
 2         ambiguous as to having to go to
 3         determine.
 4    BY MR. GERHARDSTEIN:
 5         Q.   You can answer.
 6              MR. LEWALLEN:  If you understand the
 7         question and you have an answer, you can.
 8         A.   If I was the only watch lieutenant
 9    involved, then yes.
10    BY MR. GERHARDSTEIN:
11         Q.   What did you review for this
12    deposition?  Any papers?  And don't tell me
13    anything you said to your lawyer or the lawyer
14    said to you.  Okay?
15         A.   The only thing I reviewed was the
16    OBTS.
17         Q.   And what is that?
18         A.   The arrest form that documents --
19    the receiving desk arrest form on each
20    individual that comes into custody.  It's a
21    one-page, multi-line form.
22         Q.   Is it called the arrest report?
23         A.   I just refer to OBTS.  I'm sorry.
24              If you can show it to me, I can tell
25    you if it is or not.
```

1        Q.   Yeah.  Let me just see.

2             And I take it you mean the OBTS

3   regarding Joshua Spriestersbach?

4        A.   I believe that's his name, yes.

5        Q.   Okay.  Let me -- all right.

6             Do you see it on the screen?

7        A.   I see a portion of it, yes.

8        Q.   Okay.  So have I scrolled through

9   the whole thing?

10       A.   Yes.

11       Q.   All right.  And that's the document

12  you looked at prior to the deposition?

13       A.   I believe so, yes.

14       Q.   Okay.  We'll get back to it.

15             MS. HURA:  Mr. Gerhardstein, are you

16       marking that as an exhibit, and what is

17       the -- could you also --

18             MR. GERHARDSTEIN:  I'm sorry.  It's

19       already an exhibit.  It's Exhibit 2 and

20       it is the last page of that exhibit,

21       Bates number C000220.

22             MS. HURA:  Thank you.

23             MR. GERHARDSTEIN:  Yeah.  Thank you.

24  BY MR. GERHARDSTEIN:

25       Q.   Without telling me anything you said

20

1    to your lawyer and anything your lawyer said to

2    you, who did you speak to about this

3    deposition?

4          A.   I told my wife I got to come here.

5    That's about it.

6          Q.   Okay.  Well, I asked you if you had

7    any bosses and there are -- you forgot to talk

8    about that.

9               All right.  Anybody else?

10         A.   Zero.

11         Q.   Okay.  And do you have any of your

12   own records regarding Joshua Spriestersbach?

13         A.   No.

14         Q.   Did you keep any notes, when you

15   were working at the Honolulu Police Department,

16   your own diary or notebooks?

17         A.   The OBTS, I kept a whole box in case

18   anything happened.  But that's seven years ago

19   and at the end of my career, because nothing

20   happened, I basically chucked it.

21         Q.   Okay.  So you no longer have any

22   records of your own regarding your work at the

23   Honolulu Police Department; is that fair?

24         A.   Yes.

25         Q.   Were body-worn cameras in use before

21

1   you retired?

2       A.   That's a good question.  I don't

3   think so.  If anything, it was -- if anything,

4   it was in the test phase.

5       Q.   Okay.  And you retired in what,

6   November of 2017?

7       A.   Yes.

8       Q.   Was there any incident that

9   triggered your retirement, or were you just

10  done?

11      A.   I have my reasons to retire, yes.

12      Q.   And what were they?

13           MR. MOSER:  Excuse me, Lieutenant.

14           This is Kendall Moser.  I object as to

15           relevance.

16           MS. HURA:  I join.  As well as,

17           although I have no standing, as to

18           confidentiality as to personnel --

19           MR. LEE:  Join as well.

20           MS. HURA:  -- as to personnel

21           records under 92F.

22           MR. LEWALLEN:  Join as well.

23  BY MR. GERHARDSTEIN:

24      Q.   Personnel files have already been

25  produced in this case.

22

1          You can answer.

2          A.    I choose not to.  I mean, I have my

3    reasons to retire like everyone else.

4          Q.    Okay.  Well, just tell me this; did

5    your reason for retiring have anything to do

6    with the working conditions at the Honolulu

7    Police Department?

8          A.    What do you mean?  The working

9    conditions are always -- there's always working

10   conditions.

11         Q.    Yeah.  So was --

12         MR. GERHARDSTEIN:  Go ahead.

13         MS. HURA:  Sorry.  I'm just going to

14         object as to, again, confidentiality of

15         personnel records under 92F HRS, as well

16         as relevance.  And vague and ambiguous.

17         MR. LEE:  Join.

18         MS. HURA:  Join as well.

19   BY MR. GERHARDSTEIN:

20         Q.    Did your reason for retiring involve

21   anything to do with Joshua Spriestersbach?

22         A.    Oh, no, not at all.

23         Q.    Okay.  When you were working at the

24   Honolulu Police Department, what training did

25   you receive on how to determine the identity of

23

```
 1    a person who didn't have any paper ID or ID
 2    card, no driver's license, no State ID; how
 3    would you determine the identity of such
 4    person?  How were you trained to do that?
 5                MR. LEWALLEN:  Objection.  Vague and
 6           ambiguous.
 7                To the extent you understand the
 8           question and have an answer, you can
 9           proceed.
10           A.   If a person has fingerprints, I rely
11    on the fingerprints in the -- I believe it was
12    called the AFIS system.
13    BY MR. GERHARDSTEIN:
14           Q.   Tell me about that.  How did that
15    work?
16           A.   I'm not trained in that.
17           Q.   So how did you access it?
18           A.   I did not access it.  We have
19    officers that -- who are trained in it and
20    provide information to me.
21           Q.   When an officer under your command
22    would take the fingerprints of a suspect,
23    how -- how much time would elapse before you
24    could learn the identity of that suspect by
25    virtue of the fingerprint being taken?
```

24

```
 1        A.    Well, sometimes -- that is also a
 2   vague question.  Sometimes it's instant.
 3   Sometimes the internet is down.  Sometimes the
 4   machine is down.  So it may take an hour, I'm
 5   guessing.  I mean, it does happen.  I mean,
 6   it's technology.
 7        Q.    Yeah.  So assuming things are
 8   working the way they're supposed to be working,
 9   I know it doesn't always happen, but assume
10   that the fingerprint machine is working, assume
11   the internet's working, what was the normal
12   time that would elapse between taking someone's
13   fingerprints and receiving the information
14   about what the fingerprint told you about the
15   identity?
16             MR. LEWALLEN:  Objection.  Misstates
17        his testimony.
18             You can answer if you understand the
19        question.
20        A.    Well, I'm not trained on it.  The
21   officer has access to it.  It is as fast as
22   they can work.  I mean -- and get back to me.
23             So if you're asking how fast the
24   machine responds back, I do not know.  I do not
25   operate the machine.  Never been trained on it.
```

25

```
 1   BY MR. GERHARDSTEIN:

 2        Q.   Well, I understand.

 3             When you would rely on officers who

 4   are trained on it, would you say that it was

 5   typical, if everything was working, that you

 6   could learn the identity of someone based on

 7   the fingerprint within an hour?

 8             MR. LEE:  Objection.  Improper

 9        hypothetical.

10             MR. LEWALLEN:  Join.  Incomplete

11        hypothetical.

12             If you understand the question and

13        you have an answer, you can proceed.

14        A.   It's not pertinent.  I don't want to

15   answer.  I'm not -- that's not my area.

16   BY MR. GERHARDSTEIN:

17        Q.   And I'm only asking you based on

18   your experience.  So when you, as the watch

19   commander, were wanting to learn the identity

20   of a person for whom --

21        A.   I have a lot of experience on the

22   receiving desk.  I have a lot of different

23   cases.  Every case is different.  So to say,

24   generically, you know, as a generic time, it's

25   not proper so I can't -- I can't give you an
```

26

1    answer and be accountable for that answer, so I

2    don't want to answer.

3           Q.   Well, I understand every case is

4    different.  And I'm only asking what your

5    typical experience would be if everything

6    worked the way it was supposed to work.

7                And I'm just looking to find out if,

8    in the way the system was set up, whether you

9    could find out the identity of a person based

10   on fingerprints within an hour or two.

11          A.   Is that your statement?

12          Q.   Well, I'm asking that, whether --

13          A.   That is your statement, an hour or

14   two.

15          Q.   Yeah.  I'm asking if that is your

16   experience.

17          A.   I've not seen that.

18                MR. LEWALLEN:  I'm going to object.

19          Counsel is testifying and the witness has

20          stated what his answer is to the

21          question.

22                MR. LEE:  Join in this objection.

23          It's also vague and ambiguous.  It's an

24          incomplete hypothetical.

25   BY MR. GERHARDSTEIN:

1          Q.    So if all you had was fingerprints

2     to identify a person, did you typically release

3     them because it took so long to get the results

4     back that you couldn't hold them?

5               MR. LEWALLEN:  Objection.  Vague and

6          ambiguous.

7               If you understand the question, you

8          may answer.

9               MR. LEE:  We join in this objection.

10              MS. HURA:  I'm going to join.  And

11         also argumentative.

12         A.    What do you want me to say?  I mean,

13    I don't recall any case like that.

14    BY MR. GERHARDSTEIN:

15         Q.    Okay.  Are you aware of something

16    called a digital notebook?

17         A.    No.

18         Q.    Are you aware of a database that

19    officers would use that would have information

20    about suspects that were wanted and they could

21    review it so that if they saw those suspects,

22    they could make arrests out in the field?

23         A.    I don't think it's an HPD file.  I'm

24    not aware of it.

25         Q.    I'm going to show you what's

28

1    previously been marked as Exhibit 1.

2            Does this document refresh your

3    recollection as to the existence of something

4    called the digital notebook?

5        A.    No.

6        Q.    Have you ever seen a printout like

7    this?

8        A.    No.

9        Q.    Are you aware of any database

10   available to officers that had photos of people

11   that were known to be in their area and

12   associated those photos with outstanding

13   warrants?

14       A.    No.

15       Q.    Was there any database that would

16   help -- that you know of, that would help an

17   officer learn whether somebody on his or her

18   beat was wanted on an open warrant?

19       A.    No.

20       Q.    You said when somebody did not have

21   an ID, like a State ID or a driver's license,

22   one thing you would rely on to identify them is

23   fingerprints, right?

24       A.    That's one thing, yes.

25       Q.    If the person gave you like personal

29

1    identifiers, name, date of birth, social

2    security number, what were some of the other

3    tools you had to identify people when they gave

4    you those types of personal information?

5        A.    We have arrest procedures, arrest

6    record, we have driver's license check, we have

7    NCIC.  There's about five computer checks I've

8    done on nearly every arrest that I refer to to

9    validate the information that the officer's

10   providing.

11       Q.    Was CrimeStoppers one of them?

12       A.    No.

13       Q.    Did the officers that you worked

14   with rely on any information from

15   CrimeStoppers?

16           MS. HURA:  Objection.  Calls for

17       speculation.

18           MR. LEWALLEN:  Join.

19   BY MR. GERHARDSTEIN:

20       Q.    You can answer.

21           Do you know?

22       A.    You would have to ask the officer.

23       Q.    Okay.  And from your knowledge, did

24   officers ever report to you that they had

25   relied on CrimeStoppers?

30

1          A.    I answered that.  No.

2          Q.    Oh, okay.  I'm sorry.  I missed

3    that.

4                So CJIS, driver's license, NCIC.

5    That's three.  You said there were five

6    computer checks.  Do you know what the others

7    would be?

8          A.    There's a driver's license file

9    itself.

10         Q.    Okay.

11         A.    There's a separate pull-down to

12   check for photos.  There is a warrant file.

13   I'm not that current, but I know there's --

14   there's five.  There's definitely five.

15         Q.    Okay.  Tell me about the warrant

16   file.  How would you check that?

17         A.    You just punch in the person's name

18   as LEQM on the State site, I believe.  And all

19   the names will come out that are similar or

20   matches the person's name.  If there's a typo,

21   it might -- it might show.

22                Also, it depends on I guess the

23   queue or whatever computer program, whoever

24   wrote the program, but it's -- it's a file that

25   has been in existence before I joined the

31

1    department in 1986.  That is how old that

2    program is.

3        Q.   Okay.  And when you retrieved

4    information from that file, did it include a

5    photo of the person wanted on the warrant?

6        A.   No.  It was very antiquated.  It was

7    before 1986.

8        Q.   So what information would you get?

9        A.   Person's name, birth date, social

10   security.  I'm guessing -- I haven't seen that

11   file forever, probably the magistrate, the

12   amount of money, the district court issuing the

13   warrant, and all pertinent information that

14   would be found on the hard copy of the warrant.

15       Q.   You mentioned you had worked in

16   records for a while.

17            Did you ever work in any capacity

18   where you provided information to the database

19   regarding warrants?

20       A.   No.  I'm the supervisor of the

21   personnel in the records division.

22       Q.   Did some of those personnel maintain

23   the warrants database?

24       A.   Yes.  I know it's yes, but that

25   wasn't my area.  Warrants belonged to another

32

```
 1   lieutenant.  I'm in records.  Warrants is a

 2   separate section.

 3        Q.   Okay.  Did you ever serve as

 4   supervisor of the section that was responsible

 5   for maintaining the warrants database?

 6        A.   General question -- general answer,

 7   no.

 8        Q.   Now, you said that toward the end of

 9   your career you were at the central police

10   station and working as the officer in charge of

11   the receiving desk.

12             Can you just walk me through a

13   typical arrest and each step from the point

14   where a patrol officer would get to the door of

15   the police station with the suspect --

16             MR. LEWALLEN:  Objection.

17   BY MR. GERHARDSTEIN:

18        Q.   -- and what happens at the next

19   stage?

20             MR. LEWALLEN:  Objection.  Vague and

21        ambiguous as to typical.

22             MR. LEE:  We join.

23             MR. LEWALLEN:  If you understand the

24        question and have an answer, you can

25        proceed.
```

33

1          A.    There's no typical arrest, period.

2     You got to adapt, adjust.  There is no typical

3     arrest.

4     BY MR. GERHARDSTEIN:

5          Q.    What is the -- tell me that about

6     each step in the booking process, each step

7     that immediately preceded your decision as the

8     officer in charge as to whether it was a valid

9     arrest?

10         A.    I would have to ask of you to refer

11    to the policy of the receiving desk on the date

12    and time.  You're asking seven years ago, you

13    know.

14              I'm going to miss some procedures.

15    I haven't made an arrest or gone to the

16    receiving desk in -- I've been there.  I

17    haven't made any arrests in -- since

18    retirement.

19              Are you talking what type of arrest

20    from traffic to murders to shootings and

21    whatever else, to violence to -- there's so

22    many conditions, you just got to adjust.

23              The crew has to adjust.  The

24    receiving desk crew is awesome.  It gets spit

25    on, they got -- they take away weapons.  You

 1    cannot --

 2            Q.    Okay.  I'm most interested --

 3            A.    -- answer the question.

 4            Q.    -- in the process involving a person

 5    who would be arrested on an open bench warrant.

 6    Okay?

 7                  Would that person have their mug

 8    shot taken?

 9            A.    Would have their what?

10            Q.    Would such a person, that is an

11    individual arrested on a bench warrant, have

12    their mug shot taken?

13                  MR. LEWALLEN:  Objection.  Vague and

14            ambiguous as to time.

15                  MR. GERHARDSTEIN:  Oh, I'm sorry.

16            2017.  Thank you.

17                  MR. LEE:  Join in this objection.

18    BY MR. GERHARDSTEIN:

19            Q.    You can answer.

20            A.    You would have to ask the receiving

21    desk crew to answer that.

22            Q.    I'm --

23            A.    Generally, yes.  But there have been

24    cases where the person is so resistant, so

25    non-compliant, if that person had a recent

35

1    photograph taken of a recent arrest, it is --

2    to my knowledge, it is possible, not definite,

3    possible that the officer will rely on the

4    prior mug shot.

5        Q.   Okay.  So you said generally yes.

6    When a --

7        A.   No.  You're asking me a very general

8    question.  Okay?

9        Q.   Yeah?

10        A.   I mean --

11        Q.   And I understand that.

12        A.   -- conditions change.  Let's say if

13    it was for, let's say, a Class A felony or

14    something very serious, definitely a photograph

15    would be taken.  Okay?

16            It is up to the officer.  He has to

17    justify his work, his liability.  I mean, he's

18    a professional, even though we don't have a law

19    degree or doctorate, but the officers are also.

20        Q.   In your experience when a mug shot

21    is taken, what happens to that photograph?

22    Does it go into a database?  Does it get

23    transmitted somewhere?  What was your

24    experience with that?

25        A.   I'm not an ITD person.  I don't know

1   exactly where it goes.

2       Q.   What about a person who is arrested

3   on a bench warrant, would that person normally,

4   absent any extraordinary circumstances, be

5   fingerprinted?

6       A.   Personally fingerprinted?

7       Q.   Yeah.

8       A.   Yes.

9       Q.   Okay.  In your experience, what

10  happens with the fingerprint?  Is that sent to

11  a database?  Is that checked somewhere?

12          MR. LEWALLEN:  Objection.  Asked and

13          answered.

14          To the extent that you understand

15          the question and have an answer, you can

16          proceed.

17      A.   I'm not trained in the fingerprint

18  verification.  I just have information that the

19  officer tells me.

20  BY MR. GERHARDSTEIN:

21      Q.   Okay.  Was the fingerprint -- to

22  your knowledge, was the fingerprint

23  verification done at Honolulu Police Department

24  or done out in some other agency?

25      A.   For 2017 it was taken at the

37

1    Honolulu Police Department.  I do not know

2    where these other arrests would be.

3         Q.    And then was the matching of the

4    fingerprint, any known print, was that process

5    done at the Honolulu Police Department?

6              MR. LEWALLEN:  Objection.  Asked and

7         answered.

8              To the extent that you understand

9         the question and have an answer, you may.

10        A.    I'm just given the information back

11   from the officer.

12   BY MR. GERHARDSTEIN:

13        Q.    So you didn't know who verified it;

14   is that fair?

15        A.    It's a computer program.  I did not

16   write the program.

17        Q.    Was there any camera that recorded

18   events in the booking area of the central

19   police station?

20        A.    Of course.

21        Q.    And was there any policy on how long

22   the footage from those cameras was maintained?

23        A.    I do not know.

24        Q.    Were individuals at some point in

25   the process who had been verified as an

38

1    appropriate arrest by you as an officer in

2    charge of the receiving desk, were those

3    individuals given a wristband?

4        A.    Would be a what?  I'm sorry.

5        Q.    Were those individuals given a

6    wristband, like ID bracelets?

7        A.    The arrestee?

8        Q.    Yes.

9        A.    Of course, yes.

10        Q.    Okay.  And what information would be

11    on the ID bracelet?

12        A.    I would think the person's name.

13    I've never written an ID bracelet.  That's the

14    officer's duties.

15        Q.    When you were serving as the officer

16    in charge of the receiving desk in 2017, was

17    there any normal shift that you worked?

18        A.    Midnights.

19        Q.    And when does that shift start and

20    end?

21        A.    If I recall correctly, it starts at

22    9:30 p.m. and runs to 5:30 a.m.

23        Q.    Do you know whether you were serving

24    as the officer in charge of the receiving desk

25    at 1715, at 5:15 p.m., on May 11th, 2017?

39

1          A.   I think I was.  The paperwork says I

2    was, but seven years ago, my memory's kind of

3    fading.  So the answer is I do not know.

4          Q.   Having looked at that arrest report

5    that you told me about, did that trigger any

6    recollection of the -- of the arrest of Joshua

7    Spriestersbach?  Do you remember it, as you sit

8    here today?

9          A.   I handle many arrests.  I do not

10   know if I'm thinking of one arrest or another.

11            The issue with your document is

12   there's no -- I have no signature on it.  It's

13   an electronic signature that another officer

14   placed there.  There's no actual signature.

15         Q.   So when you approved an arrest, are

16   you saying that your typical procedure would

17   involve physically writing your signature on

18   the form?

19         A.   No.

20         Q.   So how would you document your

21   involvement in approving an arrest?

22         A.   When trusted officers would put my

23   name on it.

24         Q.   Okay.  And you mentioned that the

25   form we looked at -- which I'll bring up again.

40

1    And I'm showing you the part of the form, which

2    is Exhibit 2, Bates number C000220.

3              It has your name under Received By.

4              Do you see that?

5         A.   Yes.

6         Q.   And are you -- tell me, is there a

7    problem with that?

8         A.   If you're asking for me to remember

9    it in detail, I do not.  Based on information

10   provided, I'm guessing at an event that I do

11   recall part of it, but that's all I have.

12             I mean, seven years ago, a

13   document -- unsigned document, an officer, a

14   time that I don't normally work.  I may have

15   come in on overtime on that shift, which was

16   common.

17             I think I know who Officer Bruhn is.

18   And at one point of time I did speak to him

19   about an arrest.  But if it's the 2017 case

20   you're talking about, the exact date and time,

21   I can't say with certainty, but it was an

22   uneventful that -- on that particular day that

23   I met Officer Bruhn and I approved the

24   fingerprint portion of the arrest.

25             (Mr. Moser left the videoconference at

1              2:22 p.m. EST.)

2    BY MR. GERHARDSTEIN:

3         Q.   Okay.  Well, first of all, I'm

4    curious about your name on this line that says

5    Received By.  Is there any problem with this --

6    association of your name on this line?

7         A.   No, but there -- I have a problem --

8    issue with other portions of this document

9    which I'm not familiar with.

10        Q.   Okay.  Tell me what problem you have

11   with the other portions of this document.

12        A.   If you scroll to the bottom --

13        Q.   Okay.

14        A.   -- you see the part that says

15   Submitted By at the very bottom?

16        Q.   Yes.

17        A.   Approved By on the next column?

18        Q.   Yes.

19        A.   I do not know who that person is.

20   Okay?

21             If you look at the ID Number,

22   Z00115 --

23        Q.   Yes.

24        A.   -- to my knowledge, that is not a

25   sworn officer ID number.  It might be a records

42

1    person.  It be might be somebody not connected

2    to the receiving desk.  Or it might be somebody

3    temporary.

4              See the date on the far right,

5    August 25th?

6         Q.   I do.

7         A.   I don't know why August 25th is even

8    printed there.  And you see the Synopsis right

9    above it, that big block?

10        Q.   Yeah.

11        A.   Lieutenant D. Chang approves the

12   following changes.  I do not know -- it's

13   probably for court, but I do not know why it's

14   there.

15             I mean, I've never had to do that.

16   I guess the receiving desk crew does that.  I

17   mean, I work midnights.  That was in my area,

18   so I'm unfamiliar with those entries into this

19   OBTS, so --

20        Q.   Okay.  Well, that's helpful.

21             Normally, when you filled out these

22   documents, would you be the one who signs off

23   after the word submitted by?

24             MR. LEWALLEN:  Objection.  Vague and

25             ambiguous.

1              To the extent that you understand

2         the question that's being asked of you

3         and you have an answer, you may proceed.

4         A.   I haven't typed an OBTS in years, so

5    I do not know how the computer system works.

6    BY MR. GERHARDSTEIN:

7         Q.   Okay.  In these forms that you do

8    recall, you're saying that you didn't know who

9    this person Cuba, Tierra-Lyn is and you're not

10   familiar with the ID number, I'm just asking

11   what would you expect in those portions of this

12   form?

13        A.   I would expect an officer's name, an

14   officer's ID number, a rank, and a date and

15   time closer to the arrest date.

16        Q.   So did you ever figure out who Cuba

17   is?

18        A.   I didn't even know they had this

19   case going so I wouldn't know even where to

20   look for her.

21        Q.   Okay.  All right.  And where it says

22   Received By Lieutenant D. Kon, is that your

23   employee number, 447450?

24        A.   Yes.

25        Q.   Did you type in your name and your

44

1    employee number, if you know?

2            I'm sorry.  Did you answer?

3        A.    No.

4        Q.    And would you normally be the one

5    who types in your own name or number, or would

6    was something the staff would do?

7        A.    The staff would do that.

8        Q.    Now, you did say that you have some

9    recollection of talking to Officer Bruhn about

10   a case.  Tell me just what recollection you

11   have and as best you can.

12       A.    On one particular day I was asked to

13   come in early.  Normally, we work four hours

14   earlier than normal.

15           I took over the desk from Lieutenant

16   Nakama -- G. Nakama.  If this is the same

17   incident, the body was already there in

18   custody.  Checks were already made by the

19   previous lieutenant and all we were waiting for

20   was the fingerprint verification to come back.

21           Within minutes, the verification

22   came back.  I was now in charge of the desk.

23   The day watch receiving officer, I do not know

24   his name, came up and said, Lieutenant,

25   fingerprints are good and such-and-such.

1                Officer Bruhn came in, apprised me

2    of the arrest.  Something about a person

3    sleeping in front of a doorway or something.  I

4    don't know if he was called to the case or

5    what.  There were no injuries.  Nothing

6    outstanding.  It was just a warrant arrest.

7                I said okay.  Previous lieutenant

8    made all the checks, fingerprints are good.  I

9    accepted the arrest.

10        Q.   Would you say it was a warrant

11   arrest?

12        A.   If that -- yeah.  I don't think

13   there was any other connecting offense.  I

14   believe it was a warrant arrest.

15        Q.   And the officer in charge of the

16   receiving desk who did the previous searches

17   that you described, do you know who that person

18   was?

19        A.   You would have to look at the -- it

20   says -- the OBTS says Officer S. Iwamasa,

21   Custodial Search and ID on the OBTS.  But you

22   would have to ask him if he did it.

23        Q.   Okay.  And then who was serving as

24   the receiving desk lieutenant while that search

25   was being made, the immediate receiving desk

46

 1    lieutenant before you?

 2          A.   Can you scroll up for the time of

 3    the arrest?

 4          Q.   Sure.

 5          A.   I would have to examine this form

 6    more, but the arrest came in on the previous

 7    watch.  I came in early, before the four hours.

 8    And we were in transition.

 9               The body came in on the prior watch.

10    The prior lieutenant was working at the time.

11    And about 1730 -- four hours -- 5:30 p.m.

12    probably.  I'm thinking if it was just a

13    routine day, I would have been there, but I --

14    I know I had a conversation with the prior

15    lieutenant, if it's the same incident, and we

16    were just waiting for fingerprints.  Everything

17    else was good.

18               So based on that, the body came in

19    on his watch.

20          Q.   And, again, do you recall who that

21    person was that you're referring to?

22          A.   Glen Nakama.

23          Q.   This person here, Nakama?

24          A.   He came in the next day and he -- if

25    you scroll down to the --

1      Q.   Oh, yeah.  Sure.  He came in at

2   6:30 in the morning.

3      A.   And he worked second watch and I

4   believe sent the body to court.

5           So, basically, he is working the

6   shift before me.  I came in early and he

7   relieved me.

8      Q.   What would the hours be of the shift

9   before you?

10      A.   Probably 1:30 p.m. to 9:30 p.m.  The

11   lieutenants came in early.  The lieutenants

12   always came in early.

13      Q.   And help me out.  Are you saying

14   that Lieutenant Nakama was working from 1:30 --

15   the 1:30 shift on May 11th but left early and

16   you relieved him, and then he relieved you the

17   next morning as well?

18      A.   Yes.

19      Q.   Okay.

20      A.   His exact time -- I do not know his

21   start time, but I was there to relieve him if

22   we are talking about the same day.

23      Q.   So the incident that you're

24   recalling you said was a warrant arrest,

25   correct?

1      A.   Yes.

2      Q.   So the fingerprint work in a case

3   like that would involve checking the

4   fingerprints of the person in custody against

5   the fingerprints of the person wanted on the

6   warrant; is that correct?

7           MR. LEWALLEN:  Objection.  Asked and

8        answered.

9           To the extent that you understand

10       the question and have an answer, you may.

11     A.   There are no fingerprints on the

12   warrant.  There's fingerprints on the arrest

13   record.

14   BY MR. GERHARDSTEIN:

15     Q.   Okay.  But there's an individual

16   wanted on the warrant, right?

17     A.   Yes.

18     Q.   And my question is simply in terms

19   of process.  One of your tasks as the officer

20   in charge of the receiving desk would be to

21   make sure you have the right person, you have

22   the person who truly is wanted on that warrant

23   in custody, right?

24     A.   I would have to say that the person

25   matches, his database matches.

49

1          Q.   What do you mean?

2          A.   We can have people of different

3    names on an arrest record, generally speaking,

4    and the person's fingerprint has to be matching

5    to an exact person.

6          Q.   Okay.  And when you are verifying

7    the arrest of the person on a warrant, wouldn't

8    you agree that the person that is in custody

9    should match the fingerprints of the person who

10   is wanted on the warrant?

11         A.   Of course.

12         Q.   Okay.  So in this case, we're

13   looking at the arrest report.  And the arrest

14   is a revocation of probation.  That's what the

15   warrant is about, right?

16         A.   I've only seen this OBTS.  What is

17   typed there, yes, revocation.  If that's what

18   it is, that's what it is.

19         Q.   Okay.  Also in Exhibit 2, page

20   number C000219, is a copy of the warrant that's

21   referred to in that arrest report.  Okay?  And

22   I'm showing that to you now.

23         A.   Yes.

24         Q.   So the bench warrant that triggered

25   the arrest in this case was directed to a

50

1    person named Thomas R. Castleberry.

2         Do you see that?

3    A.    Yes.

4    Q.    So would you agree that in order to

5    make sure the arrest was valid, you would want

6    the fingerprints of the person in custody, the

7    person who was arrested, to match the known

8    fingerprints of Thomas R. Castleberry, right?

9    A.    Yes.  Yes.

10    Q.    Okay.  And do you know if that was

11    accomplished in the case you were thinking

12    about, the one that you remembered talking to

13    Officer Bruhn about?

14    A.    I was informed by the young officer

15    at the receiving desk that the fingerprints

16    matched.

17    Q.    And when you heard that, you

18    understood that to mean that the fingerprints

19    of the person you had in custody matched Thomas

20    R. Castleberry, the person on the warrant,

21    right?

22    A.    Yes.

23    Q.    Did you ever learn whether that was

24    inaccurate?

25    A.    No.

51

1         Q.   I'm going to show you the arrest

2    report again.

3              Do you see in the upper right-hand

4    corner, it says Verified By Prints?

5              MR. LEWALLEN:  We cannot see that,

6         Al.  It's blocked by the camera view of

7         the counsel.

8              MS. HURA:  And, Mr. Gerhardstein,

9         can you please refer to the exhibit

10        number as well as the Bates stamp number?

11        Thank you.

12             MR. GERHARDSTEIN:  Yeah.  It's

13        Exhibit 2, C000220.  I'll scroll.

14             Does that help at all?  I'm not sure

15        what the problem is.

16             MR. LEWALLEN:  I think I fixed it,

17        Al.

18             MR. GERHARDSTEIN:  Oh, okay.

19             MR. LEWALLEN:  I moved the icon,

20        so --

21             MR. GERHARDSTEIN:  Oh, okay.

22   BY MR. GERHARDSTEIN:

23        Q.   So in the upper right-hand corner of

24   this document, Exhibit 2, and it's the arrest

25   report, do you see where it says Adult Verified

52

1    By Prints?

2        A.    Yes.

3        Q.    What does that mean?

4        A.    I guess adult verified by prints.

5        Q.    Yeah.  I'm just wondering in your

6    experience completing these forms, what does

7    verified by prints mean?

8        A.    I don't see the form.  I don't sign

9    the form.  I don't know if it means -- if I saw

10   adult verified by prints.

11             The information is provided to me

12   verbally.  An officer goes and types and

13   completes the form.

14             So I can't say I seen any forms like

15   this unless I'm working day watch, which is

16   rare and did not happen in this case.  So I

17   can't say I -- I know this form or what the

18   form means.  It's adult verified by prints.  I

19   think that's the first time I've seen this

20   form.

21       Q.    You refer to it as an OBT something.

22   Tell me again what that was.

23       A.    Can you go to the top?

24       Q.    Yeah.  Are we there?

25       A.    I don't know what it is.  I always

```
 1    called it OBTS.  It's just what we referred to.

 2    It's some acronym for this form.

 3         Q.    Okay.

 4              MR. LEWALLEN:  Excuse me, Counsel.

 5              MR. GERHARDSTEIN:  Yeah.

 6              MR. LEWALLEN:  Can we take a break?

 7         I need a break myself personally.  I need

 8         to --

 9              MR. GERHARDSTEIN:  Sure.

10              MR. LEWALLEN:  My arthritic knees,

11         so --

12              MR. GERHARDSTEIN:  So let's do

13         ten minutes?

14              MR. LEWALLEN:  Ten minutes, please.

15              MR. GERHARDSTEIN:  All right.

16              (A recess was taken from 2:42 to 2:53.)

17    BY MR. GERHARDSTEIN:

18         Q.    Mr. Kon, do you know if there was a

19    job description written for the tasks you

20    performed as watch commander or officer in

21    charge of the receiving desk?

22         A.    No.

23         Q.    Well, does the no mean that you just

24    don't know or there is no job description?

25         A.    There's no job description that I
```

54

1    know of.

2         Q.   Okay.  And in some departments there

3    would be a post order for the tasks associated

4    with watch commander or officer in charge of

5    the receiving desk.  Is there such a document

6    that you're aware of?

7         A.   Very generally speaking, when you

8    get promoted at any rank or accepted into the

9    police department, that is the only job

10    description I know of of -- of the rank.  Not

11    of the specific job.

12         Q.   So there's a job description for

13    lieutenant, but that's it; is that fair?

14         A.   What is required for the interview

15    process.  After that I do not know.

16         Q.   Okay.  So there's a job --

17         A.   Promotion requirements.

18         Q.   Like what your skills are supposed

19    to be or what the requirements are for the

20    position that you're interviewing for.  Is that

21    what you're referring to?

22         A.   I don't think it even has a skill

23    listed in it.

24         Q.   Okay.  So also in your years at the

25    police department, did you ever come across any

55

1    errors in the date of birth or other personal

2    identifiers in a report or record in the case

3    reporting system at the Honolulu Police

4    Department?

5              MR. LEWALLEN:  Objection.

6              MS. HURA:  Objection.

7              Go ahead.

8              MR. LEWALLEN:  Vague and ambiguous.

9         Overly broad.

10             To the extent you understand the

11        question and have an answer, you may

12        proceed.

13             MS. HURA:  Join.

14             MR. LEE:  Join.

15        A.   I don't have access to the CRS

16   system.  I don't think I ever have.

17   BY MR. GERHARDSTEIN:

18        Q.   Have you ever noticed any errors in

19   personal identifiers in police reports, you

20   know, incident reports or arrest reports?

21             MS. HURA:  Objection.

22             MR. LEWALLEN:  Same objection.

23             MS. HURA:  Yes.  Same.  Join.

24             MR. LEE:  Join again.

25             MR. LEWALLEN:  You can answer if you

 1           understand the question and have an

 2           answer.

 3           A.    At the most, maybe a typo.

 4    BY MR. GERHARDSTEIN:

 5           Q.    In terms of a typo, do you mean a

 6    typo about like the date of birth or the height

 7    or the --

 8           A.    No.  No.  More like my name, Darryl,

 9    spelled with one R versus two or --

10           Q.    Okay.

11           A.    -- that kind of thing.

12           Q.    Did you ever notice errors like in a

13    social security number or the State ID number?

14           MS. HURA:  Objection.  Vague and

15           ambiguous as to what you mean by errors.

16           Whose errors?  What is that based

17           on?  How would this witness identify any

18           of that?

19           MR. GERHARDSTEIN:  Okay.  You can

20           just do an objection without doing a

21           talking objection.

22    BY MR. GERHARDSTEIN:

23           Q.    You can answer.

24           MR. LEWALLEN:  I'm going to join in

25           the objection.

1                MR. LEE:  Join as well.

2          A.    I don't recall.

3    BY MR. GERHARDSTEIN:

4          Q.    Did you ever have -- this is

5    Exhibit 38.  It's Form 510.

6                Did you ever have occasion to use

7    this form to correct any personal identifiers

8    that were found to be inaccurate in any of the

9    reports you worked with?

10         A.    This is the first time I've seen

11   this form.

12         Q.    Were you ever trained on what to do

13   to correct any errors and inaccuracies with

14   respect to personal identifiers --

15               MR. LEWALLEN:  Objection.

16               MS. HURA:  Go ahead.

17   BY MR. GERHARDSTEIN:

18         Q.    -- on police forms?

19               MR. LEWALLEN:  Objection.  Vague and

20               ambiguous.  Overly broad.  Calls for

21               speculation.

22               To the extent that you understand

23               the question and have an answer, you may.

24               MS. HURA:  Join.

25               MR. LEE:  Join in this, too.

58

```
 1              A.    I don't recall any incident as such.
 2      BY MR. GERHARDSTEIN:
 3              Q.    No.  My question is, were you ever
 4      trained on that?
 5              A.    There are many things I have not
 6      been trained on.  I have not been trained on
 7      that.
 8              Q.    Okay.  You mentioned that you did
 9      have this recollection of one particular arrest
10      involving a warrant that you talked to Officer
11      Bruhn about.  I just want to be sure.  Can you
12      tell me what you said to Bruhn and what he said
13      to you, as best you can recall?
14              MR. LEWALLEN:  Take five.  We're
15          having our monthly emergency broadcast
16          services here at Honolulu campus.  This
17          will be over in a matter of seconds.
18          Apologies.
19              (Off the record.)
20      BY MR. GERHARDSTEIN:
21              Q.    So the question was whether you
22      could tell me what you said to Bruhn, what he
23      said to you as best you can recall.
24              A.    All I remember is something about
25      sleeping on the sidewalk in front of a door or
```

59

1    something as such.  I don't know if he was

2    called or what to it.  And that's about it.

3    That's what I recall from seven years ago.

4        Q.    But I take it you also recall that

5    this was an arrest on a warrant, right?

6        A.    Yeah.

7        Q.    And --

8        A.    The documents you showed me also

9    says it's a REVO/MOD, which I don't recall if

10   it's a REVO/MOD.  You showed me documents I'm

11   just saying yes to.

12       Q.    And there were no other charges with

13   respect to the arrest that Officer Bruhn talked

14   to you about, right?

15       A.    Unless you show me another document,

16   I don't recall.

17       Q.    Okay.  And as you sit here today, do

18   you recall whether the arrest you talked to

19   Officer Bruhn about involved Joshua

20   Spriestersbach?

21       A.    No.

22       Q.    Okay.  I did have an occasion to

23   look at your personnel file, which was produced

24   in this case under a protective order.

25            I did not see any performance

60

```
 1    evaluations.  Were you regularly evaluated in

 2    the Honolulu Police Department?

 3         A.   Of course.

 4         Q.   So were there written performance

 5    evaluations?

 6         A.   I made lieutenant.  There must have

 7    been some reports.

 8         Q.   Did you ever see any of the

 9    performance evaluations related to your work?

10         A.   I've signed -- I've signed --

11    electronically signed performance reviews.

12         Q.   Okay.  Did you ever -- were you ever

13    requested to get additional training in any

14    areas where you were deficient in your

15    performance?

16              MS. HURA:  I'm going to object to

17         this line of questioning under 92F HRS,

18         and relevance.

19    BY MR. GERHARDSTEIN:

20         Q.   You can answer.

21              MR. LEWALLEN:  Join.

22         A.   I don't know what you're asking.

23    You're always in training in some form.

24    BY MR. GERHARDSTEIN:

25         Q.   Okay.  Were you disciplined at all
```

61

1   for any of your conduct with respect to the

2   arrest of Joshua Spriestersbach?

3          A.   Of course not.

4          Q.   Were you told that you needed any

5   retraining with respect to any of the actions

6   you took with respect to Joshua Spriestersbach?

7          A.   Of course not.  I don't even know

8   who this guy is.

9          Q.   Were you ever told that you did

10  anything wrong with respect to the arrest of

11  Joshua Spriestersbach?

12         A.   Negative.

13         Q.   And as you looked over the paperwork

14  that you did review, did you notice any

15  mistakes with respect to the arrest of Joshua

16  Spriestersbach?

17              MS. HURA:  Objection.  Calls for

18         speculation.  Vague and ambiguous.

19              MR. LEWALLEN:  Join.

20              If you understand the question and

21         have an answer, please provide it.

22         A.   Only what I highlighted on the

23  signatures and other items.

24  BY MR. GERHARDSTEIN:

25         Q.   And that involved not really being

62

1    clear on who that person was at the bottom of

2    the form, right?

3         A.    The date and time.

4         Q.    Right.

5         A.    ID number, the person's existence.

6         Q.    Okay.  As a person who served as

7    watch commander and officer in charge of the

8    receiving desk, did you also fill out

9    evaluations of people under your command?

10        A.    If I did, the only person I would

11   do, would be my responsibility, is the desk

12   sergeant.

13        Q.    I'm sorry.  I missed it.

14        A.    There would be only one person I

15   would be responsible for and that's the desk

16   sergeant.  And I don't recall.

17        Q.    Did you work with more than one desk

18   sergeant?

19        A.    Yes.  I mean, we operate 24/7 so

20   there's always somebody else or --

21        Q.    Now, I'm going to show you what's

22   been marked as Exhibit 3.  And this is that

23   bench warrant, again, that was the basis for

24   the arrest we're talking about in this case.

25              And do you see the exhibit on the

63

```
 1   screen?

 2        A.   Yes.

 3        Q.   And do you see where in handwriting

 4   it says, AKA:  Spriestersbach, Joshua C?

 5        A.   Yes.

 6        Q.   In this case, do you know why his

 7   name was written on this copy of the bench

 8   warrant for Thomas Castleberry?

 9        A.   You would have to ask the person who

10   wrote it.  Seven years ago I can guess why it's

11   written, but I don't think I saw the warrant.

12   I see the data.  I hear what the officer tells

13   me, but they don't say, here's the warrant,

14   Lieutenant.

15        Q.   In this case, apparently the City

16   database listed Thomas Castleberry -- or Joshua

17   Spriestersbach as an alias for Thomas

18   Castleberry.  Okay?  You can assume that.  All

19   right?

20        A.   Assume it from your info?

21        Q.   Yeah.

22        A.   Okay.

23        Q.   So if that's so, when you have an

24   alias, is it appropriate to write, like, the

25   alias name on the bench warrant, if you know?
```

64

 1          A.   Appropriate?  I can't answer that.

 2   I know if the identify -- information provided

 3   by the officers to receiving desk crew matches

 4   the warrant, including the alias, I approve the

 5   warrant.  As far as writing the name in, I

 6   can't say it is or isn't.

 7          Q.   So what does it mean to approve the

 8   warrant?

 9          A.   The computer -- computer information

10   matches, fingerprint matches, everything

11   matches to the warrant.  The name on the

12   warrant, or whatever is connecting information,

13   is on the warrant.

14          Q.   So in this case, the person on the

15   form -- let's go back to that -- on the arrest

16   report, is Joshua Spriestersbach.

17             So how -- how do you -- when you

18   have a person in a situation like this where

19   the person that you've arrested as the

20   defendant is not the name on the warrant, does

21   that trigger like some responsibility, or what

22   do you do about the warrant for a person of a

23   different name?

24             MR. LEWALLEN:  Objection.  Vague and

25             ambiguous question.

1           If you understand it, you may

2       answer -- and have an answer.

3       A.   I have a general answer but it's not

4   worth even saying, so -- you just got to -- you

5   just got to adapt to the information provided.

6   Whatever is provided, that is what you go on.

7   Whatever the computer shows, whatever the

8   fingerprint shows, what a common person, a

9   reasonable person would understand, that is

10   what -- that's what we do.

11           If there's any -- if there's -- I'm

12   not done.  If there's --

13       Q.   Okay.

14       A.   -- discreption (sic) on a simple

15   warrant, I would have let him go.  Okay?  But

16   everything came back with the lieutenant before

17   me, his checks all came out.  All we did was

18   the fingerprints.  That was all I had to do.

19           So so long as the fingerprints came

20   back matched or unmatched, I would have made my

21   decision on that.

22       Q.   Okay.  If the fingerprints of Joshua

23   Spriestersbach did not match those of Thomas

24   Castleberry, what would you have done?

25           MR. LEWALLEN:  Objection.  Calls for

1          speculation.  Incomplete hypothetical.

2               MR. LEE:  Join.

3          A.   I don't understand.  You show me the

4     prints in front of me, the conditions, okay.

5     You verbal -- I don't know who you're talking

6     about, John Doe 1, John Doe 2.

7               I mean, the information on the CJIS,

8     the fingerprints attached to the CJIS,

9     everything matched.  And that is only if it's

10    the same case that I recall.  There were no

11    issues.

12    BY MR. GERHARDSTEIN:

13         Q.   So in this case, is it your

14    recollection that the person listed as the

15    defendant, Joshua Spriestersbach, was viewed by

16    you as being the same person as Thomas

17    Castleberry?

18         A.   I don't know.  I don't remember his

19    name.

20         Q.   Okay.  If you were under the

21    understanding that a person arrested was using

22    an alias for the person wanted on the warrant,

23    would that -- would it be appropriate then to

24    hold the person simply because he was listed as

25    an alias for the person wanted on the warrant?

1           MR. LEWALLEN:  Objection.

2       Incomplete hypothetical.  Calls for

3       speculation.  Vague and ambiguous.

4           If you understand the question and

5       have an answer, you may answer.

6           MS. HURA:  Join.

7           MR. LEE:  Join in this.

8       A.   You should be talking more specific,

9   especially in this case.  I'm not going to

10  answer a general question.

11          You always got to adapt to the

12  conditions provided.  Okay?  You always got to

13  adjust.  Okay?

14          It's not cut and dry.  It's not like

15  reading a book or reading -- Monday morning

16  quarterback.  Okay?  It's nothing like that.

17  You got to make decisions, you got to adjust,

18  and that's it.

19  BY MR. GERHARDSTEIN:

20      Q.   Would you agree that the person in

21  your custody in this case, Joshua

22  Spriestersbach, would have to have fingerprints

23  that matched Thomas Castleberry for you to say

24  that's a valid arrest on Thomas Castleberry's

25  warrant?

68

1              MS. HURA:  Objection.

2              MR. LEWALLEN:  Objection.

3              MS. HURA:  Go ahead.

4              MR. LEWALLEN:  Vague and ambiguous.

5              If you understand the question.

6              MS. HURA:  Objection.  Assumes --

7         join that one.  Assumes facts not in

8         evidence.

9              The witness has already asked and

10        answered -- has already answered this

11        question.

12             MR. LEE:  We join in the objection

13        by both counsel.  Thank you.

14   BY MR. GERHARDSTEIN:

15        Q.   You can answer.

16        A.   I do not know.

17        Q.   Well, isn't that the task, though,

18   of the officer in charge of the receiving desk

19   to make sure that the fingerprints of the

20   person in custody actually match the one -- the

21   person who you're seeking to arrest on the

22   warrant?

23             MS. HURA:  Objection.

24        Argumentative.

25             It's not the same question.  The

1              hypothetical has changed.

2                    MR. LEE:  Join.

3                    MR. LEWALLEN:  Join.

4      BY MR. GERHARDSTEIN:

5         Q.   You can answer.

6         A.   I'm getting thrown off by

7      Castleberry and Spea -- whatever his name is.

8                    So when the officer says to me

9      fingerprints match, fingerprints match the

10     warrant, 10-4, arrest is good.  All other data

11     matches, birth date, social, whatever is given

12     matches, good.  I mean, if those conditions are

13     met, everything's good.

14                   And as far as that particular case,

15     I remember an officer, in my memory, saying

16     fingerprints are good.

17                   As far as what data he was referring

18     to exactly, I interpreted it as being the

19     person on the warrant.

20                   MR. GERHARDSTEIN:  Okay.  I don't

21          have any other questions.

22                   Thank you, Mr. Kon.  Other counsel

23          may have questions.

24                   MS. HURA:  Mr. Lee, do you have

25          questions?

70

1              MR. LEE:  I do not, Ms. Hura.

2              MS. HURA:  Thank you.

3                      EXAMINATION

4    BY MS. HURA:

5        Q.   I just have, I think, a couple maybe

6    clarification questions about acronyms, I

7    think.

8              So good morning.  My name is Justine

9    Hura.  I represent the Office of Public

10   Defender defendants in this lawsuit and I work

11   for the Department of the Attorney General.

12             I did want to ask -- you mentioned

13   the acronym ITD, I believe, as part of what

14   your job was working for the City and County or

15   the Honolulu Police Department.

16             Do you recall that acronym and what

17   it stands for?

18       A.   Yes.  Information technology -- I

19   don't know if it's development or division.

20   It's the computer section, database section of

21   the internals of the police department.

22       Q.   Okay.  Is that attached to internal

23   affairs or no?

24       A.   No, no, no, no.  No.  Like it's the

25   computer guy.  That's all.

1          Q.    Okay.  And then you mentioned, if

2     I'm not mistaken, LEQM?

3          A.    Yes.  That is a command.  I do not

4     know the acronym for it, but it is -- the

5     warrant -- we check for warrants under the old

6     City's or State's driver's -- there's several

7     commands in that program on the system.  It's

8     one of the oldest computer systems we have.  We

9     do driver's license checks, warrant checks.  I

10    don't know what else, but there's like ten

11    commands that we can find.

12          MS. HURA:  Okay.  And then -- I

13        think those are my questions.  Thank you.

14          MR. GERHARDSTEIN:  All right.

15          MR. LEWALLEN:  I have no questions.

16          MR. GERHARDSTEIN:  Thank you very

17        much, sir.

18          THE WITNESS:  Thank you.

19          MS. HURA:  Thank you.

20          THE REPORTER:  Wait a minute.

21        Signature to the deposition?

22          MR. LEWALLEN:  Yes, please.  If you

23        will send it to me, and we'll forward it

24        to Mr. Kon for his review.

25          THE REPORTER:  Okay.  Justine, do

1    you want a copy?

2         MS. HURA:  Yes, please.  Ordinary

3    course.  Thank you.

4         MR. LEWALLEN:  Same for me.

5         THE REPORTER:  Mr. Lee?

6         MR. LEE:  We're not going to order a

7    copy of this.  Thank you.

8         THE REPORTER:  Okay.

9

10        _____

                    DARRYL T. KON

11

12

13              - - -

14   DEPOSITION ADJOURNED AT 3:20 P.M.

15              - - -

16

17

18

19

20

21

22

23

24

25

1              C E R T I F I C A T E

2

3    STATE OF OHIO        :
                          :  SS
4    COUNTY OF HAMILTON   :

5

6              I, Tracy L. Allen, RPR, RMR, the

7    undersigned, a duly qualified and commissioned

8    notary public within and for the State of Ohio,

9    do certify that before the giving of his

10   deposition, DARRYL T. KON was by me first duly

11   sworn to depose the truth, the whole truth and

12   nothing but the truth; that the foregoing is

13   the deposition given at said time and place by

14   DARRYL T. KON; that I am neither a relative of

15   nor employee of any of the parties or their

16   counsel, and have no interest whatever in the

17   result of the action.

18           IN WITNESS WHEREOF, I hereunto set my

19   hand and official seal of office at Cincinnati,

20   Ohio, this 5th day of February 2024.

21

22   _____
          Tracy L. Allen, RPR, RMR
23        Notary Public - State of Ohio
          My commission expires July 29, 2028.

24

25

1              E R R A T A   S H E E T

2         DEPOSITION OF: DARRYL T. KON
              TAKEN: FEBRUARY 1, 2024
3

4    Please make the following corrections to my
     transcript:
5

6    Page  Line Number           Correction Made

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24

25   _____    _____
     Witness Signature               Date

## 1

**1** 28:1 66:6
**10-4** 69:10
**11th** 38:25 47:15
**1405** 12:2
**1715** 38:25
**1730** 46:11
**1981** 9:20
**1986** 10:1 31:1,7
**1:30** 47:10,14,15
**1:33** 6:3
**1st** 6:5

## 2

**2** 19:19 40:2 49:19 51:13, 24 66:6
**2017** 17:9 21:6 34:16 36:25 38:16,25 40:19
**2024** 6:5
**24/7** 62:19
**25th** 11:9 42:5,7
**2:22** 41:1
**2:42** 53:16
**2:53** 53:16

## 3

**3** 62:22
**30** 10:1
**38** 57:5
**3:20** 72:14

## 4

**4** 11:4,14
**447450** 43:23

## 5

**5** 10:12
**510** 57:5
**5:15** 38:25
**5:30** 38:22 46:11

## 6

**6:30** 47:2

## 8

**801** 12:2,15
**81** 17:11

## 9

**92F** 21:21 22:15 60:17
**9:30** 38:22 47:10

## A

**a.m.** 38:22
**absent** 36:4
**accept** 12:25 13:9,21,22
**acceptable** 13:16
**accepted** 45:9 54:8
**accepting** 13:2 15:6,11
**access** 23:17,18 24:21 55:15
**accomplished** 50:11
**accountable** 26:1
**accounted** 15:3
**acronym** 53:2 70:13,16 71:4
**acronyms** 70:6
**actions** 61:5
**actual** 39:14
**adapt** 14:10 33:2 65:5 67:11
**additional** 15:11,15 60:13
**address** 12:3
**ADJOURNED** 72:14
**adjust** 33:2,22,23 67:13,17
**administered** 7:2
**administration** 16:9
**adult** 51:25 52:4,10,18
**affairs** 70:23
**AFIS** 23:12
**agency** 36:24
**agent** 9:4,7,9
**ago** 20:18 33:12 39:2 40:12 59:3 63:10
**agree** 6:24 7:9 49:8 50:4 67:20
**agrees** 7:5
**ahead** 22:12 55:7 57:16 68:3
**aid** 9:22
**airport** 8:15,16
**AKA** 63:4
**Al** 6:9 51:6,17
**alias** 63:17,24,25 64:4 66:22,25
**Alipio** 9:9
**Allison** 6:19
**ambiguous** 17:24 18:2 22:16 23:6 26:23 27:6 32:21 34:14 42:25 55:8

56:15 57:20 61:18 64:25 67:3 68:4
**amount** 15:25 31:12
**answer** 18:5,7 22:1 23:8 24:18 25:13,15 26:1,2,20 27:8 29:20 32:6,24 34:3, 19,21 36:15 37:9 39:3 43:3 44:2 48:10 55:11,25 56:2,23 57:23 60:20 61:21 64:1 65:2,3 67:5,10 68:15 69:5
**answered** 30:1 36:13 37:7 48:8 68:10
**antiquated** 31:6
**Anybody** 20:9
**Apologies** 58:18
**apparently** 63:15
**appointed** 9:25
**apprise** 13:12
**apprised** 45:1
**appropriate** 38:1 63:24 64:1 66:23
**approve** 64:4,7
**approved** 39:15 40:23 41:17
**approves** 42:11
**approving** 39:21
**approximately** 6:3 10:13, 25 12:24
**area** 25:15 28:11 31:25 37:18 42:17
**areas** 60:14
**argumentative** 27:11 68:24
**arrest** 13:13,24 14:1,11, 13,14,20 15:7,11,19,24 16:24 17:21 18:18,19,22 29:5,8 32:13 33:1,3,9,15, 19 35:1 38:1 39:4,6,10,15, 21 40:19,24 43:15 45:2,6, 9,11,14 46:3,6 47:24 48:12 49:3,7,13,21,25 50:5 51:1,24 55:20 58:9 59:5,13,18 61:2,10,15 62:24 64:15 67:24 68:21 69:10
**arrested** 13:18 17:15 34:5, 11 36:2 50:7 64:19 66:21
**arrestee** 38:7
**arresting** 16:19
**arrests** 13:3,10 16:10,12 27:22 33:17 37:2 39:9
**arthritic** 53:10
**asked** 20:6 36:12 37:6 43:2 44:12 48:7 68:9

asking  16:20 24:23 25:17
  26:4,12,15 33:12 35:7
  40:8 43:10 60:22
assigned  11:10 14:7
assignment  10:8 11:19
associated  28:12 54:3
association  41:6
assume  16:5,11 24:9,10
  63:18,20
Assumes  68:6,7
assuming  15:17 24:7
attached  66:8 70:22
attorney  6:15 7:25 8:13
  9:11,14 70:11
August  42:5,7
auto  11:1
available  17:6 28:10
aware  27:15,18,24 28:9
  54:6
awesome  33:24

B

back  10:17 11:24 19:14
  24:22,24 27:4 37:10
  44:20,22 64:15 65:16,20
bad  13:19
bail  14:4,5 15:25 16:1 17:2
based  16:25 17:13 25:6,17
  26:9 40:9 46:18 56:16
basement  12:16
basically  8:19 15:23 20:20
  47:5
basis  62:23
Bates  19:21 40:2 51:10
beat  28:18
behalf  6:21
believe  11:11 12:3 19:4,13
  23:11 30:18 45:14 47:4
  70:13
belonged  31:25
bench  34:5,11 36:3 49:24
  62:23 63:7,25
Beretania  12:2,3,15 17:11
best  44:11 58:13,23
big  42:9
birth  14:21 29:1 31:9 55:1
  56:6 69:11
block  42:9
blocked  51:6
blur  11:5
body  44:17 46:9,18 47:4
body-worn  20:25
bondsman  16:2

book  67:15
booking  33:6 37:18
boss  8:24,25 9:5,8,10
bosses  20:7
bottom  41:12,15 62:1
box  20:17
bracelet  38:11,13
bracelets  38:6
break  53:6,7
bring  39:25
brings  9:16
broad  55:9 57:20
broadcast  58:15
Bruhn  40:17,23 44:9 45:1
  50:13 58:11,12,22 59:13,
  19
building  12:4
busy  8:10,11

C

C000219  49:20
C000220  19:21 40:2 51:13
call  10:12 16:1
called  10:14 18:22 23:12
  27:16 28:4 45:4 53:1 59:2
Calls  29:16 57:20 61:17
  65:25 67:2
camera  37:17 51:6
cameras  20:25 37:22
campus  58:16
capacity  31:17
car  10:15
card  23:2
career  10:3,23 16:13,20
  20:19 32:9
case  13:21,23 14:7 20:17
  21:25 25:23 26:3 27:13
  40:19 43:19 44:10 45:4
  48:2 49:12,25 50:11 52:16
  55:2 59:24 62:24 63:6,15
  64:14 66:10,13 67:9,21
  69:14
cases  8:22 25:23 34:24
Castleberry  50:1,8,20
  63:8,16,18 65:24 66:17
  67:23 69:7
Castleberry's  67:24
cause  13:16
cellblock  17:12,17
central  12:20 17:10 32:9
  37:18
certainty  40:21
cetera  13:13 14:8,22

Chang  42:11
change  35:12
changed  8:14 69:1
changes  42:12
charge  12:9,13,24 13:5,12
  16:6,23 17:14 32:10 33:8
  38:2,16,24 44:22 45:15
  48:20 53:21 54:4 62:7
  68:18
charges  13:17 59:12
check  15:11 29:6 30:12,16
  71:5
checked  36:11
checking  48:3
checks  15:5,10 29:7 30:6
  44:18 45:8 65:17 71:9
chief/special  9:7,9
choose  22:2
chucked  20:20
CID  10:24 12:5
circumstances  36:4
City  6:21 63:15 70:14
City's  71:6
CJIS  15:7 30:4 66:7,8
clarification  70:6
Class  35:13
clear  62:1
closer  43:15
colleague  17:20
column  41:17
come  13:12 20:4 30:19
  40:15 44:13,20 54:25
comes  18:20
command  23:21 62:9 71:3
commander  12:19,23 13:7
  15:6,18 16:24 25:19 53:20
  54:4 62:7
commanders  12:17
commands  71:7,11
common  40:16 65:8
completes  52:13
completing  52:6
computer  14:22 15:2,5
  29:7 30:6,23 37:15 43:5
  64:9 65:7 70:20,25 71:8
concerned  16:9
conditions  14:9 22:6,9,10
  33:22 35:12 66:4 67:12
  69:12
conduct  61:1
confidentiality  21:18
  22:14
connected  42:1
connecting  45:13 64:12

conversation 46:14
copy 31:14 49:20 63:7
 72:1,7
corner 51:4,23
correct 9:20 13:18 17:22
 47:25 48:6 57:7,13
correctly 38:21
Cost 8:10
counsel 6:6 26:19 51:7
 53:4 68:13 69:22
County 6:22 70:14
couple 70:5
course 37:20 38:9 49:11
 60:3 61:3,7 72:3
court 17:4,5,7,17 31:12
 42:13 47:4
crew 16:8 33:23,24 34:21
 42:16 64:3
Crimestoppers 29:11,15,
 25
criminal 7:24 8:13,22 12:7
CRS 55:15
Cuba 43:9,16
curious 41:4
current 7:23 30:13
Custodial 45:21
custodies 10:10
custody 13:14 18:20 44:18
 48:4,23 49:8 50:6,19
 67:21 68:20
cut 67:14

D

Daniel 8:16 9:2
Darryl 6:2,23 7:10,19 56:8
 72:10
data 63:12 69:10,17
database 27:18 28:9,15
 31:18,23 32:5 35:22 36:11
 48:25 63:16 70:20
date 6:4 14:21 17:4 29:1
 31:9 33:11 40:20 42:4
 43:14,15 55:1 56:6 62:3
 69:11
day 12:25 13:11 16:17
 17:6 40:22 44:12,23
 46:13,24 47:22 52:15
decision 33:7 65:21
decisions 67:17
deep 15:8
defendant 64:20 66:15
defendants 6:16 70:10
Defender 6:16 70:10
deficient 60:14

definite 35:2
definitely 30:14 35:14
degree 35:19
department 6:12 8:4,18
 10:1,4 20:15,23 22:7,24
 31:1 36:23 37:1,5 54:9,25
 55:4 60:2 70:11,15,21
departments 54:2
depends 14:1 30:22
deposed 7:12
deposition 6:2,25 18:12
 19:12 20:3 71:21 72:14
deputy 6:15 9:7
described 45:17
description 53:19,24,25
 54:10,12
desk 10:9 11:12,16 12:9,
 13,14,18 13:2,5 16:6,23
 17:14 18:19 25:22 32:11
 33:11,16,24 34:21 38:2,
 16,24 42:2,16 44:15,22
 45:16,24,25 48:20 50:15
 53:21 54:5 62:8,11,15,17
 64:3 68:18
detail 10:23 40:9
detective 10:24 14:7
determination 16:12 17:1,
 13,21
determine 13:15 14:4,5,13
 15:18 16:24 17:16 18:3
 22:25 23:3
development 70:19
diary 20:16
different 16:18 25:22,23
 26:4 49:2 64:23
digital 27:16 28:4
directed 49:25
disapprove 13:10
disapproving 13:3
disciplined 60:25
discroption 65:14
dispatch 15:14
district 10:12 11:4,14
 31:12
division 11:10 12:7 17:11
 31:21 70:19
doctorate 35:19
document 19:11 28:2
 39:11,20 40:13 41:8,11
 51:24 54:5 59:15
documents 16:8 18:18
 42:22 59:8,10
Doe 66:6
doing 11:6 56:20
door 32:14 58:25

doorway 45:3
Dr 6:19
drive 10:15
driver's 15:7 23:2 28:21
 29:6 30:4,8 71:6,9
dry 67:14
duly 7:11
duties 8:12,19 9:13 10:5
 13:1 38:14

E

earlier 44:14
early 44:13 46:7 47:6,11,
 12,15
Eastern 6:4
eight 10:25
either 16:19
elapse 23:23 24:12
electronic 39:13
electronically 60:11
emergency 58:15
employee 43:23 44:1
employment 7:23
ended 11:13
enforcement 8:18
entries 42:18
errors 55:1,18 56:12,15,16
 57:13
especially 67:9
EST 41:1
et 13:13 14:7,22
evaluated 60:1
evaluations 60:1,5,9 62:9
event 40:10
events 37:18
everything's 69:13
evidence 68:8
exact 40:20 47:20 49:5
exactly 36:1 69:18
EXAMINATION 7:13
 70:3
examine 14:19 46:5
examined 7:12
Excuse 21:13 53:4
exhibit 19:16,19,20 28:1
 40:2 49:19 51:9,13,24
 57:5 62:22,25
existence 28:3 30:25 62:5
exists 15:1
expect 43:11,13
experience 13:6 25:18,21
 26:5,16 35:20,24 36:9
 52:6

**extent** 23:7 36:14 37:8
43:1 48:9 55:10 57:22
**extraordinary** 36:4

---
**F**
---

**facts** 68:7
**fading** 39:3
**fair** 17:17 20:23 37:14
54:13
**familiar** 41:9 43:10
**far** 42:4 64:5 69:14,17
**fast** 24:21,23
**fatal** 10:19
**fatalities** 10:20
**February** 6:5
**Feel** 16:1
**felony** 8:15 14:3,6 35:13
**field** 27:22
**figure** 43:16
**file** 27:23 30:8,12,16,24
31:4,11 59:23
**filed** 9:16
**files** 21:24
**fill** 62:8
**filled** 42:21
**find** 26:7,9 71:11
**fine** 11:6
**fingerprint** 23:25 24:10,14
25:7 36:10,17,21,22 37:4
40:24 44:20 48:2 49:4
64:10 65:8
**fingerprinted** 15:22 36:5,6
**fingerprints** 23:10,11,22
24:13 26:10 27:1 28:23
44:25 45:8 46:16 48:4,5,
11,12 49:9 50:6,8,15,18
65:18,19,22 66:8 67:22
68:19 69:9,16
**first** 9:22 10:8 11:19 41:3
52:19 57:10
**five** 10:13 15:5 29:7 30:5,
14 58:14
**fixed** 51:16
**follow-ups** 10:20
**following** 42:12
**follows** 7:12
**footage** 37:22
**forever** 31:11
**forgot** 20:7
**form** 18:18,19,21 39:18,25
40:1 43:12 46:5 52:8,9,13,
17,18,20 53:2 57:5,7,11
60:23 62:2 64:15
**forming** 8:17

**forms** 43:7 52:6,14 57:18
**forward** 71:23
**found** 31:14 57:8
**founded** 13:24 14:14,16,
18
**four** 8:2 44:13 46:7,11
**free** 16:1
**front** 45:3 58:25 66:4
**FTO** 10:8
**full** 7:17

---
**G**
---

**gambling** 10:23
**gap** 8:3
**Garrett** 6:19 9:6
**general** 6:15 8:13 9:11,14
32:6 35:7 65:3 67:10
70:11
**General's** 7:25
**generally** 34:23 35:5 49:3
54:7
**generic** 25:24
**generically** 25:24
**Gerhardstein** 6:9 7:5,14
18:4,10 19:15,18,23,24
21:23 22:12,19 23:13
25:1,16 26:25 27:14 29:19
32:17 33:4 34:15,18 36:20
37:12 41:2 43:6 48:14
51:8,12,18,21,22 53:5,9,
12,15,17 55:17 56:4,19,22
57:3,17 58:2,20 60:19,24
61:24 66:12 67:19 68:14
69:4,20 71:14,16
**getting** 69:6
**give** 25:25
**given** 12:25 13:11 17:5
37:10 38:3,5 69:11
**gives** 14:23
**Glen** 46:22
**go** 15:8 17:2,19 18:2 22:12
35:22 52:23 55:7 57:16
64:15 65:6,15 68:3
**goes** 36:1 52:12
**going** 22:13 26:18 27:10,
25 33:14 43:19 51:1 56:24
60:16 62:21 67:9 72:6
**good** 6:14,17,20 7:15,16
21:2 44:25 45:8 46:17
69:10,12,13,16 70:8
**graduated** 9:20
**guess** 30:22 42:16 52:4
63:10
**guessing** 24:5 31:10 40:10

**guy** 61:8 70:25

---
**H**
---

**half** 11:12,20
**handle** 14:4 39:9
**Handled** 10:25
**handwriting** 63:3
**happen** 24:5,9 52:16
**happened** 20:18,20
**happens** 13:1,22,25 14:12
15:20 32:18 35:21 36:10
**hard** 8:9 31:14
**Hawaii** 6:12,13 7:25
**he'll** 17:5
**hear** 63:12
**heard** 50:17
**height** 56:6
**held** 17:8
**helicopter** 9:23
**help** 8:19 28:16 47:13
51:14
**helpful** 42:20
**high** 9:20
**highlighted** 61:22
**hold** 27:4 66:24
**Honolulu** 6:22 9:25 10:4
20:15,23 22:6,24 36:23
37:1,5 55:3 58:16 60:2
70:15
**Hospital** 6:13
**hour** 24:4 25:7 26:10,13
**hours** 44:13 46:7,11 47:8
**HPD** 27:23
**HRS** 22:15 60:17
**Hura** 6:14,15 7:7 18:1
19:15,22 21:16,20 22:13,
18 27:10 29:16 51:8 55:6,
13,21,23 56:14 57:16,24
60:16 61:17 67:6 68:1,3,6,
23 69:24 70:1,2,4,9 71:12,
19 72:2
**hypothetical** 25:9,11
26:24 66:1 67:2 69:1

---
**I**
---

**icon** 51:19
**ID** 23:1,2 28:21 38:6,11,13
41:21,25 43:10,14 45:21
56:13 62:5
**identifiers** 29:1 55:2,19
57:7,14
**identify** 6:7 27:2 28:22
29:3 56:17 64:2

**identity** 22:25 23:3,24
  24:15 25:6,19 26:9
**immediate** 45:25
**immediately** 33:7
**Improper** 25:8
**inaccuracies** 57:13
**inaccurate** 50:24 57:8
**incident** 21:8 44:17 46:15
  47:23 55:20 58:1
**include** 31:4
**including** 13:2 16:2 64:4
**incomplete** 25:10 26:24
  66:1 67:2
**individual** 8:22 14:12
  15:20 17:8,15 18:20 34:11
  48:15
**individuals** 37:24 38:3,5
**info** 63:20
**information** 23:20 24:13
  27:19 29:4,9,14 31:4,8,13,
  18 36:18 37:10 38:10 40:9
  52:11 64:2,9,12 65:5 66:7
  70:18
**informed** 50:14
**initial** 10:7
**injuries** 13:13 45:5
**Inouye** 8:16
**instant** 24:2
**interested** 34:2
**internal** 70:22
**internals** 70:21
**internet** 24:3
**internet's** 24:11
**interpreted** 69:18
**interview** 54:14
**interviewing** 54:20
**investigation** 12:7
**investigator** 7:24 8:13,15,
  21
**involve** 22:20 39:17 48:3
**involved** 18:9 59:19 61:25
**involvement** 39:21
**involves** 14:11
**involving** 34:4 58:10
**issue** 39:11 41:8
**issued** 15:24
**issues** 66:11
**issuing** 31:12
**ITD** 11:13 35:25 70:13
**items** 61:23
**Iwamasa** 45:20

**J**

**January** 10:1
**job** 8:5 53:19,24,25 54:9,
  11,12,16 70:14
**jobs** 10:5,6
**John** 66:6
**join** 21:16,19,22 22:17,18
  25:10 26:22 27:9,10 29:18
  32:22 34:17 55:13,14,23,
  24 56:24 57:1,24,25 60:21
  61:19 66:2 67:6,7 68:7,12
  69:2,3
**joined** 30:25
**Joshua** 9:16 19:3 20:12
  22:21 39:6 59:19 61:2,6,
  11,15 63:4,16 64:16 65:22
  66:15 67:21
**judge** 15:25
**justify** 35:17
**Justine** 6:14 70:8 71:25

**K**

**Kailua** 10:16
**Kalihi** 10:11,12,17
**keep** 8:10 20:14
**keeping** 8:11
**Kendall** 6:11 21:14
**kept** 20:17
**kind** 39:2 56:11
**knees** 53:10
**know** 15:1 24:9,24 25:24
  28:16 29:21 30:6,13 31:24
  33:13 35:25 37:1,13,23
  38:23 39:3,10 40:17 41:19
  42:7,12,13 43:5,8,18,19
  44:1,23 45:4,17 46:14
  47:20 50:10 52:9,17,25
  53:18,24 54:1,10,15 55:20
  59:1 60:22 61:7 63:6,25
  64:2 66:5,18 68:16 70:19
  71:4,10
**knowledge** 29:23 35:2
  36:22 41:24
**known** 28:11 37:4 50:7
**Kon** 6:3,23 7:10,15,19
  43:22 53:18 69:22 71:24
  72:10

**L**

**law** 8:18 35:18
**lawsuit** 9:15 70:10
**lawyer** 18:13 20:1

**learn** 23:24 25:6,19 28:17
  50:23
**Lee** 6:17,18 7:8 21:19
  22:17 25:8 26:22 27:9
  32:22 34:17 55:14,24
  57:1,25 66:2 67:7 68:12
  69:2,24 70:1 72:5,6
**left** 40:25 47:15
**LEQM** 30:18 71:2
**let's** 35:12,13 53:12 64:15
**level** 8:15 12:16 14:1
**Lewallen** 6:20,21 7:9
  17:23 18:6 21:22 23:5
  24:16 25:10 26:18 27:5
  29:18 32:16,20,23 34:13
  36:12 37:6 42:24 48:7
  51:5,16,19 53:4,6,10,14
  55:5,8,22,25 56:24 57:15,
  19 58:14 60:21 61:19
  64:24 65:25 67:1 68:2,4
  69:3 71:15,22 72:4
**liability** 35:17
**license** 15:7 23:2 28:21
  29:6 30:4,8 71:9
**lieutenant** 11:8,15 12:10,
  14 13:12 18:8 21:13 32:1
  42:11 43:22 44:15,19,24
  45:7,24 46:1,10,15 47:14
  54:13 60:6 63:14 65:16
**lieutenants** 47:11
**line** 41:4,6 60:17
**listed** 54:23 63:16 66:14,
  24
**little** 8:6
**living** 8:10
**located** 11:25
**lockup** 17:3
**long** 8:1 27:3 37:21 65:19
**longer** 20:21
**look** 13:18 14:5 41:21
  43:20 45:19 59:23
**looked** 19:12 39:4,25
  61:13
**looking** 26:7 49:13
**lot** 25:21,22
**lowest** 14:4

**M**

**machine** 24:4,10,24,25
**Maeda** 9:6
**magistrate** 15:25 31:11
**main** 17:10
**maintain** 31:22
**maintained** 37:22

maintaining 32:5
manually 11:23
marked 28:1 62:22
marking 19:16
match 49:9 50:7 65:23
68:20 69:9
matched 50:16,19 65:20
66:9 67:23
matches 13:16 14:21
30:20 48:25 64:3,10,11
69:11,12
matching 37:3 49:4
matter 58:17
mean 11:16 12:22 13:5,10
14:24 16:11,18 19:2 22:2,
8 24:5,22 27:12 35:10,17
40:12 42:15,17 49:1 50:18
52:3,7 53:23 56:5,15
62:19 64:7 66:7 69:12
means 52:9,18
memory 69:15
memory's 39:2
mentioned 31:15 39:24
58:8 70:12 71:1
met 40:23 69:13
middle 7:20
midnights 38:18 42:17
military 9:23
minute 71:20
minutes 44:21 53:13,14
missed 30:2 62:13
misses 15:14
Misstates 24:16
mistaken 71:2
mistakes 61:15
Monday 67:15
money 31:12
monthly 58:15
morning 6:14,17,20 7:15,
16 47:2,17 67:15 70:8
Moser 6:11 7:6 21:13,14
40:25
motor 10:14
moved 51:19
mug 34:7,12 35:4,20
mugged 15:22
multi-line 18:21
multiple 16:13
murders 11:2 33:20

**N**

Nakama 44:16 46:22,23
47:14

name 7:17,21 15:2 19:4
29:1 30:17,20 31:9 38:12
39:23 40:3 41:4,6 43:13,
25 44:5,24 56:8 63:7,25
64:5,11,20,23 66:19 69:7
70:8
named 50:1
names 14:22 30:19 49:3
narcotics 11:11 13:19
narcotics/vice 10:22
nature 13:3
NCIC 15:7 29:7 30:4
nearly 29:8
need 53:7
needed 61:4
Negative 61:12
never 24:25 38:13 42:15
new 8:18
Nicholas 6:18
non-compliant 34:25
normal 24:11 38:17 44:14
normally 36:3 40:14 42:21
44:4,13
notary 7:4
notebook 27:16 28:4
notebooks 20:16
notes 20:14
notice 56:12 61:14
noticed 55:18
November 21:6
number 19:21 29:2 40:2
41:21,25 43:10,14,23
44:1,5 49:20 51:10 56:13
62:5

**O**

oath 7:2
object 21:14 22:14 26:18
60:16
objection 17:23 18:1 23:5
24:16 25:8 26:22 27:5,9
29:16 32:16,20 34:13,17
36:12 37:6 42:24 48:7
55:5,6,21,22 56:14,20,21,
25 57:15,19 61:17 64:24
65:25 67:1 68:1,2,6,12,23
OBT 52:21
OBTS 18:16,23 19:2 20:17
42:19 43:4 45:20,21 49:16
53:1
occasion 57:6 59:22
occasions 16:13
offenders 15:9
offense 14:2 45:13

offenses 14:3
Office 6:16 7:25 70:9
officer 10:9 12:8,12 13:4,
11 15:15 16:6,19,22 17:14
23:21 24:21 28:17 29:22
32:10,14 33:8 35:3,16
36:19 37:11 38:1,15,24
39:13 40:13,17,23 41:25
44:9,23 45:1,15,20 48:19
50:13,14 52:12 53:20 54:4
58:10 59:13,19 62:7 63:12
68:18 69:8,15
officer's 29:9 38:14 43:13,
14
officers 12:25 15:13 23:19
25:3 27:19 28:10 29:13,24
35:19 39:22 64:3
Oh 14:18 22:22 30:2 34:15
47:1 51:18,21
Ohio 7:4
okay 8:24 9:13,19 11:22
14:18 15:17 16:16 18:14
19:5,8,14 20:6,11,21 21:5
22:4,23 27:15 29:23 30:2,
10,15 31:3 32:3 34:2,6
35:5,8,15 36:9,21 38:10
39:24 41:3,10,13,20 42:20
43:7,21 45:7,23 47:19
48:15 49:6,12,19,21 50:10
51:18,21 53:3 54:2,16,24
56:10,19 58:8 59:17,22
60:12,25 62:6 63:18,22
65:13,15,22 66:4,20
67:12,13,16 69:20 70:22
71:1,12,25 72:8
old 12:1,3,4 31:1 71:5
oldest 71:8
one-page 18:21
open 28:18 34:5
operate 24:25 62:19
order 50:4 54:3 59:24 72:6
Ordinary 72:2
outstanding 28:12 45:6
Overly 55:9 57:20
overtime 40:15

**P**

p.m. 6:3 38:22,25 41:1
46:11 47:10 72:14
page 19:20 49:19
paper 23:1
papers 18:12
paperwork 39:1 61:13
part 40:1,11 41:14 70:13
particular 40:22 44:12
58:9 69:14

**patrol** 32:14
**people** 11:23 28:10 29:3 49:2 62:9
**performance** 59:25 60:4, 9,11,15
**performed** 53:20
**period** 8:7 11:7 33:1
**person** 14:20 16:20 17:1, 25 23:1,4,10 25:20 26:9 27:2 28:25 31:5 34:4,7,10, 24,25 35:25 36:2,3 41:19 42:1 43:9 45:2,17 46:21, 23 48:4,5,21,22,24 49:5,7, 8,9 50:1,6,7,19,20 62:1,6, 10,14 63:9 64:14,18,19,22 65:8,9 66:14,16,21,22,24, 25 67:20 68:20,21 69:19
**person's** 13:17 30:17,20 31:9 38:12 49:4 62:5
**personal** 28:25 29:4 55:1, 19 57:7,14
**personally** 16:7 36:6 53:7
**personnel** 21:18,20,24 22:15 31:21,22 59:23
**pertinent** 25:14 31:13
**phase** 21:4
**photo** 31:5
**photograph** 35:1,14,21
**photos** 28:10,12 30:12
**physically** 39:17
**place** 17:24
**placed** 39:14
**plaintiff** 6:10 7:5
**please** 6:7 7:17 15:15 51:9 53:14 61:21 71:22 72:2
**point** 15:20 32:13 37:24 40:18
**points** 16:18
**police** 8:4 10:1,4 12:1,20 15:13 17:10 20:15,23 22:7,24 32:9,15 36:23 37:1,5,19 54:9,25 55:3,19 57:18 60:2 70:15,21
**policy** 33:11 37:21
**portion** 16:9 19:7 40:24
**portions** 41:8,11 43:11
**position** 54:20
**possible** 35:2,3
**post** 54:3
**power** 14:20
**preceded** 33:7
**present** 6:6,18
**previous** 44:19 45:7,16 46:6
**previously** 28:1

**print** 37:4
**printed** 42:8
**printout** 28:6
**prints** 51:4 52:1,4,7,10,18 66:4
**prior** 15:6 17:7 19:12 35:4 46:9,10,14
**probable** 13:16
**probably** 9:11 14:3 31:11 42:13 46:12 47:10
**probation** 49:14
**problem** 40:7 41:5,7,10 51:15
**procedure** 39:16
**procedures** 29:5 33:14
**proceed** 23:9 25:13 32:25 36:16 43:3 55:12
**process** 16:3 33:6 34:4 37:4,25 48:19 54:15
**processed** 15:21
**processing** 10:9 11:23
**produced** 21:25 59:23
**professional** 35:18
**program** 10:8 30:23,24 31:2 37:15,16 71:7
**promoted** 10:24 54:8
**Promotion** 54:17
**proper** 25:25
**protective** 59:24
**provide** 23:20 61:21
**provided** 31:18 40:10 52:11 64:2 65:5,6 67:12
**providing** 29:10
**Public** 6:12,16 70:9
**pull-down** 30:11
**punch** 30:17
**put** 39:22

---

## Q

**quarterback** 67:16
**question** 18:7 21:2 23:8 24:2,19 25:12 26:21 27:7 32:6,24 34:3 35:8 36:15 37:9 43:2 48:10,18 55:11 56:1 57:23 58:3,21 61:20 64:25 67:4,10 68:5,11,25
**questioning** 60:17
**questions** 16:21 69:21,23, 25 70:6 71:13,15
**queue** 30:23

---

## R

**R-E-E-D** 9:2

**rank** 43:14 54:8,10
**rare** 52:16
**reading** 67:15
**really** 61:25
**reason** 15:24 22:5,20
**reasonable** 65:9
**reasons** 21:11 22:3
**reassigned** 8:19
**recall** 27:13 38:21 40:11 43:8 46:20 57:2 58:1,13, 23 59:3,4,9,16,18 62:16 66:10 70:16
**recalling** 47:24
**receive** 22:25
**Received** 40:3 41:5 43:22
**receiving** 10:9 11:11,16 12:9,13,14,18 13:5 16:6, 23 17:11,14 18:19 24:13 25:22 32:11 33:11,16,24 34:20 38:2,16,24 42:2,16 44:23 45:16,24,25 48:20 50:15 53:21 54:5 62:8 64:3 68:18
**recess** 53:16
**recollection** 28:3 39:6 44:9,10 58:9 66:14
**record** 6:1,8 7:18 29:6 48:13 49:3 55:2 58:19
**recorded** 37:17
**records** 11:10 20:12,22 21:21 22:15 31:16,21 32:1 41:25
**recruit** 10:7
**Reed** 9:2
**refer** 18:23 29:8 33:10 51:9 52:21
**referred** 49:21 53:1
**referring** 46:21 54:21 69:17
**refresh** 28:2
**regarding** 13:14 19:3 20:12,22 31:19
**regularly** 60:1
**related** 9:15 60:9
**release** 27:2
**relevance** 21:15 22:16 60:18
**relied** 29:25
**relieve** 47:21
**relieved** 47:7,16
**rely** 23:10 25:3 28:22 29:14 35:3
**remember** 11:10 39:7 40:8 58:24 66:18 69:15
**remembered** 50:12

**remote** 6:2 7:1
**remotely** 7:1
**repair** 9:23
**report** 18:22 29:24 39:4
  49:13,21 51:2,25 55:2
  64:16
**reporter** 6:1,24 7:3 71:20,
  25 72:5,8
**reporting** 55:3
**reports** 55:19,20 57:9 60:7
**represent** 70:9
**requested** 60:13
**required** 54:14
**requirements** 54:17,19
**resistant** 34:24
**respect** 9:13 57:14 59:13
  61:1,5,6,10,15
**responds** 24:24
**responsibility** 13:1 62:11
  64:21
**responsible** 32:4 62:15
**results** 27:3
**retire** 8:8 21:11 22:3
**retired** 21:1,5
**retirement** 8:4 21:9 33:18
**retiring** 22:5,20
**retraining** 61:5
**retrieved** 31:3
**review** 18:11 27:21 61:14
  71:24
**reviewed** 18:15
**reviews** 60:11
**REVO/MOD** 59:9,10
**revocation** 49:14,17
**Richard** 6:21
**right** 16:6,11 19:5,11 20:9
  28:23 42:4,8 43:21 48:16,
  21,23 49:15 50:8,21 53:15
  59:5,14 62:2,4 63:19
  71:14
**right-hand** 51:3,23
**robberies** 11:1
**rookie** 11:18 16:17
**room** 6:7
**routine** 16:3 46:13
**runs** 38:22

---

**S**

**Safety** 6:13
**saw** 27:21 52:9 63:11
**saying** 39:16 43:8 47:13
  59:11 65:4 69:15
**says** 39:1 41:4,14 43:21
  45:20 51:4,25 59:9 63:4

69:8
**school** 9:20 10:8
**screen** 19:6 63:1
**scroll** 41:12 46:2,25 51:13
**scrolled** 19:8
**search** 13:20 45:21,24
**searches** 45:16
**Sears** 12:4
**second** 47:3
**seconds** 58:17
**section** 32:2,4 70:20
**security** 29:2 31:10 56:13
**see** 19:1,6,7 40:4 41:14
  42:4,8 50:2 51:3,5,25 52:8
  59:25 60:8 62:25 63:3,12
**seeking** 68:21
**seen** 26:17 28:6 31:10
  49:16 52:14,19 57:10
**send** 71:23
**sent** 36:10 47:4
**separate** 30:11 32:2
**sergeant** 11:4,8 62:12,16,
  18
**serious** 35:14
**serve** 12:8 16:7 32:3
**served** 12:12 15:22 16:5
  62:6
**services** 58:16
**serving** 15:18 16:22 38:15,
  23 45:23
**set** 17:4 26:8
**seven** 10:21 20:18 33:12
  39:2 40:12 59:3 63:10
**seventh** 10:18
**sexual** 15:9
**sheet** 14:5
**shift** 38:17,19 40:15 47:6,
  8,15
**shootings** 33:20
**short** 11:7
**shortest** 10:23
**shot** 34:8,12 35:4,20
**show** 18:24 27:25 30:21
  51:1 59:15 62:21 66:3
**showed** 59:8,10
**showing** 40:1 49:22
**shows** 65:7,8
**sic** 65:14
**sidewalk** 58:25
**sign** 52:8
**signature** 39:12,13,14,17
  71:21
**signatures** 61:23
**signed** 60:10,11

**signs** 42:22
**similar** 30:19
**simple** 65:14
**simply** 48:18 66:24
**sir** 71:17
**sit** 39:7 59:17
**site** 30:18
**situation** 64:18
**sixth** 10:18
**skill** 54:22
**skills** 54:18
**sleeping** 45:3 58:25
**social** 29:1 31:9 56:13
  69:11
**somebody** 28:17,20 42:1,2
  62:20
**someone's** 24:12
**sorry** 11:5 18:23 19:18
  22:13 30:2 34:15 38:4
  44:2 62:13
**sort** 17:2
**South** 12:2,15 17:11
**Spea** 69:7
**speak** 20:2 40:18
**speaking** 49:3 54:7
**special** 9:4
**specific** 54:11 67:8
**speculation** 29:17 57:21
  61:18 66:1 67:3
**spell** 7:20
**spelled** 56:9
**spit** 33:24
**Spriestersbach** 9:17 19:3
  20:12 22:21 39:7 59:20
  61:2,6,11,16 63:4,17
  64:16 65:23 66:15 67:22
**staff** 44:6,7
**stage** 32:19
**stamp** 51:10
**stand** 12:6
**Standard** 6:4
**standing** 21:17
**stands** 70:17
**start** 38:19 47:21
**started** 11:17
**starting** 8:5
**starts** 38:21
**state** 6:12,13 7:4,17,24
  8:17 23:2 28:21 30:18
  56:13
**State's** 71:6
**stated** 26:20
**statement** 26:11,13
**station** 12:1,20 17:10

**stenographic** 7:3
**step** 32:13 33:6
**Street** 12:2,3,15 17:11
**studied** 9:22
**submitted** 41:15 42:23
**such-and-such** 44:25
**supervisor** 8:25 12:17
  17:20 31:20 32:4
**Supervisory** 9:4
**supposed** 24:8 26:6 54:18
**sure** 14:6,21 15:1 46:4
  47:1 48:21 50:5 51:14
  53:9 58:11 68:19
**suspect** 13:25 23:22,24
  32:15
**suspects** 27:20,21
**sworn** 7:11 41:25
**Synopsis** 42:8
**system** 23:12 26:8 43:5
  55:3,16 71:7
**systems** 71:8

**T**

**T-A-K-E-S-H-I** 7:22
**take** 10:3 19:2 23:22 24:4
  33:25 53:6 58:14 59:4
**taken** 7:1 17:5,7,17 23:25
  34:8,12 35:1,15,21 36:25
  53:16
**Takeshi** 7:19
**talk** 20:7
**talked** 58:10 59:13,18
**talking** 14:2 33:19 40:20
  44:9 47:22 50:12 56:21
  62:24 66:5 67:8
**task** 68:17
**tasks** 48:19 53:19 54:3
**team** 10:19
**technology** 24:6 70:18
**tell** 15:14 18:12,24 22:4
  23:14 30:15 33:5 40:6
  41:10 44:10 52:22 58:12,
  22
**telling** 19:25
**tells** 36:19 63:12
**temporary** 42:3
**ten** 12:24 53:13,14 71:10
**term** 14:16
**terms** 48:18 56:5
**test** 21:4
**testifying** 26:19
**testimony** 24:17

**Thank** 19:22,23 34:16
  51:11 68:13 69:22 70:2
  71:13,16,18,19 72:3,7
**thefts** 11:1
**thing** 18:15 19:9 28:22,24
  56:11
**things** 13:3,20 15:4 24:7
  58:5
**think** 21:3 27:23 38:12
  39:1 40:17 45:12 51:16
  52:19 54:22 55:16 63:11
  70:5,7 71:13
**thinking** 39:10 46:12
  50:11
**Thomas** 9:9 50:1,8,19
  63:8,16,17 65:23 66:16
  67:23,24
**thought** 14:17
**three** 30:5
**thrown** 69:6
**Tierra-lyn** 43:9
**time** 6:3,4 11:8 17:24
  23:23 24:12 25:24 33:12
  34:14 40:14,18,20 43:15
  46:2,10 47:20,21 52:19
  57:10 62:3
**times** 16:5
**title** 9:3
**today** 9:16 39:8 59:17
**told** 20:4 24:14 39:5 61:4,9
**tools** 29:3
**top** 52:23
**traffic** 10:19,20 14:2,3
  33:20
**trained** 23:4,16,19 24:20,
  25 25:4 36:17 57:12 58:4,
  6
**training** 10:7 22:24 60:13,
  23
**transferred** 10:11,16,19,
  22 11:3,4
**transition** 46:8
**transmitted** 35:23
**Tried** 8:8
**trigger** 39:5 64:21
**triggered** 21:9 49:24
**TROS** 15:8
**truly** 48:22
**trusted** 39:22
**two** 11:12,20 26:10,14
  56:9
**type** 33:19 43:25
**typed** 43:4 49:17
**types** 29:4 44:5 52:12
**typewriters** 11:24

**typical** 25:5 26:5 32:13,21
  33:1,2 39:16
**typically** 27:2
**typo** 30:20 56:3,5,6

**U**

**understand** 6:25 9:19 18:6
  23:7 24:18 25:2,12 26:3
  27:7 32:23 35:11 36:14
  37:8 43:1 48:9 55:10 56:1
  57:22 61:20 65:1,9 66:3
  67:4 68:5
**understanding** 66:21
**understood** 50:18
**uneventful** 40:22
**unfamiliar** 42:18
**Unfounded** 14:15
**unmatched** 65:20
**unsigned** 40:13
**upper** 51:3,23
**use** 20:25 27:19 57:6

**V**

**vague** 17:23 18:1 22:16
  23:5 24:2 26:23 27:5
  32:20 34:13 42:24 55:8
  56:14 57:19 61:18 64:24
  67:3 68:4
**valid** 15:19 16:13,25
  17:16,21 33:8 50:5 67:24
**validate** 14:23,24 29:9
**various** 10:5 14:9 15:10
**verbal** 66:5
**verbally** 52:12
**verification** 36:18,23
  44:20,21
**verified** 15:4 37:13,25
  51:4,25 52:4,7,10,18
**verify** 15:15
**verifying** 49:6
**versus** 56:9
**vice** 11:11 13:19
**videoconference** 40:25
**view** 51:6
**viewed** 66:15
**violence** 33:21
**virtue** 23:25

**W**

**Waikiki** 11:7
**Wait** 71:20
**waiting** 44:19 46:16

**walk** 32:12
**want** 15:8 25:14 26:2
  27:12 50:5 58:11 70:12
  72:1
**wanted** 27:20 28:18 31:5
  48:5,16,22 49:10 66:22,25
**wanting** 25:19
**warrant** 14:12,13,19,20,
  23,25 15:3,14,16,19,22,23
  16:25 17:15 28:18 30:12,
  15 31:5,13,14 34:5,11
  36:3 45:6,10,14 47:24
  48:6,12,16,22 49:7,10,15,
  20,24 50:20 58:10 59:5
  62:23 63:8,11,13,25 64:4,
  5,8,11,12,13,20,22 65:15
  66:22,25 67:25 68:22
  69:10,19 71:5,9
**warrants** 15:12 28:13
  31:19,23,25 32:1,5 71:5
**wasn't** 31:25
**watch** 12:16,17,18,22 13:6
  15:6,18 16:23 18:8 25:18
  44:23 46:7,9,19 47:3
  52:15 53:20 54:4 62:7
**way** 24:8 26:6,8
**we'll** 19:14 71:23
**we're** 49:12 58:14 62:24
  72:6
**weapons** 33:25
**went** 11:7 13:20
**wife** 20:4
**witness** 7:11 26:19 56:17
  68:9 71:18
**wondering** 52:5
**word** 42:23
**work** 9:15 20:22 23:15
  24:22 26:6 31:17 35:17
  40:14 42:17 44:13 48:2
  60:9 62:17 70:10
**worked** 10:13,16 26:6
  29:13 31:15 38:17 47:3
  57:9
**working** 8:21 9:14 10:24
  13:4 16:18 20:15 22:6,8,9,
  23 24:8,10,11 25:5 32:10
  46:10 47:5,14 52:15 70:14
**works** 43:5
**worth** 65:4
**wouldn't** 43:19 49:7
**wristband** 38:3,6
**write** 37:16 63:24
**writing** 39:17 64:5
**written** 38:13 53:19 60:4
  63:7,11

**wrong** 13:21 61:10
**wrote** 30:24 63:10

—————————————
           **Y**
—————————————

**yeah** 9:1 19:1,23 22:11
  24:7 26:15 35:9 36:7
  42:10 45:12 47:1 51:12
  52:5,24 53:5 59:6 63:21
**year** 8:6 10:16,18 11:9,12,
  19,21
**years** 8:2 10:13,21,25
  11:13,20 20:18 33:12 39:2
  40:12 43:4 54:24 59:3
  63:10
**young** 50:14

—————————————
           **Z**
—————————————

**Z00115** 41:22
**Zero** 20:10